**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) No. 4:18-cr-975-ERW |
| DUSTIN BOONE and CHRISTOPHER MYERS, | ) |
| Defendants. | ) June 15, 2021 |

**JURY TRIAL - DAY #7**
**BEFORE THE HONORABLE E. RICHARD WEBBER**
**UNITED STATES DISTRICT JUDGE**

**APPEARANCES**

| | |
|---|---|
| **FOR PLAINTIFF** | Carrie Costantin, Esq. |
| | Robert F. Livergood, Esq. |
| | U.S. Attorney's Office |
| | 111 S. 10th St., 20th Fl. |
| | St. Louis, MO 63102 |
| | (314) 539-2200 |
| **FOR DEFENDANT** | Patrick S. Kilgore, Esq. |
| Dustin Boone | Attorney at Law |
| | 1015 Locust, Suite 914 |
| | St. Louis, MO 63101 |
| | (314) 753-0096 |
| **FOR DEFENDANT** | N. Scott Rosenblum, Esq. |
| Christopher Myers | Adam D. Fein, Esq. |
| | Rosenblum, Schwartz, et al. |
| | 120 S. Central Ave., Suite 130 |
| | Clayton, MO 63105 |
| | (314) 862-4332 |
| **REPORTED BY:** | Laura A. Esposito, RPR, CRR, CRC |
| | U.S. District Court |
| | 111 South 10th Street |
| | St. Louis, MO 63102 |
| | (314) 244-7739 |

(PRODUCED BY COMPUTER-AIDED MECHANICAL STENOGRAPHY.)

**INDEX**

*Witnesses:*

Defendant Myers' case:

**PAUL CHESTER**

    Direct Examination by Mr. Rosenblum . . . .   Page   4
    Cross-Examination by Ms. Costantin . . . . .   Page  21
    Redirect Examination by Mr. Rosenblum . . .   Page  23

Defendant Boone's case:

**DARREN BOEHLJE**

    Direct Examination by Mr. Kilgore  . . . . .  Page  26
    Cross-Examination by Mr. Rosenblum . . . . .  Page  30
    Cross-Examination by Ms. Costantin . . . . .  Page  49
    Recross-Examination by Mr. Rosenblum . . . .  Page  53

Defendant Myers' case:

**DARREN BOEHLJE**

    Direct Examination by Mr. Rosenblum . . . .   Page  66
    Cross-Examination by Ms. Costantin . . . . .  Page  79


Defendants Boone and Myers Rest . . . . . . . .  Page  80
Rule 50 Motions . . . . . . . . . . . . . . . .  Page  81
Court's Instructions to the Jury . . . . . . . .  Page  88
Government's Closing Argument . . . . . . . . .  Page 109
Defendant Myers' Closing Argument . . . . . . .  Page 131
Defendant Boone's Closing Argument . . . . . . .  Page 177
Government's Rebuttal Closing Argument . . . . . Page 194

```
 1        (The following proceedings were held in open court
 2         with the defendants present, commencing at 9:00 a.m.)
 3        (Jury not present.)
 4      MR. LIVERGOOD:  I don't believe we ever moved to admit
 5  Exhibits 500, 501, 502, and 503, and we're moving, without
 6  objection, to introduce those.
 7        THE COURT:  500, 501, 502, 503 are received.
 8        (Government's Exhibit Nos. 500-503 admitted.)
 9        THE COURT:  Can you give me a general description of
10  those.  I keep this record.
11      MR. LIVERGOOD:  Your Honor, 500 is the stipulations
12  regarding 120 interviews.
13        501 is the stipulation regarding Dustin Boone's texts.
14        THE COURT:  Okay.
15      MR. LIVERGOOD:  And 502 is stipulations regarding DNA,
16  et cetera.
17        THE COURT:  Okay.
18      MR. LIVERGOOD:  And 503 is the stipulation regarding
19  Chris Myers' texts.
20        THE COURT:  Thank you.
21        (Jury in.)
22      THE COURT:  Good morning, ladies and gentlemen.  Can
23  you identify the next witness, Mr. Rosenblum.
24      MR. ROSENBLUM:  Yes, sir.  Paul Chester.
25        (The witness is sworn)
```

1        **DEPUTY CLERK:**  Could you please spell your name for

2    the court reporter.

3        **THE WITNESS:**  Spell it?

4        **COURTROOM DEPUTY:**  Spell it.

5        **THE WITNESS:**  P-A-U-L, C-H-E-S-T-E-R.

6        **DEPUTY CLERK:**  Could you please have a seat in the

7    witness stand.

8        **THE COURT:**  You may inquire.

9        **MR. ROSENBLUM:**  Thank you, Your Honor.

10              **PAUL CHESTER, DEFENDANTS' WITNESS, SWORN**

11                         **DIRECT EXAMINATION**

12                 **QUESTIONS BY MR. ROSENBLUM:**

13   *Q.*    You can take your mask off.

14          Will you state your name, please.

15   *A.*    Paul Chester.

16   *Q.*    And what is your occupation?

17   *A.*    I'm an officer for the City of St. Louis.

18   *Q.*    And what is your rank?

19   *A.*    Detective.

20   *Q.*    And, Detective, how long have you been employed in the

21   City of St. Louis?

22   *A.*    Approximately six years.

23   *Q.*    And what is your current duty assignment?

24   *A.*    Intelligence.

25   *Q.*    Can you describe for the jury what that role entails.

1   *A.*     We play multiple roles, anything from monitoring

2   protests to assessing threat assessments.

3   *Q.*     And in that role, from time to time, are you in an

4   undercover capacity?

5   *A.*     Yes.

6   *Q.*     Now, I know you didn't work undercover in September

7   of -- that weekend of September 15th, 2017, the Stockley

8   protests, but you were there, were you not?

9   *A.*     Yes.

10  *Q.*     Since that time, have you worked any undercover

11  protests?

12  *A.*     Yes.

13  *Q.*     When you work in an undercover capacity, do you carry

14  your firearm?

15  *A.*     I do.

16  *Q.*     Always?

17  *A.*     Yes.

18  *Q.*     When you work in an undercover capacity, would you

19  ever carry your firearm, or have you ever carried your

20  firearm in a backpack?

21  *A.*     No.

22  *Q.*     Why is that?

23  *A.*     Fear for losing it.

24  *Q.*     And in an undercover capacity, obviously you're --

25  well, I shouldn't say "obviously."  Part of the mission is

1    to be undercover and not expose yourself; correct?

2    *A.*    Yes.

3    *Q.*    Now, are there situations when you break cover?

4    *A.*    I have not, but there would be situations, yes.

5    *Q.*    And what would be a situation that would cause you to

6    break cover?

7    *A.*    In fear for my life or personal safety.

8    *Q.*    Personal safety?

9    *A.*    Yes.

10   *Q.*    All right.  Now, directing your attention to,

11   September 17th, Sunday, of 2017, were you part of the CDT

12   unit?

13   *A.*    Yes, I was.

14   *Q.*    And what was your role?

15   *A.*    I was part of the arrest team.

16   *Q.*    Did you work that entire weekend?

17   *A.*    Yes, I did.

18   *Q.*    Can you describe for the jury the activity that was

19   going on that weekend with respect to the rioters.

20          **MS. COSTANTIN:**  Judge, I would object unless it

21   relates to September 17th.

22          **MR. ROSENBLUM:**  Your Honor, Ms. Costantin's been

23   talking about the entire weekend, and it goes to his --

24          **THE COURT:**  Overruled.

25          **MR. ROSENBLUM:**  -- mindset on the 17th.

1    **THE COURT:**  Overruled.

2    Q.   *(By Mr. Rosenblum)* Can you describe for the jury the

3    activity with respect to the rioters, starting on the 15th?

4    A.    Destroying property, injuring officers, being chaotic.

5    Q.    I'm sorry?

6    A.    Being chaotic.

7    Q.    So you said destructing property, injuring officers,

8    and being chaotic?

9    A.    Yes.

10   Q.    Are you personally aware of the number of officers

11   that were injured?

12   A.    Not the total number, but I know of some of them, yes.

13   Q.    Some serious?

14   A.    Yes.

15   Q.    Were you in a situation -- you were a shield guy;

16   correct?

17   A.    Yes.

18   Q.    Were you having objects thrown at you?

19   A.    Yes.

20   Q.    Were you -- describe for the jury what type of objects

21   were being thrown at you.

22   A.    Ranging from frozen water bottles to bricks.

23   Q.    Any substances?

24   A.    At times we believed it just to be paint, possibly --

25   I heard that some officers had urine thrown on them.

1    *Q.*    Any chemical substances that you're aware of?

2    *A.*    Not that I'm aware of, but I know that we had paint --

3         **MS. COSTANTIN:**  Judge, I'd object if he's not aware of

4    it.

5         **THE COURT:**  Sustained.

6    *Q.*    *(By Mr. Rosenblum)* Do you actually still have markings

7    on your uniform from substances thrown at you?

8    *A.*    I believe on my shin guards, yes.

9    *Q.*    What color are those markings?

10   *A.*    Red.

11   *Q.*    And that would be consistent leading up to the 17th?

12   *A.*    Yes.

13   *Q.*    Now, at some point on the 17th in the evening -- and I

14   understand this is some time ago, so I'm asking you to

15   recall from memory.

16        But at some time on the 17th, did you have occasion to

17   respond to ultimately the corner of 11th and -- I'm sorry,

18   Olive and 14th Street?

19   *A.*    Yes.

20   *Q.*    Do you generally have an idea of what time that was?

21   *A.*    In general, yes, now.

22   *Q.*    Pardon me?

23   *A.*    Yes.

24   *Q.*    Now, do you recall what -- your understanding as to

25   why you were called to that scene?

1  *A.*   I believe at the time that we were sent there, it was
2  due to property damage.
3  *Q.*   And is failure to disperse an arrestable offense?
4  *A.*   Yes.
5  *Q.*   So you are going out there for property damage.  Is it
6  unusual to be called back once you're basically at
7  headquarters or the staging area?
8  *A.*   No.
9  *Q.*   And when you're called back, what does that usually
10  mean?
11  *A.*   Means that --
12     **MS. COSTANTIN:**  Judge, I'd object.  This calls for
13  speculation.
14     **THE COURT:**  Overruled.
15  *Q.*  *(By Mr. Rosenblum)* And when you're called back, what
16  does that usually mean?
17  *A.*   It means that there's property damage or people
18  blocking traffic.
19  *Q.*   And did you -- now, when you are engaging in rioters,
20  is the situation or the scene static?  I mean, another way
21  to say it, are they rapidly changing?
22  *A.*   Yes.
23  *Q.*   At times can you see what would relatively be a calm
24  scene?
25  *A.*   Yes.

1    *Q.*    And then could that rapidly change?

2    *A.*    Yes, it could.

3    *Q.*    And when it would rapidly change, how could it change

4    and what would it develop into?

5    *A.*    It could change into people throwing, you know,

6    objects at us and large crowds gathering.

7    *Q.*    When you approached the scene, do you recall seeing

8    any number of people?  If you recall.

9    *A.*    I don't really recall.

10   *Q.*    Now, does that mean that that scene can't be volatile

11   in the next minute or two?

12   *A.*    No.

13   *Q.*    And you guys see that all the time; right?

14   *A.*    Yes.

15   *Q.*    Now, as you approached the scene, you were in a CDT

16   line; correct?

17   *A.*    I don't recall.

18   *Q.*    Do you recall that when you got off of the bus, it was

19   rather chaotic that evening?

20   *A.*    Yes.

21       **MS. COSTANTIN:**  Judge, I'd object.  Leading.

22       **THE COURT:**  Sustained.

23   *Q.*    *(By Mr. Rosenblum)* Can you describe -- when you arrived

24   in the area, can you describe generally how the situation

25   was?

1   *A.*    I believe there were people running, running away.

2   *Q.*    I'm talking with respect to the CDT officers.

3   *A.*    No, I don't recall.

4   *Q.*    You can't recall?

5   *A.*    No.

6   *Q.*    Fair enough.  Now, did you have your phone on you that

7 night?

8   *A.*    Yes.

9   *Q.*    And did you always have your phone as you were

10 involved with the CDT?

11   *A.*    Yes.

12   *Q.*    To your knowledge, do most officers have their phone

13 on them?

14   *A.*    Most likely, yes.

15   *Q.*    Did you see a number of officers with their phones?

16   *A.*    Yes.

17   *Q.*    At some point when you arrived on the scene, did you

18 have contact with Sergeant Jemerson?

19   *A.*    Yes, I believe so.

20   *Q.*    And with respect to your contact with

21 Sergeant Jemerson, would that have been at the corner of

22 Olive and 14th?

23   *A.*    Yes.

24   *Q.*    And did you see on that corner, after you arrived on

25 that corner --

1      **MS. COSTANTIN:**  Judge, I'd object to leading at this

2   point.

3   *Q.   (By Mr. Rosenblum)* What, if anything, did you see

4   Sergeant Jemerson do?

5   *A.*   He and I walked across the street to address a group

6   of protesters.

7   *Q.*   I'm sorry.  To address a group of protesters?

8   *A.*   Yes.

9      **MR. ROSENBLUM:**  Okay.  And one moment, please.  Can

10   you pull up 193.

11      **DEPUTY CLERK:**  Government's Exhibit 193?

12      **MR. ROSENBLUM:**  193.

13      **DEPUTY CLERK:**  Government's?

14      **MR. ROSENBLUM:**  Government's Exhibit.

15   *Q.   (By Mr. Rosenblum)* Do you generally recognize that

16   scene?

17   *A.*   Yes.

18   *Q.*   And do you recognize this gentleman?

19   *A.*   No.

20   *Q.*   Now, are these four officers -- you recognize

21   Mr. Myers?

22   *A.*   Yes, sir.

23   *Q.*   Do you recognize this individual?

24   *A.*   Yes, sir.

25   *Q.*   That would be you; correct?

1   *A.*   Yes.

2   *Q.*   And did you recognize this individual?

3   *A.*   No.

4   *Q.*   Do you recognize -- well, you can't see him, but did

5   you know who that individual was?

6   *A.*   No.

7   *Q.*   So were you working with your normal arrest team?

8   *A.*   No.  There were -- we were split up.  I think they

9   kind of put pieces of us together.

10  *Q.*   Pieces of you together?

11  *A.*   Yes.

12  *Q.*   All right.  And if I can go back, please, to -- I'm

13  not going to go through all the series of photographs, but

14  let's take a look for a second at 154.  Let's try 158.

15        All right.  Now, do you recognize this individual?

16  *A.*   No.

17  *Q.*   Does that appear to be you, or not?

18  *A.*   Yes, it is.

19        **MS. COSTANTIN:**  Objection, leading.

20        **THE COURT:**  Sustained.

21  *Q.*   *(By Mr. Rosenblum)* Let's try 159.  That's the same

22  second.

23  *A.*   Yes.

24  *Q.*   Does that appear to be you?

25  *A.*   Yes.

1   *Q.*   Okay.  And you're able to pick yourself out by various
2   things you're wearing?
3   *A.*   Yes.
4   *Q.*   How much do you weigh?
5   *A.*   Roughly 200 pounds.
6   *Q.*   All right.  And can we now go back to, say, 205.
7          Okay.  Now, looking at this scene, that's you;
8   correct?
9   *A.*   Yes.
10  *Q.*   And it looks like your shield is facing out; correct?
11  *A.*   Yes.
12  *Q.*   And there's a reason for that?
13  *A.*   Yes.
14  *Q.*   What is it?
15  *A.*   We're supposed to face out and defend the arrest team
16  behind us.
17  *Q.*   I'm sorry?
18  *A.*   We're supposed to face out and protect the arrest team
19  that's behind us.
20  *Q.*   Okay.  And do you recognize this gentleman now?
21  *A.*   I don't know his name.
22  *Q.*   Okay.  What's he have in his hand, an ASP?
23  *A.*   Yes.
24  *Q.*   And do you have a specific recollection of these
25  two gentlemen on the corner?

1   A.    Yes.

2   Q.    Now, did you at any point in time know that

3   Luther Hall was a police officer?

4   A.    No.

5   Q.    Up until this time, or even at that corner, did you

6   see anything that would cause you any concern?

7   A.    No.

8   Q.    Did you see anything that would cause you to believe

9   there's any sort of criminal investigation afoot?

10  A.    No.

11  Q.    Now, you said -- at one point you were saying that you

12  walked Sergeant Jemerson across the street?

13  A.    Yes.

14  Q.    Can you tell -- with respect to this picture, and I'm

15  not asking you to be specific, can you give us an

16  approximation of when that may have happened?

17  A.    No, not exactly.

18  Q.    And you said you accompanied -- you went with him?

19  A.    Yes.

20  Q.    And -- when he went to greet or talk to a group of

21  protesters?

22  A.    Yes.

23  Q.    Why did you go with him?

24  A.    Because he's walking by himself with no protection.

25  Q.    So you were acting as his protection?

1    *A.*    Yes.

2    *Q.*    With your shield?

3    *A.*    Yes.

4    *Q.*    Situations are volatile?

5    *A.*    Yes.

6    *Q.*    Now, while you were at that street corner, do you

7    recall Mr. Myers engaging in conversation with Mr. Hall?

8        **MS. COSTANTIN:**  Judge, I'd object to hearsay.

9        **THE COURT:**  Well, it's just -- first, it just asked if

10   he recalls them engaging in conversation.  Overruled so far.

11       **MR. ROSENBLUM:**  I'm asking if -- with respect to

12   hearsay.

13       **THE COURT:**  Well, we haven't gotten there yet.  The

14   question was, recall them engaging in the conversation.  And

15   he can answer that question.

16   *Q.*    *(By Mr. Rosenblum)* Do you recall Mr. Hall saying

17   anything to Mr. Myers?

18       **MS. COSTANTIN:**  Judge, at this point I would object.

19       **THE COURT:**  Sustained.

20       **MR. ROSENBLUM:**  I'm going to offer it for two reasons,

21   Your Honor.  One, it goes to subsequent conduct.

22       **THE COURT:**  Okay.  Well, would you ask the question,

23   and then please don't answer, sir, until I have a chance to

24   rule, okay?

25       **THE WITNESS:**  Yes, sir.

1    **THE COURT:**  Okay.  Go ahead, ask the question.

2    **MR. ROSENBLUM:**  I'm offering another reason.  Can I

3    approach the bench?

4    **THE COURT:**  Okay.

5                         *   *   *   *

6    **(Discussion held at sidebar between the Court and**

7        **counsel as follows:)**

8    **MR. ROSENBLUM:**  I anticipate generally --

9    **THE COURT:**  Tell me the question because I didn't hear

10   all the question.

11   **MR. ROSENBLUM:**  The question is:  Did you hear

12   conversation between Mr. Myers and Mr. Hall?  And I expect

13   his answer to be, generally, at least from the last trial

14   and grand jury, was that Mr. Hall asked about his phone.

15        Now -- and then Mr. Hall -- and Myers responded

16   something to the effect, "Don't worry about your phone.  I'm

17   going to put it in your backpack.  I'm going to put it on

18   your person," something to that effect.  I can show you the

19   transcript.

20        And, two reasons:  (A) it goes to impeachment of

21   Mr. Hall because I specifically asked him if he had that

22   conversation, and he said no.  I specifically asked him if

23   he had that particular conversation, and he said no.

24        Additionally, it goes to the subsequent conduct of

25   Mr. Myers and what this officer observed.

1      **THE COURT:**  Okay.  But how do you get over the hearsay

2  objection?  What's -- in other words, it's obviously

3  favorable testimony to your client, but what is the basis

4  for overcoming the hearsay objection?

5      **MR. ROSENBLUM:**  The basis for overcoming the hearsay

6  objection, it goes to subsequent conduct.  I'm not offering

7  it for the truth of the matter.

8      **THE COURT:**  The subsequent conduct of whom?

9      **MR. ROSENBLUM:**  Pardon me?

10     **THE COURT:**  Subsequent conduct of whom?

11     **MR. ROSENBLUM:**  Of Christopher Myers, and this

12  officer, because once he had the conversation, what he

13  observed, which is Mr. Myers go for Mr. Hall's backpack.

14     Also, I'm offering it for impeachment because I

15  specifically asked Mr. Hall about this conversation, and he

16  denied it.  He denied having a conversation with Mr. Myers

17  about his telephone.

18     **THE COURT:**  I will allow you to say -- ask him if he

19  had a conversation with Mr. Myers.  I will allow that.

20     **MR. ROSENBLUM:**  Okay.  And will you -- you won't allow

21  that he specifically asked about his phone?

22     **THE COURT:**  I don't see that the -- the reason for

23  allowing the hearsay is so -- is --

24     **MR. ROSENBLUM:**  Because I asked Mr. Hall about, did he

25  have a conversation -- it's an issue in the case because

1   Mr. Hall said that, I think, at some point, SWAT put it in.

2       But on this particular -- this is a witness that would

3   testify that he heard the conversation, which impeaches

4   Mr. Hall, that he specifically heard him ask about his

5   phone, which again impeaches Mr. Hall.

6       And then once he heard it, Mr. Myers responded by

7   saying, "Don't -- I'm putting it in your backpack," and he

8   watched him open up the backpack.

9       **MS. COSTANTIN:**  Judge, that's just rank hearsay.

10      **THE COURT:**  You can ask him if had the conversation

11  and if he saw -- you can ask him if he saw the backpack

12  open.  That's permissible.

13      **MR. ROSENBLUM:**  Okay.

14      **THE COURT:**  But not what Luther Hall said.

15      **MR. ROSENBLUM:**  I can't mention anything about the

16  phone?

17      **THE COURT:**  You can -- if you saw him -- if you saw

18  him put the phone in the backpack, yes, you can do that.

19      **MS. COSTANTIN:**  Which he did not, Judge.  He did not

20  see that.  He says he told the FBI all he saw was him open

21  the backpack.

22      And, frankly, Judge, he never said that he heard

23  Luther Hall -- Myers tell Luther Hall that he would put the

24  phone in his backpack.  He told -- Myers told him later,

25  told Chester that he put the phone in the backpack, so

1  there's -- that's complete hearsay.

2      **MR. ROSENBLUM:** I don't agree with that. Can I show

3  you the transcript?

4      **THE COURT:** Let's go back. You can ask him if he

5  overheard a conversation with Myers and Hall. That's what

6  you wanted -- that's okay. And you can also have him

7  testify about opening the backpack, what he saw open the

8  backpack, but the balance is objectionable, and the

9  objection will be sustained.

10     **MR. ROSENBLUM:** Okay.

11     *(End of discussion at sidebar.)*

12                         *   *   *   *

13 Q.  *(By Mr. Rosenblum)* Detective, I'm not going to ask you

14 about the specific words, but while you were on that street

15 corner, did you hear a conversation between Mr. Hall and

16 Mr. Myers?

17 A.  Yes.

18 Q.  And after that conversation, what action, if any, did

19 you see Mr. Myers take?

20 A.  He opened up Luther Hall's backpack.

21 Q.  You didn't focus exactly what he did on the backpack?

22 A.  No.

23 Q.  So, Mr. Hall has a conversation with Mr. Myers, and

24 then after that, Mr. Myers responds by opening up the

25 backpack?

1  *A.    Yes.*

2       **MR. ROSENBLUM:**  One moment, please.

3  *Q.  (By Mr. Rosenblum)* And just to be certain, this all

4  took place while you were at the corner?

5  *A.    Yes.*

6       **MR. ROSENBLUM:**  Thank you, sir.

7       **MR. KILGORE:**  Your Honor, I have no questions for

8  Detective Chester.

9       **THE COURT:**  All right.  Cross?

10                     **CROSS-EXAMINATION**

11              **QUESTIONS BY MS. COSTANTIN:**

12 *Q.    Officer Chester, how long have you been in the

13 Intelligence Unit?

14 *A.    Approximately six months.

15 *Q.    Okay.  So you've been in the Intelligence Unit for

16 six months?

17 *A.    Yes.

18 *Q.    Okay.  I want to talk to you about the corner of Olive

19 and 14th on September 17th of 2017.  Is it fair to say that

20 you don't really remember much about what happened that

21 night?

22 *A.    Yes.

23 *Q.    In fact, when you were first interviewed by the FBI,

24 you thought that this incident happened at 4, 5:00 in the

25 afternoon; is that right?

1    A.    Yes.

2    Q.    And nobody was throwing any objects at Olive and 14th;

3    right?

4    A.    No.

5    Q.    And do you recall when the FBI showed you that RTCC

6    video, you were surprised because you thought there had been

7    more people in the area?

8    A.    Yes.

9    Q.    Now, you told the FBI, when you were interviewed, that

10   you saw Defendant Myers open Detective Hall's backpack but

11   you didn't know if Defendant Myers had located anything

12   within the backpack.  Do you recall that?

13   A.    Yes.

14   Q.    And you were not present the entire time that

15   Detective Hall was seated there, were you?

16   A.    No.

17   Q.    And, in fact, your last memory is of going north on

18   14th Street and leaving Detective Hall and the other

19   individual at the curb; is that right?

20   A.    Yes.

21   Q.    You weren't there when SWAT arrived; is that correct?

22   A.    No, ma'am.

23   Q.    And do you recall -- well, first of all, an ASP is not

24   a familiar piece of equipment for an arrest team member, is

25   it?

1    *A.*    No.

2    *Q.*    And you're not aware whether that's even authorized

3    for the arrest team, are you?

4    *A.*    No, ma'am.

5        ***MS. COSTANTIN:***  Judge, I don't have anything more.

6        ***THE COURT:***  All right.  Re-cross.

7                    **REDIRECT EXAMINATION**

8                **QUESTIONS BY MR. ROSENBLUM:**

9    *Q.*    When you first sat down with the FBI, that would have

10   been October 17th, 2018?

11   *A.*    I believe so, yes.

12   *Q.*    And that was about a year and a month after the

13   events; correct?

14   *A.*    Yes.

15   *Q.*    And I think you described those events as a blur, that

16   entire weekend?

17       ***MS. COSTANTIN:***  Judge, I'd object, this is leading.

18       ***THE COURT:***  Sustained.

19   *Q.*    *(By Mr. Rosenblum)* Do you recall how you described the

20   events?

21   *A.*    Yes.

22   *Q.*    How did you describe the events?

23   *A.*    Basically as a blur.

24   *Q.*    And that was because of some of the things you

25   described earlier?

1    *A.*    Yes.

2    *Q.*    When you sat down with the FBI, the Department of

3    Justice lawyers Fara Gold and Emily Savner were there;

4    correct?

5         ***MS. COSTANTIN:***  Judge, this is beyond the scope.

6         ***THE COURT:***  Yes, sustained.

7    *Q.*    *(By Mr. Rosenblum)* And you talked about -- you were

8    asked about being surprised that there were more people --

9    that there were not more people.  As you said, that would

10   change in a heartbeat; correct?

11   *A.*    Yes.

12   *Q.*    And when you were -- the way you refreshed your

13   recollection, that was with the RTCC video image?

14   *A.*    Yes.

15   *Q.*    You didn't -- you were not shown any what's called the

16   Lawrence Bryant photographs, were you?

17   *A.*    Not to my recollection.

18        ***MR. ROSENBLUM:***  Thank you.

19        ***THE COURT:***  You may step down.

20        ***THE WITNESS:***  Thank you.

21        ***MR. KILGORE:***  Sorry, Judge.  I'd like to call

22   Agent Boehlje to the stand, please.

23        ***MS. COSTANTIN:***  Could we approach for one moment.

24        ***THE COURT:***  Okay.

25                              *  *  *  *

1        *(Discussion held at sidebar between the Court and*
2          *counsel as follows:)*
3        **MS. COSTANTIN:**  Judge, I'm just unclear if any party
4    has rested here.  Have you rested?
5        **MR. ROSENBLUM:**  Most likely.  There's still a witness
6    out there.  I don't think I'm going to call him, but I
7    will -- I can formally rest after this.
8        **THE COURT:**  After this witness?
9        **MR. ROSENBLUM:**  Yeah.
10       **MS. COSTANTIN:**  This is called by Mr. --
11       **MR. KILGORE:**  I will formally rest after this.
12       **MS. COSTANTIN:**  Okay.  I'm just a little -- I mean, we
13   allowed them to take one witness out of order, and now it
14   seems like we're getting more --
15       **THE COURT:**  Okay.  So we'll have this witness called,
16   and after this --
17       **MR. ROSENBLUM:**  I'm most likely going to rest as well
18   after that.
19       *(End of discussion at sidebar.)*
20                          *  *  *  *
21       *(The witness is sworn)*
22       **DEPUTY CLERK:**  Could you please spell your name for
23   the court reporter real quick.
24       **THE WITNESS:**  First name is Darren, D-A-R-R-E-N; last
25   name is Boehlje, B-O-E-H-L-J-E.

1    **DEPUTY CLERK:**  Thank you.  You can have a seat.

2    **THE COURT:**  Whenever you're ready.

3    **MR. KILGORE:**  Thank you, Judge.

4          **DARREN BOEHLJE, DEFENDANT'S WITNESS, SWORN**

5                      **DIRECT EXAMINATION**

6                 **QUESTIONS BY MR. KILGORE:**

7    *Q.*   Good morning, sir.

8    *A.*   Good morning.

9    *Q.*   Could you state your name, please.

10   *A.*   My name is Darren Boehlje.

11   *Q.*   How are you employed, sir?

12   *A.*   I'm a Special Agent with the FBI.

13   *Q.*   And how long have you been so employed?

14   *A.*   I've been a Special Agent with the FBI ten years.

15   *Q.*   Okay.  And as part of your job as a Special Agent,

16   were you assigned to the Luther Hall case?

17   *A.*   I was assigned to this case, yes.

18   *Q.*   Okay.  And when were you assigned to that case -- or

19   this case?

20   *A.*   When we first talked to Luther Hall in November of

21   2017.

22   *Q.*   November of 2017?

23   *A.*   Yes.

24   *Q.*   Okay.  And is it -- are you the main agent or the

25   agent in charge in this case?

1   *A.*   I'm the case agent on this case.  There's also an
2   additional agent assigned to it with me.
3   *Q.*   Okay.  And as a case agent on this particular case,
4   are you familiar with every aspect of this investigation?
5   *A.*   Every specific single thing, no.  In general, I am
6   familiar with the entirety of the investigation.
7   *Q.*   Okay.  That's fair.  And when you received or began
8   working on this case in November of 2017, you were working
9   with a couple of lawyers from the Department of Justice; is
10  that accurate?
11  *A.*   I was working with Fara Gold and Emily Savner, who are
12  Department of Justice attorneys.
13  *Q.*   Okay.  And how long did you work with those
14  individuals on this case?
15  *A.*   How long did I work with them on the case?
16  *Q.*   On this particular case, yes, sir.
17  *A.*   I -- they started on the case with me.  I don't recall
18  exactly when they stepped out of the case.
19  *Q.*   Okay.  And as part of being assigned to this case, you
20  would do all necessary things to conduct the investigation;
21  is that accurate?
22  *A.*   I'm not sure what you mean by "all necessary."
23  *Q.*   I'm sorry.  That was a bad question.  Let me ask you
24  this:  As part of your investigation, you would interview
25  witnesses?

1   *A.*   I would interview witnesses.

2   *Q.*   And you would first try to find out who the witnesses

3   were; fair?  What, if any, witnesses existed?

4   *A.*   I would attempt to identify if someone was a witness

5   and was there at the corner of 14th and Olive.

6   *Q.*   Okay.  And you did so in this case; right?

7   *A.*   I did identify folks that were witnesses in this case.

8   *Q.*   Okay.  Do you recall approximately how many people --

9   how many witnesses you interviewed in this case?

10  *A.*   I do not.

11  *Q.*   Okay.  Did you -- when you would interview a witness,

12  would you -- would Ms. Gold and Ms. Savner be present when

13  you conducted those interviews?

14  *A.*   Some of the interviews Ms. Gold and Ms. Savner were

15  present.

16  *Q.*   Okay.  And what did you do -- in the course of an

17  interview, would you take notes?

18  *A.*   I take notes during interviews.

19  *Q.*   Okay.  And you would takes those notes to memorialize

20  as accurately as you could what occurred in those

21  interviews; is that fair?

22  *A.*   I take notes and then use them as the basis for the

23  report that I write afterwards.

24  *Q.*   Okay.  And that report that you write afterwards is

25  called a 302 report?

1    *A.*    A 302 report is the reports that we write at the FBI.

2    *Q.*    Okay.  As part of your investigation, did you have

3    contact with -- did you approach Dustin Boone first in June

4    of 2018?

5    *A.*    I approached Dustin Boone in June of 2018 to try and

6    give him the opportunity to come forward and do the right

7    thing for Detective Hall, yes.

8    *Q.*    Okay.  And at that meeting in June of 2018, did you

9    hand him what's called a target letter?

10   *A.*    I first asked to speak to him.  He agreed to speak to

11   me.  We stepped into a van, and I talked to him briefly, and

12   then I gave him a target letter that was produced by the

13   Department of Justice.

14   *Q.*    Okay.  And what is a target letter?

15   *A.*    It basically identifies him as a potential target of

16   the investigation, with the hopes that he will do something

17   to move forward with the investigation.

18   *Q.*    Okay.  And with regard to the case moving forward,

19   Dustin Boone was indicted in November of 2018; is that

20   accurate?

21   *A.*    I believe, yes, it was November of '18 is when he was

22   indicted.

23   *Q.*    And then in January of 2020, did you receive the

24   Lawrence Bryant photos?

25   *A.*    I first contacted Lawrence Bryant in December of 2019,

1    when the -- one of the photos was run in the

2    *St. Louis American*.  After seeing that photo, I contacted

3    Lawrence Bryant, met with him first in December of 2019,

4    where he provided some of the photos.  I followed up with

5    him later in January of 2020, where he provided all of the

6    photos.

7    *Q.*    And once Mr. Bryant provided all of those photos to

8    you, fair to say that you took a significant amount of time

9    to review those photos?

10   *A.*    Myself and others on the investigation took a

11   significant amount of time looking at the photos.

12   *Q.*    Because as an agent on this case, you would want to be

13   as familiar as you possibly could with those photos; is that

14   fair?

15   *A.*    I try and familiarize myself with any evidence that I

16   uncover in an investigation.

17   *Q.*    Fair enough.

18       **MR. KILGORE:**  That's all I have, Judge.

19       **THE COURT:**  Mr. Rosenblum.

20                    **CROSS-EXAMINATION**

21              **QUESTIONS BY MR. ROSENBLUM:**

22   *Q.*    Good afternoon, Agent.

23   *A.*    Good afternoon.

24   *Q.*    Or "morning" I should say.  Good morning, Agent.

25   *A.*    Good morning.

1  Q.    So you've been sitting here throughout this trial,
2  have you not?
3  A.    I've sat here through each day.
4  Q.    And you've heard the witnesses testify; correct?
5  A.    I have heard the witnesses that have testified.
6  Q.    And, as Mr. Kilgore said, that you were the case agent
7  and generally familiarized yourself with every aspect of the
8  case?
9  A.    Again, I'm the case agent.  I familiarize myself as
10 much as possible with the case.  I do not know every single
11 detail.
12 Q.    Now, your first involvement in this case was
13 November 21st of 2017, when you interviewed Luther Hall;
14 correct?
15 A.    On November 21st, 2017 was the first time that we met
16 with Luther Hall, and we did interview him on that day.
17 Q.    Prior to that time, did you gain -- did you attempt to
18 gain access to any IAD, or Internal Affairs, information?
19 A.    I had a conversation prior to that with Detective Tony
20 Abel with the Internal Affairs Division of the St. Louis
21 Metropolitan Police Department.
22 Q.    Did he produce whatever Internal Affairs had?
23 A.    He did not.
24 Q.    Were you aware generally at some point that Mr. Hall
25 was not cooperating with Internal Affairs?

1  *A.*   My understanding was that Mr. Hall went to Internal

2  Affairs with his attorney, he provided names of individuals

3  who had self-identified that they were there at the -- as

4  potential witnesses at the scene, and he also looked at

5  photographs at Internal Affairs and identified individuals

6  that he recognized as potentially being at the scene.

7  *Q.*   Now -- but you're also aware that he didn't tell

8  Internal Affairs what he said happened?

9  *A.*   He did not give a full statement of what happened that

10  evening.

11  *Q.*   Now let me show you what's been previously marked, and

12  I believe you previously generally identified at a hearing

13  in March, as Defendant's A.  This is not to introduce to the

14  jury.  I just want to show them to you, see if you recognize

15  them, okay?

16  *A.*   Yes, sir.

17       ***(Handing exhibits to witness)***

18  *A.*   Sir, did you have a request for me of this?

19  *Q.*   I was going to ask you if you would look through them,

20  see if you recognize them.

21  *A.*   Yes, sir.

22       ***THE COURT:***  The jurors may stand up and stretch if you

23  care to.

24       ***THE WITNESS:***  Generally, sir, these are drafts of 302s

25  that have proposed edits made by Ms. Savner.

1    **MR. ROSENBLUM:**  And, Your Honor, at this point in

2    time, I'm going to read a stipulation between the parties,

3    if the Court please.

4        **THE COURT:**  All right.

5        **MR. ROSENBLUM:**  The parties have stipulated -- it is

6    stipulated by and between the undersigned parties as

7    follows:  "The parties stipulate that agents from the

8    Federal Bureau of Investigation have conducted more than

9    120 interviews of law enforcement officers or former law

10   enforcement officers in the investigation of this case."

11       It's signed by Ms. Costantin, Mr. Myers, myself,

12   Mr. Boone, and Mr. Kilgore.

13   Q.   *(By Mr. Rosenblum)* With that stipulation in mind, does

14   that -- is that accurate about how many interviews that you

15   and fellow agents conducted?

16   A.   I don't know whether it was 120 individual officers or

17   it was over 120 interviews done.  Some officers were

18   interviewed more than once.  Some people were interviewed

19   that were not police officers.

20   Q.   Does that number sound familiar that we just

21   stipulated to, sir?

22   A.   It sounds familiar.

23   Q.   Okay.  Now, looking at the interview -- the 302s in

24   front of you, if you would.

25       **MS. COSTANTIN:**  I'm going to object.  This is beyond

1    the scope of direct.

2         **THE COURT:**  Over -- let me hear the question.

3    Overruled.

4    Q.    *(By Mr. Rosenblum)* Looking at the 302s in front of

5    you, now that you looked at them, most of those interviews,

6    if not all, included Fara Gold and Emily Savner; correct?

7    A.    Well, I would have to go through each individual

8    document to say whether most were including Emily and Fara.

9    Q.    Well, is it fair that they were there for the

10   predominant interviews as you recall?

11   A.    During the investigation, when they were part of the

12   investigation, they were present for most of the interviews.

13   Q.    All right.  And you said that you had worked with Fara

14   Gold in the past but not Emily Savner; correct?

15   A.    I had worked with Fara Gold on previous

16   investigations, but I had not worked with Emily Savner.

17   Q.    And they are DOJ lawyers; correct?

18   A.    Correct.

19   Q.    Department of Justice lawyers; correct?

20   A.    Fara Gold, I believe, is still a Department of Justice

21   lawyer, but I believe Emily Savner is no longer with the

22   Department of Justice.

23   Q.    I'm sorry.  At the time they were Department of

24   Justice lawyers; correct?

25   A.    At the time, they were both Department of Justice

1  lawyers.

2  *Q.*    And during the course of those interviews before you,

3  these lawyers here were not involved in the case?

4  *A.*    The time -- during the time that Fara Gold and

5  Emily Savner were part of the case, these particular lawyers

6  were not part of the case.

7  *Q.*    And those interviews and those 302s that you have in

8  front of you --

9      *MS. COSTANTIN:*  Judge, at this time I would object.

10  This is beyond the scope of direct.

11      *MR. ROSENBLUM:*  Your Honor, Mr. Kilgore went into it,

12  and then I'd be happy to, for these questions, rest, or call

13  him in my case.

14      *THE COURT:*  I don't understand.  It does seem to be

15  beyond the scope.

16      *MR. ROSENBLUM:*  Can we approach, Your Honor?

17      *THE COURT:*  Yeah.

18                          *    *    *    *

19      *(Discussion held at sidebar between the Court and*

20       *counsel as follows:)*

21      *THE COURT:*  Go ahead.

22      *MR. ROSENBLUM:*  Mr. Kilgore went into the interviews

23  that he went on with Mr. -- with Ms. Gold and Ms. Savner.  I

24  went through this with the last trial so I have an idea what

25  his answers are going to be, and he's going to talk about

how they edited and redlined it, and that he listened and
they listened and some of the stuff that he didn't agree
with, he wouldn't include, so that there's a number of 302s
that have been basically subject to two different
interpretations.  He can explain why and he's going to say
that that was unusual.

**MS. COSTANTIN:**  Judge, the last trial was a completely
different trial.  I called him as a witness and we had the
whole other issues.  I mean, it was completely different,
okay?

In this situation, Mr. Kilgore called the agent and
asked him about one specific interview, I believe, which was
the interview of the defendant, Dustin Boone.  I mean, he
asked whether they were present at other interviews, but he
didn't get into anything more.  I mean, now we're going to
start talking about each interview and changes -- it's
beyond the scope.

**MR. ROSENBLUM:**  There's a couple things:  (A) I think
Mr. Kilgore did go further and talk over the interviews with
Fara Gold; and (B) this officer has indicated on multiple
occasions that he was aware of every aspect of the
investigation.  He's the case agent.  He specifically said
that he's aware of every aspect and participated in every
aspect of the investigation.  So I don't know how it can be
beyond the scope when he's indicated that he's familiar with

```
1    every aspect of the investigation.
2            THE COURT:  Overruled.
3            MR. ROSENBLUM:  Sorry?
4            THE COURT:  Overruled.
5            MR. ROSENBLUM:  I didn't hear.
6            THE COURT:  Objection's overruled.
7            MR. ROSENBLUM:  Thank you.
8            (End of discussion at sidebar.)
9                        *   *   *   *
10   Q.    (By Mr. Rosenblum) So, getting back to those 302s in
11   front of you, the way that it would generally take place is
12   there would be a number of potential -- you and other agents
13   in a room; correct?
14   A.    Generally there would be myself and another agent in
15   the room, and then Ms. Gold and Ms. Savner, and sometimes
16   Ms. Winfield as well.
17   Q.    And the person that you -- the person that you were
18   being -- that was being interviewed, fair enough?
19   A.    Correct.
20   Q.    Now, the process that you went through with Ms. Gold
21   and Ms. Savner, and particularly Ms. Savner, is you would
22   sit there and take -- you would take notes in the interview;
23   correct?
24   A.    I took notes during the interviews, as I stated
25   earlier.
```

1  Q.    And then Ms. Gold or Ms. Savner would take notes in
2  the interview; correct?
3  A.    For sure Ms. Savner.  I'm not sure whether Ms. Gold
4  would routinely take notes or not.
5  Q.    And then you would produce what's called a 302;
6  correct?
7  A.    I would produce a draft of an FD302, which is what we
8  do for interviews.
9  Q.    And then you would send that to Ms. Gold and
10 Ms. Savner; correct?
11 A.    I would send that draft to them.
12 Q.    And then almost in every occasion, you would get a --
13 that draft back with a number of notes from Ms. Savner;
14 correct?
15 A.    I would receive proposed edits back from Ms. Savner
16 regarding the drafts that I sent her.
17 Q.    And sometimes those edits would include entire
18 paragraphs; correct?
19 A.    There were times where she would request additional
20 information to be added.
21 Q.    Sometimes they would include an addendum where it was
22 an extra page; specifically, for instance, in the
23 Luther Hall 302.  Do you remember that?
24 A.    Yes.  There was a time when she added information and
25 added a page of information that she wanted to have added to

1  the 302.

2  *Q.*   So even though the two of you were listening to the

3  same interview, when you would get those edits back,

4  oftentimes, it was not consistent with what you heard?

5  *A.*   I can't account for what Ms. Savner heard.

6  *Q.*   Sir, that's not my question.  My question is -- I'm

7  not asking you to do that.

8        My question is:  Oftentimes it was not consistent with

9  what you heard; is that a correct statement?

10  *A.*   Again, I can only account for what I heard, not what

11  Ms. Savner heard or --

12      **MR. ROSENBLUM:**  Your Honor, I would ask him to answer

13  the question.

14      **THE COURT:**  Well, I think he's trying.  Ask it again.

15  *Q.*   (By Mr. Rosenblum) Oftentimes it would not be

16  consistent with what you personally heard?

17      **MS. COSTANTIN:**  Judge, perhaps if we define what "it"

18  is, that might help him answer.

19      **MR. ROSENBLUM:**  To the extent that's an objection,

20  I'll accommodate her.

21  *Q.*   (By Mr. Rosenblum) It is the information that the two

22  of you are receiving in the same room, okay?

23  *A.*   Okay.

24  *Q.*   You would receive information, Ms. Savner would

25  receive information, and that she would send you redlined

1  documents; right?

2  *A.*   She would send me proposed edits.

3  *Q.*   And oftentimes it would be not consistent with what

4  you heard; correct?

5  *A.*   She would generally add -- ask to have things added

6  that apparently she heard.

7  *Q.*   Would it be fair to say that oftentimes you would

8  disagree with what she heard?

9  *A.*   I would not place anything in my 302 that either

10  myself or the other agent in the room heard because it is

11  our FBI document, it is not a Department of Justice

12  document.

13  *Q.*   Again, Agent, would you answer my question.

14  Oftentimes --

15  *A.*   I'm trying to, sir.

16  *Q.*   Well, I understand.  Oftentimes what she proposed, you

17  would disagree with; is that not a correct statement?

18  *A.*   If she proposed something that either myself or the

19  other agent did not hear, then we would not place it in the

20  report.

21  *Q.*   And that happened; yes?

22  *A.*   There were times where she proposed things that we did

23  not place in the report because we did not hear those

24  things.

25  *Q.*   And that would be because you heard things

1  differently; correct?

2  A.    I don't think it was necessarily differently.  She

3  apparently heard something that myself or the other agent

4  didn't hear.

5  Q.    Handing you a transcript from a previous hearing on --

6  in March of 2021, as well as your grand jury testimony.  All

7  right?

8  A.    Yes, sir.

9       **THE COURT:**  Please, please, don't throw something.

10      **MR. ROSENBLUM:**  I didn't mean to throw it.

11      **THE COURT:**  Please, don't do that anymore.

12      **MR. ROSENBLUM:**  I would not -- I didn't mean to do

13  that.

14  Q.    *(By Mr. Rosenblum)* All right.  If I can direct your

15  attention to page 162.

16  A.    Of which document, sir?

17  Q.    Of the previous hearing in March.  And read to

18  yourself, if you would, lines 8 through line 23.

19      **MS. COSTANTIN:**  Judge, I'd object.  This is improper

20  impeachment.  This is not inconsistent with what he just

21  said.

22      **THE COURT:**  Well, I'm not sure yet.  Overruled.

23      **THE WITNESS:**  Yeah, I'm not sure how that's any

24  different than what I just said, sir.

25  Q.    *(By Mr. Rosenblum)* Well, did you say in that document

1  that at times you would disagree as to what should go in the
2  final product?  Is that a true statement?
3  *A.*    I just said that here today, sir.
4  *Q.*    And is that because you heard things differently?  Did
5  you say that?
6  *A.*    I -- you used the word "differently."  I didn't use
7  the word "differently," sir.
8  *Q.*    But did you agree -- did you answer that question by
9  saying, "That's fair"?
10  *A.*    That was my answer in the previous hearing.
11  *Q.*    Okay.  When I said, "And that was because you may have
12  heard things differently," your answer was, "That's fair."
13        Did I get that right?
14  *A.*    That was my answer in the previous hearing.
15  *Q.*    And when that would occur, you would leave that
16  information out; would that be correct?
17  *A.*    I would leave out, again, any information either
18  myself or the other agent did not hear during the interview.
19  *Q.*    And would you agree with me that that process of
20  editing that's in front of you stopped when those
21  two lawyers left the case?
22  *A.*    That process did stop when those two lawyers left the
23  case.
24  *Q.*    Would you agree with me that in your years as an FBI
25  agent, that process was unusual?

1    *A.*    That process was unusual.

2    *Q.*    In those interviews that you spoke about, of all those

3    interviews -- there's different types of interviews.

4    There's the witness interview; correct?

5    *A.*    Well, there's interviews in general.

6    *Q.*    But sometimes, as you say, you're interviewing what

7    would be a target; correct?

8    *A.*    I interview witnesses, targets.  They're still

9    interviews.

10   *Q.*    I understand.  And sometimes when you're interviewing

11   targets, before you speak to that person, there's something

12   called a proffer letter; correct?

13   *A.*    I'm familiar with what a proffer letter is.

14   *Q.*    And we've seen them here in court; correct?

15   *A.*    Yes, I believe there was a proffer letter that was

16   gone through by you here in court.

17   *Q.*    And typically that was with Mr. Marcantano; correct?

18   *A.*    That was with Mr. Marcantano.

19   *Q.*    And typically in a proffer letter, what happens is the

20   lawyers and the individual in the room and his lawyer, they

21   review that before they continue to talk; correct?

22   *A.*    The proffer letter is generally produced at the

23   beginning of the interview at the request of the attorney of

24   the person that we're trying to talk to.  And then the --

25   both the attorney and the witness sign the proffer letter,

1   and then we conduct the interview, with the witness and

2   their attorney present.

3   *Q.*   You generally understand what a proffer letter is?

4   *A.*   Generally.

5   *Q.*   And you generally understand that a proffer letter

6   gives that prospective individual some protection from those

7   words being used against him in the case in chief?

8   *A.*   I think the attorney for the witness requests a

9   proffer letter for that reason.

10  *Q.*   I asked you if you generally know what a proffer

11  letter is.

12  *A.*   And I said, "Yes, I do."

13  *Q.*   And would you agree that that gives the protections

14  that we talked about in court when you sat here and listened

15  to it?  Would you agree with that?

16  *A.*   As I said, I believe that's why the attorney would

17  request that on behalf of the client.

18  *Q.*   How many proffer letters were in this case?  We know

19  Mr. Marcantano, and I believe the only other one was

20  Mr. Hays.

21      ***MS. COSTANTIN:***  I would object to the relevance of

22  this.

23      ***THE COURT:***  Sustained.

24  *Q.*   *(By Mr. Rosenblum)* Now, in those 120 interviews, you're

25  asking for any relevant information, are you not?

1    *A.*    I mean, it depends on the individual interview, but

2    we're looking for information about what happened to

3    Detective Hall.

4    *Q.*    Were you able to determine one individual that saw

5    Chris Myers damage that telephone?

6    *A.*    I believe the evidence that we've shown shows --

7    *Q.*    I didn't ask that question.

8    *A.*    -- damage that telephone.

9    *Q.*    Sir, can you --

10        **MR. ROSENBLUM:**  Your Honor, I would ask again that he

11   answer my question.

12        **THE COURT:**  Well, if he doesn't, just object because

13   it's nonresponsive.

14        **MR. ROSENBLUM:**  I will object for nonresponsive.

15   *Q.    (By Mr. Rosenblum)* Okay.  In those 120 interviews, did

16   you identify one human being that saw, on that street

17   corner, Chris Myers damage that telephone with any item?

18   Yes or no.

19        **MS. COSTANTIN:**  Judge, I'd object.  This is hearsay.

20        **THE COURT:**  Overruled.

21   *Q.    (By Mr. Rosenblum)* In those 120 interviews, did you

22   identify one human being that saw Chris Myers damage that

23   telephone with any items?  Yes or no.

24   *A.*    I did not talk to an individual who saw Mr. Myers

25   strike that phone.

1   Q.   A number of these individuals also testified before
2   the grand jury; correct?
3   A.   Yes.
4   Q.   And as we -- as has been pointed out before any
5   individual testifies before a grand jury, they're typically
6   warned that they must tell the truth, otherwise, there could
7   be a criminal penalty for not telling the truth; correct?
8   A.   I'm not inside the grand jury when a witness testifies
9   so I can't speak to exactly what they're told.
10  Q.   But as an agent, you understand what a 1001 violation
11  is; correct?
12  A.   I do understand what a 1001 violation is.
13  Q.   So lying to --
14       *MS. COSTANTIN:*  Judge, this is definitely beyond the
15  scope.
16       *THE COURT:*  Yes, it is.  Sustained.
17  Q.   *(By Mr. Rosenblum)* Okay.  Now, you presented some
18  evidence before the grand jury; correct?
19  A.   I did speak in front of the grand jury.
20  Q.   And you --
21       *MS. COSTANTIN:*  Judge, this is also beyond the scope.
22       *THE COURT:*  Yes, it is.  Sustained.
23       *MR. ROSENBLUM:*  Your Honor, can we approach?  It goes
24  to impeachment.
25       *THE COURT:*  All right.

1                    *  *  *  *

2          *(Discussion held at sidebar between the Court and*

3           *counsel as follows:)*

4          **THE COURT:**  You know, I'm not -- I thought we were

5     just going to kind of fill, in but you've just taken it to a

6     whole new mini trial with this witness.

7          **MR. ROSENBLUM:**  I don't mean to do that, but I have

8     two areas.  I have this and then I have that he -- what he

9     determined about the scene, the RTCC tape.

10         And then Ms. Costantin has gone on to that RTCC tape

11    with a witness and has made a big point that there is only

12    one individual, so I'm going to go into that.

13         **MS. COSTANTIN:**  There's only one what?

14         **THE COURT:**  Wait, wait.

15         **MR. ROSENBLUM:**  I'm sorry, that there is -- that she

16    specifically was talking about the guy in the orange

17    T-shirt.  With respect to what he said to the grand jury, it

18    specifically goes to impeachment with respect to

19    Luther Hall.  He --

20         **THE COURT:**  Wait, wait.  All of your -- that's really

21    distracting me.  I can't hear what he said with you waving.

22         **MS. COSTANTIN:**  I can't hear what he's saying either.

23    That's what I'm having trouble with.

24         **MR. ROSENBLUM:**  With respect to what he said in the

25    grand jury, it goes to impeachment with respect to

1   Luther Hall. Specifically, he said to the grand jury that
2   Luther Hall told him he raised his hands in surrender.
3       That's not what Mr. Hall testified to today. He
4   specifically said that Mr. Myers was the -- Mr. Myers
5   threw -- took the camera off and broke it. We know that's
6   not the evidence. So there are specific items of
7   impeachment. Not a lot. That's all I'm going to ask him.
8       **THE COURT:** All right.
9       **MS. COSTANTIN:** This is all beyond the scope. This is
10  beyond the scope of direct, and as far as -- I don't even
11  know what you're talking about with the RTCC tape.
12      **MR. ROSENBLUM:** I'm sorry, the Tac A and B tape.
13      **MS. COSTANTIN:** Well, there's been no questions on
14  direct about the Tac A or B tape either, and there's been no
15  questions about what Luther Hall did or didn't say on --
16      **THE COURT:** This is way beyond the scope of --
17      **MR. ROSENBLUM:** I mean, Your Honor, here's what I --
18      **THE COURT:** You know, if you wanted to call him as a
19  witness, you should have called him as a witness. I mean --
20      **MR. ROSENBLUM:** He's still subject to recall. I can
21  close my cross and call him as a witness now.
22      **THE COURT:** All right. If you want to do that, that's
23  fine.
24      **MR. ROSENBLUM:** Okay.
25      *(End of discussion at sidebar.)*

1                           *   *   *   *

2         *MR. ROSENBLUM:*  Your Honor, at this point I will end

3   my cross, and I will recall Mr. Boehlje to the stand as part

4   of my case.

5         *THE COURT:*  You may proceed.

6         *MS. COSTANTIN:*  Judge, I believe I'm entitled to

7   cross-examination before that occurs.

8         *THE COURT:*  Yes.  Absolutely.  Yes.

9         *MR. ROSENBLUM:*  Fair.

10                       **CROSS-EXAMINATION**

11                  **QUESTIONS BY MS. COSTANTIN:**

12  *Q.*   Agent Boehlje, is it correct that you never changed

13  your 302 based on any proposed edits by any attorneys unless

14  you actually heard that statement?

15  *A.*   Yes.  Whether I heard it or the other agent in the

16  room heard it, that is correct.

17  *Q.*   -- in the room heard it?

18  *A.*   Yes.

19  *Q.*   And in regards to this -- proffer letters, is it

20  correct that proffer letters are requested by an attorney

21  for an individual?

22  *A.*   They are requested by the individual's attorney.

23  *Q.*   And sometimes the individual is a witness, and

24  sometimes the individual is a target; is that fair to say?

25  *A.*   That's correct.

1   *Q.*   Okay.  It's something that the attorney is requesting

2   on behalf of their client?

3   *A.*   Yes.  The attorney makes the request for the proffer

4   letter.

5   *Q.*   And it's correct that at the time of the interview of

6   Sergeant Marcantano, he was not a target; isn't that true?

7   *A.*   Sergeant Marcantano was not a target.

8   *Q.*   And you had a question about determining that

9   Defendant Myers destroyed the phone.  Did your investigation

10  determine that Defendant Myers destroyed the phone?

11      **MR. ROSENBLUM:**  Objection, Your Honor.  Speculation.

12  My question specifically was with witnesses.

13      **THE COURT:**  Overruled.

14  *Q.*   *(By Ms. Costantin)* Did your investigation determine

15  that Defendant Myers destroyed the phone?

16  *A.*   Yes, ma'am, it did.

17  *Q.*   Okay.  And, specifically, did your investigation

18  determine, first of all, that at a point on the corner of

19  14th and Olive on the night of September 17th, that

20  Detective Hall's phone was facedown?

21  *A.*   Yes, his phone was facedown.

22  *Q.*   As in the camera was facedown?

23  *A.*   Yes.

24  *Q.*   And that it was showing black or showing darkness; is

25  that correct?  Did your investigation determine that?

1    *A.*    Yes, his camera was showing darkness.

2    *Q.*    Did your investigation determine that the phone then

3    rotated vertically and then stabilized?

4    *A.*    Yes.  His -- the streaking in the phone, as

5    Mr. Burzota said, was the rotating of the phone vertically

6    and then stabilizing.

7    *Q.*    And a simple way to put that would be, it spun;

8    correct?

9    *A.*    Correct, it spun.

10   *Q.*    And did the investigation determine that the --

11   Defendant Myers had an ASP that night?

12   *A.*    Yes, Defendant Myers had an ASP that night.

13   *Q.*    And he had it out before the phone was struck; is that

14   correct?

15   *A.*    He did have it out.

16   *Q.*    And did the investigation determine that the phone has

17   a circular imprint on the lower right-hand corner of the

18   phone?

19   *A.*    Yes, there is a circular imprint on the lower

20   right-hand corner of the phone.

21   *Q.*    And examining an ASP, did the investigation determine

22   that there's a hard knob on the top of the ASP?

23   *A.*    Yes, an ASP baton does have a small item on the very

24   top of it.

25   *Q.*    And based on common sense, did your investigation --

```
 1        MR. ROSENBLUM:  Objection, Your Honor.  "Based on
 2   common sense," that's argument.
 3        MS. COSTANTIN:  Then I'll just ask it differently.
 4        THE COURT:  Okay.  Sustained.
 5   Q.   (By Ms. Costantin) Did your investigation determine
 6   that it's possible that striking this phone in the lower
 7   right-hand corner could cause it to flip over?
 8        MR. ROSENBLUM:  Objection.  Speculation.
 9        THE WITNESS:  Possibly.
10        THE COURT:  It was asked if the investigation revealed
11   that, if -- I'll overrule it just to have him answer just
12   that specific question.
13        THE WITNESS:  Yes.
14   Q.   (By Ms. Costantin) And did the investigation determine
15   that Christopher Myers' face was above the phone immediately
16   after it flipped over?
17   A.   Yes, that is Christopher Myers' face on the phone.
18   Q.   And did the investigation determine that on the back
19   of the phone, there's a little bump right here in line with
20   the strike on the front of the phone?
21   A.   Yes, there is a dent in the back of the phone
22   consistent with being struck by the tip of an ASP baton.
23   Q.   Is this a dent -- normally you have a dent going in.
24   Is this a dent that goes in or coming out?
25   A.   A dent coming out.
```

1    *Q.*   Okay.  And did the investigation determine, by looking

2    at those Lawrence Bryant photos, the -- Defendant Myers is

3    seen putting the ASP away after the phone is broken?

4    *A.*   That is correct.

5         **MS. COSTANTIN:**  Judge, I don't have anything more.

6         **THE COURT:**  All right.

7         **MR. ROSENBLUM:**  Re-cross at this point, Your Honor.

8         **THE COURT:**  All right.

9                    **RECROSS-EXAMINATION**

10                **QUESTIONS BY MR. ROSENBLUM:**

11   *Q.*   So, Ms. Costantin just took you through essentially

12   Burzota's testimony; correct?

13   *A.*   I -- she asked me questions about what the

14   investigation revealed.

15   *Q.*   And what you did was just went through what Burzota

16   testified to, which was on direct and which was subject to

17   cross; correct?

18   *A.*   I'm not sure I understand your question.

19   *Q.*   Well, your investigation revealed -- did you -- did

20   she discuss anything other than what Burzota talked about

21   today -- yesterday?

22        **MS. COSTANTIN:**  Judge, I'd object.  He's also talked

23   about the photographs.

24        **THE COURT:**  Overruled.

25   *Q.*   *(By Mr. Rosenblum)* Did she talk about all this

1    speculation about what this possibly can do?  Did she talk

2    about anything other than what we heard Marcus Burzota

3    testify to?  Yes or no.

4    *A.*    I'm not sure I understand your question, sir.

5    *Q.*    I know she went through her theories of the case, but

6    with respect to what your investigation revealed, okay, did

7    your investigation also reveal that Luther Hall told you

8    that a baton caused the damage during the altercation that

9    was going on with Randy Hays?  Did you hear him say that in

10   court?

11   *A.*    A baton -- yes, he told me a baton caused the damage,

12   and an ASP is a baton, sir.

13   *Q.*    I didn't ask that question.  He never mentioned the

14   ASP when you talked to him?

15        **MS. COSTANTIN:**  This is argumentative.

16        **THE COURT:**  Yeah.  Sustained.

17   *Q.*    *(By Mr. Rosenblum)* He never mentioned the ASP, did he?

18   *A.*    I don't recall Luther Hall using the term "ASP."

19   *Q.*    Okay.  Now, all of this speculation -- first of all,

20   any witness, 120 of them, did they ever see this happen?

21   *A.*    As I told you before, sir, I did not talk to a person

22   who saw Chris Myers physically strike Luther Hall's phone.

23   *Q.*    Did you hear Burzota testify that he could not rule

24   out that that happened at 8:54:02 during the baton strikes

25   that we saw?

1    **MS. COSTANTIN:**  Judge, first of all, I'd object that
2    that mischaracterizes the evidence.  And, second of all, I'd
3    object that he's asking him to comment on another witness's
4    testimony.
5        **MR. ROSENBLUM:**  He's talking about the investigation,
6    Your Honor.
7        **THE COURT:**  Yeah, but please, you repeatedly asked him
8    about that, and I don't understand -- go ahead and ask a
9    different question.
10   Q.   (By Mr. Rosenblum) Did you hear Mr. Burzota testify as
11   to what would happen at 8:54:02?
12   A.   I don't specifically recall what Mr. Burzota said
13   about 8:54:02, sir.
14   Q.   Did you hear him say that he could not rule out that
15   it was struck by a baton during that time?  Did you hear him
16   say that?
17   A.   I believe he said that -- that it could have been
18   struck by a baton.
19   Q.   And did you hear him say that he can't say -- that he
20   could not say what caused that crack?  Did you hear him say
21   that?
22       **MS. COSTANTIN:**  Judge, I'd object.  This is commenting
23   on another witness's testimony.
24       **THE COURT:**  Yeah.  Sustained.  Sustained.
25   Q.   (By Mr. Rosenblum) Let me ask you this:  Did you --

1  during the course of this investigation, did you determine

2  that the audio went out at 54:02?

3     *MS. COSTANTIN:*  Now this is beyond the scope of -- I

4  mean we're on re-cross.

5     *THE COURT:*  Yeah.  Sustained.  Sustained.

6  *Q.  (By Mr. Rosenblum)* Did you hire any experts to

7  determine what caused the audio to go out?

8     *MS. COSTANTIN:*  Same objection.

9     *THE COURT:*  Sustained.

10     *MR. ROSENBLUM:*  I'll ask that in my case.

11  *Q.  (By Mr. Rosenblum)* And she asked whether or not you

12  made any determinations as to whether this speculation could

13  cause the phone to split -- to flip.

14     *MS. COSTANTIN:*  Judge, I'd object.  This is

15  argumentative.

16     *THE COURT:*  Sustained.

17  *Q.  (By Mr. Rosenblum)* Did you conduct any experiments on

18  a phone to see whether a strike could cause the phone to

19  flip in the manner in which you've just described?

20  *A.*    I did not conduct any experiments.

21  *Q.*    Have you ever -- did you have an expert look at this

22  phone?

23  *A.*    The phone was looked at by the Computer Analysis

24  Response Team, and they're the ones that downloaded the

25  phone.

1  *Q.*   Did you have an expert look at the phone to determine

2  what caused the crack?

3  *A.*   Like I said, we had the Computer Analysis Response

4  Team, an individual from that team.  They are experts in

5  digital imaging.  They did look at the phone.

6  *Q.*   And in answering Ms. Costantin's questions, other than

7  what we heard from Marcus Burzota, and seeing Mr. Myers'

8  picture, what else in the investigation did you conduct to

9  determine what caused the damage to that phone?

10 *A.*   I'm not sure what you mean by "conduct."

11 *Q.*   Well, you talked about, "Did your investigation

12 reveal."  Do you remember those questions by Ms. Costantin?

13     **THE COURT:**  Ms. Costantin, would you sit down, please,

14 until you object.

15 *Q.*   *(By Mr. Rosenblum)* Do you recall answering that

16 question?

17 *A.*   Could you please repeat that.  I couldn't hear.

18 *Q.*   She asked you what -- in your investigation, what did

19 it reveal?  Do you recall that with respect to the phone?

20 *A.*   Yes.

21 *Q.*   Okay.  Now, other than what we heard from Mr. Burzota,

22 which talked -- testified and had cross-examination, and you

23 mentioned the picture that was on -- Mr. Myers' picture that

24 was on the phone, what else did your investigation show,

25 other than Mr. Burzota?

A.     We showed that the last picture of Mr. Myers on the
Lawrence Bryant photos was as he was heading directly to the
area where Luther Hall was being assaulted.  You can see on
the cell phone video, the Ustream video, the darkness where
the phone is camera side down.  You can see the long, thin
shadow, which is consistent with the ASP of Chris Myers.
Q.     Now, did Mr. Burzota ever identify that as an ASP?
       **MS. COSTANTIN:**  Judge, I would object.
       **THE COURT:**  Yeah.  That's sustained, sustained,
sustained.
       **MR. ROSENBLUM:**  All right.  Just one more question on
cross, and then I'll move on.
       **THE COURT:**  Yes, sir.
Q.     *(By Mr. Rosenblum)* You talked about the Lawrence Bryant
photos?
A.     Yes, sir.
Q.     Can we look at 135, please.
       Is that the photo you're speaking of?
A.     Can you go ahead one frame.
Q.     That's 8:54:02.  By the way, does your investigation
reveal what was going on at 8:54:02?
A.     What do you mean by that, sir?
Q.     Going on in this area right here.
A.     I'm not sure what your question is.
Q.     The cell phone video, does that show the phone being

1    struck during that -- does that show Mr. Hall being struck
2    during that period of time, if you recall?
3    A.    I don't know the exact second, but there -- Randy Hays
4    is coming down with a baton.  You see the beginning of the
5    very first strike by Randy Hays.  I don't know the exact
6    second that that happened, sir.
7    Q.    Let's go to 136.  That's another picture; correct?
8    A.    That is a picture, sir.
9    Q.    And is that another picture that you referring -- that
10   you were referring to?
11   A.    I don't know whether that's -- if you could go ahead
12   one more, please.
13   Q.    Well, first of all, what direction does it appear that
14   Mr. Myers is walking?
15   A.    It appears he's going back towards the corner of 14th
16   and Olive.
17   Q.    And do you see that that's the corner right there;
18   correct?
19   A.    Yes, sir.
20   Q.    Would you agree that he's basically in the street at
21   this point?
22   A.    In this particular photograph, he appears to still be
23   in the street.
24   Q.    And let's go to 137.
25         And that's, again, 8:54:02; correct?

1    *A.*    The time in that photograph is 8:54:02.

2    *Q.*    And then you see where his head is looking?  Does it

3    appear that he's looking down at that point?

4    *A.*    Possibly.

5    *Q.*    Okay.  Does it appear that he's looking over into this

6    area?

7    *A.*    I mean, I can't tell whether his eyes are looking in

8    that area in this photograph.

9    *Q.*    Okay.  And then just let's take one -- now, remember

10   where he is, right, in this spot; right?  You see that spot?

11   *A.*    I do.

12   *Q.*    Let's look at 138.

13          And this is the next scene that a SWAT is turning into

14   that area in the vicinity of where he was standing in the

15   street; correct?

16   *A.*    Yes, sir.  I believe that's four seconds later.

17   *Q.*    I understand.  But I'm correct in saying the SWAT

18   vehicle was turning into that area where he was in the

19   street; correct?

20   *A.*    Yes, the SWAT vehicle is turning -- making the turn

21   onto 14th Street.

22   *Q.*    Now, so you mentioned Mr. Burzota, you mentioned these

23   pictures, and you mentioned Mr. Myers' face at somewhere

24   around 8:54:10, or seconds thereof; correct?

25   *A.*    I didn't say a specific time, sir.

1    *Q.*    Okay.  Well, those are the three items that you
2    mentioned with respect to your investigation; correct?
3    *A.*    Those were the three items that I said in my earlier
4    testimony.
5    *Q.*    Okay.  There is nothing else, is there, that you can
6    rely on?
7    *A.*    Again, as I was saying before, sir, there is the thin
8    line of the shadow of what is consistent with the ASP.
9    *Q.*    Okay.  Again --
10   *A.*    There is the --
11   *Q.*    All I'm asking --
12        **THE COURT:**  You asked him if there's anything else,
13   but when he was doing this before, you interrupted him and
14   he didn't finish, so let him finish.
15        **THE WITNESS:**  There is the thin shadow that is
16   consistent with the ASP.  Mr. Myers was directly in that
17   area, had his ASP out in the last photograph that we have
18   him in prior to the trucks coming around the corner.
19        As soon as the phone flips over, it's Mr. Myers' face
20   there.  The damage on the phone is consistent with the tip
21   of an ASP both on the face of the phone, the glass front of
22   the phone, as well as on the back of the phone, the dent
23   pushing outwards as if struck by an ASP while it was on the
24   ground, sir.
25   *Q.*    *(By Mr. Rosenblum)* Okay.  So a lot -- again, what you

1    were talking about is Burzota's testimony; correct?

2        **MS. COSTANTIN:**  Judge, we've been over this.  This

3    is --

4        **THE COURT:**  Sustained.

5        **MR. ROSENBLUM:**  I'm finished now.  If you don't mind,

6    can I call him --

7        **THE COURT:**  We're going to take a recess.  Ladies and

8    gentlemen, I could ask any one of you to repeat what I'm

9    about to say, and you could probably do it verbatim.

10       Until the case is given to you to decide, you must not

11   discuss among yourselves or with others or remain in the

12   presence of anyone discussing it.  If anyone should try to

13   talk to you about the case, advise me immediately.

14       Do not read, watch, or listen to radio, television, or

15   news reports of the trial, and keep an open mind until all

16   the evidence has been received and you've heard the views of

17   your fellow jurors.

18       Court's in recess for 15 minutes.

19       *(Court recessed from 10:22 a.m. to 10:29 a.m.)*

20       *(The following discussion was held with the defendants*

21        *present but outside the presence of the jury.)*

22       **MS. COSTANTIN:**  Maybe we should take something up

23   before the jury comes in.  I believe that Mr. Rosenblum is

24   going to attempt to introduce some recordings or transcripts

25   from police dispatches that night, and I would object that

1  that is hearsay.  And, I mean, we might want to handle that
2  now rather than have to come up to sidebar when I object.
3      **THE COURT:**  Okay.
4      **MR. ROSENBLUM:**  So these exhibits were part of the
5  last trial.
6      **THE COURT:**  Could you go to the microphone.  Go ahead.
7      **MR. ROSENBLUM:**  I'm specifically talking about
8  Exhibits 279 and 280, which was the Tac A -- Tac B channel
9  and the transcript thereof.  And then the other one was the
10  Tac A channel.
11      So there were questions asked by Ms. Costantin.
12  Basically with the Tac A, I'm just going to ask this witness
13  if he listened to it, which he did.  He actually ordered it,
14  he made a transcript of it, he's familiar with it.  And the
15  things that he was listening to -- the things that he was
16  looking for are dispersal orders and the type of activity
17  that was going on in that various area leading up to the
18  event.
19      I'm not asking to introduce it to the jury.  I'm not
20  asking to play it for the jury.  I'm asking if he looked at
21  it.  And if he doesn't remember any of these particular
22  events that have relevance to this trial, I would refresh
23  his recollection with the various pages of the transcript,
24  which he prepared.
25      **THE COURT:**  But if he says he didn't know anything

1    about it, then if you offered it, it would be hearsay.

2        **MR. ROSENBLUM:**  If he didn't know anything about the

3    events or actually that he listened to everything?

4        **THE COURT:**  Well, if he said he -- maybe the witness

5    should --

6        **MS. COSTANTIN:**  Judge, I mean, I can clarify.  What

7    this is is the transcripts of the Tac B channel, the

8    dispatch transcripts from the Tac B channel from 7:00 to

9    midnight.  Okay.  That's what this document is.

10        A transcript was prepared and Agent Boehlje reviewed

11   the transcript and made some corrections to it.

12        My objection is that he's preparing a transcript of

13   dispatch, which is all hearsay.  So the fact that he

14   listened to the tape and prepared a transcript does not mean

15   that the contents of what he's hearing is not hearsay.  He's

16   not present at the time.  This is just -- he's given a tape

17   and then a transcript is prepared.  It contains statements

18   from dozens of unidentified police officers, and what they

19   say is hearsay.

20        **THE COURT:**  Mr. Rosenblum is not going to offer the

21   transcript.

22        **MS. COSTANTIN:**  My understanding is he's going to ask

23   questions about the contents of the transcript for the truth

24   of the matter asserted.  "Wasn't something being thrown at

25   somebody at some time?"  Or, "Wasn't this happening at some

1  time?"

2      And that's not -- he's offering it for the truth of

3  the matter asserted is my point, Your Honor, that these

4  things were happening that night, and what I'm saying is

5  that that is hearsay.

6      **THE COURT:**  Well, whatever happened to the transcript,

7  he was not there and it can't be brought in.  It would be

8  hearsay.  If that's the plan, then that won't happen.

9      **MR. ROSENBLUM:**  Then I would just simply ask him if he

10  listened to it and listened with respect to what activity

11  was going on and listened with respect to dispersal orders,

12  because he was, in fact, actively doing that.

13      Now, whether or not it comes into evidence -- I mean,

14  it's not going to come into evidence, but that's part of the

15  investigation that he did.

16      **THE COURT:**  Okay.  Well, the fact that he listened to

17  it, if he says, "Yes, I did," then what are you going to ask

18  him?

19      **MR. ROSENBLUM:**  That's it at this point, based on the

20  Court's ruling.

21      **THE COURT:**  If he says no?

22      **MS. COSTANTIN:**  Well, he's going to say he listened to

23  it, Judge, but I mean, if you're thinking to ask him, Were

24  there dispersal orders, that's hearsay.

25      **THE COURT:**  Yeah, I got it.  I understand.  Maybe it

```
 1   would be.

 2        All right, go ahead, bring them down.

 3        (The following proceedings were held with the

 4         defendants and the jury present.)

 5        THE COURT:  Are you now calling Mr. Boehlje?

 6        MR. ROSENBLUM:  Yes, Your Honor.

 7        THE COURT:  You're still under oath, sir.

 8        THE WITNESS:  Yes, sir.

 9        MR. ROSENBLUM:  Thank you, Your Honor.

10        DARREN BOEHLJE, DEFENDANT'S WITNESS, SWORN

11                    DIRECT EXAMINATION

12            QUESTIONS BY MR. ROSENBLUM:

13   Q.   Agent, during the course of your investigation, did

14   you have conversations with Mr. Hall with respect to how he

15   responded at that corner when the police approached him?

16   A.   Well, specific -- I'm not sure what you specifically

17   mean.

18   Q.   What he did with his hands.  Do you recall what he

19   told you?

20   A.   He stated that he placed his hands up.

21   Q.   Do you recall specifically that he said that he raised

22   his hands in surrender?

23   A.   You'd have to show me that 302.  I don't recall

24   "surrender."

25   Q.   Do you have your grand jury testimony in front of you?
```

1 I believe that would have been June 27th of 2018.

2 A.    Yes.

3 Q.    And you were testifying to the grand jury under oath,

4 were you not?

5 A.    I did testify under oath that day in front of the

6 grand jury.

7 Q.    And referring your attention to page 5, lines 22

8 through 25.  Can you read that to yourself.

9 A.    I'm sorry.  What lines, sir?

10 Q.    Twenty-two through 25.

11 A.    Yes, I've read that.

12 Q.    Does that refresh your recollection, sir, as to what

13 you said to the grand jury?

14 A.    Yes.

15 Q.    And could you tell the jury what you said to the grand

16 jury with respect to how you described Luther Hall and his

17 hands on that particular evening, September 17th, 2017?

18 A.    The transcript says, "Hall raised his hands in

19 surrender," and Mr. Hall told me that he raised his hands

20 during our interview.

21 Q.    Sir, again, I'm just asking what you said to the grand

22 jury.

23 A.    Yes.  I said, "Hall raised his hands in surrender" to

24 the grand jury, sir.

25 Q.    Did he say -- did you say anything to the grand jury

1  about that that meant he put his hands in front of him?  Did
2  you mention that?
3  A.  In the grand jury testimony?
4  Q.  In the grand jury testimony.
5  A.  I don't recall the entirety of my grand jury
6  testimony, sir.
7  Q.  Now, with respect to the phone that Mr. Hall
8  produced -- correct?
9  A.  Mr. Hall produced both the phone that was broken on
10  the evening of September 17th, 2017, as well as the new
11  phone that he got, and he signed a release for us to
12  download text messages from his new phone --
13  Q.  Did you request --
14  A.  -- on the same day.
15  Q.  When you met with him on November 21st, did you
16  request the phone?
17  A.  He told us -- well, I'd have to go back and look at
18  the 302.  I don't remember whether he told us that time he
19  still had the phone or whether that was in a subsequent
20  interview.
21  Q.  Would your 302 refresh your recollection?
22  A.  Yes, I believe it would.  Do you have a specific
23  location you'd like me to look at, sir?
24  Q.  I think it's towards the back.  Page 6, it's
25  three paragraphs up.

1    *A.*    Are you talking about where it says he was able to
2    retrieve the video and audio from his broken phone, sir?
3    *Q.*    I'm just asking if that refreshes your recollection.
4    That was your first meeting with Mr. Hall, was it not?
5    *A.*    November 21st, 2017 was the first time that I met
6    Mr. Hall -- Detective Hall.
7    *Q.*    You are aware that the phone Mr. Hall was using that
8    evening was still operable, that he was texting?  We've
9    heard that evidence, have we not?
10   *A.*    I believe he did state here in court that he was able
11   to text on that phone after it was broken.
12   *Q.*    And is it also fair to say that he did not actually
13   produce the physical phone until March 28th?
14   *A.*    He -- his attorney produced the video from the phone
15   on December 8th of 2017, and then he subsequently produced
16   the actual phone, which did not have the video on it at all,
17   in March of 2018.
18   *Q.*    And that's when you downloaded text messages?
19   *A.*    Yes.  We downloaded text messages from the -- both the
20   phones.
21   *Q.*    So what you're telling me is he maintained possession
22   of the physical -- the actual phone from November through
23   March 28th?  Would your 302 refresh the exact date?
24   *A.*    Are you talking about the phone that was --
25   *Q.*    Produced.

1    *A.*    -- that was broken at the corner of 14th and Olive?

2    *Q.*    I'm talking about the only -- the phone that he

3    produced that you took a picture of that had the crack in it

4    that Mr. Burzota testified about.  That phone.  Do you

5    understand?

6    *A.*    Sir, he produced two phones on the day that he -- I'm

7    just trying to make sure I understand your question.

8    *Q.*    I'm talking about the phone that he produced to you

9    that had the crack in it that Mr. Burzota gave testimony

10   about.  Are we on the same page?

11   *A.*    The phone that is in evidence now?

12   *Q.*    The phone that is in evidence.

13   *A.*    Yes.

14   *Q.*    There's only one phone in evidence; correct?

15       **MS. COSTANTIN:**  Judge, I'd object.  This is

16   argumentative.  Just ask the question.

17       **THE COURT:**  Proceed.

18   *Q.*    *(By Mr. Rosenblum)* Do you understand which phone we're

19   talking about?

20   *A.*    There's only one phone in evidence from Luther Hall.

21   There's other phones in evidence.

22   *Q.*    Now, did he produce that on March 28th, that actual

23   phone?

24   *A.*    He turned over that phone to us -- I believe that --

25   yes, it was March 28.

1    Q.    So he had possession of that phone from September 17th

2    until the time that he produced it; correct?

3    A.    I would assume so.

4    Q.    Now, did you -- you're aware, as we said, that at

5    54:02, you watched the cell phone video where the audio went

6    out?  You're aware of that; correct, right about that time?

7    A.    You'd have to show me the video to know the exact

8    second that the audio stopped.

9    Q.    Do you recall the audio stopping during the cell phone

10   video?

11   A.    I do recall the audio stopping during the Ustream

12   video, yes.

13   Q.    Okay.  And with respect -- and that was when we went

14   over the times and dates and the exact time in court a

15   number of times.  Would you agree with that?

16   A.    With other witnesses you have.

17   Q.    Okay.  And I placed it on the board.  I don't think

18   it's still here.  But you saw that as well; correct?

19   A.    I've seen the board that was placed in front of the

20   jury, yes.

21   Q.    All right.  Now, again, with the 120 witnesses that

22   you spoke to, not one saw Chris Myers administer any damage

23   to that phone; is that a fair statement?

24   A.    Well, like I said earlier, sir, I wouldn't say there

25   was 120 witnesses.  There was 120 interviews.  Again, some

1    of those were at more -- sometimes we interviewed someone

2    more than once, including Luther Hall.

3    *Q.*    Of the 120 interviews of the officers or laypeople on

4    that corner, not one told you they saw Chris Myers damage

5    the phone; is that not a correct statement?

6    *A.*    I did not talk to an individual who said that they saw

7    Chris Myers strike Detective Hall's phone.

8    *Q.*    Did you not make an effort to locate every individual

9    that you could on that corner?

10   *A.*    There was people that were on that corner that we did

11   not talk to that we could not identify.

12   *Q.*    You had duty rosters, did you not?

13   *A.*    There were duty rosters that were sometimes accurate,

14   sometimes not accurate.  There were civilians on that corner

15   that we would not know who they would be.

16       *MR. ROSENBLUM:*  Your Honor, could we approach for one

17   moment?

18       *THE COURT:*  All right.

19                        *    *    *    *

20       *(Discussion held at sidebar between the Court and*

21        *counsel as follows:)*

22       *MR. ROSENBLUM:*  At this point, I had talked with

23   Carrie about this notice previously.

24       *THE COURT:*  I'm sorry?

25       *MR. ROSENBLUM:*  I've talked to Carrie about this

1  notice previously.  I would like to ask him about one
2  statement of Dustin Boone.  Under the 807 residual hearsay
3  exception, I think it applies.
4      The statement would be that when he interviewed
5  Mr. Boone, Mr. Boone stated that Luther Hall's camera was
6  most likely on a lanyard, and it was setting on the ground
7  above Hall's right shoulder with the light on.  Hall's phone
8  was facedown in the gutter.
9      **MS. COSTANTIN:**  I don't remember you talking about for
10  this trial, but I object that that's hearsay.
11      **MR. ROSENBLUM:**  So under 807, it says, "Under the
12  following conditions, a hearsay statement is not excluded by
13  the rule even if the statement is not admissible under
14  hearsay exceptions 803 or 804.  If the statement is
15  supported by sufficient" --
16      **THE COURT:**  I'm having trouble hearing.
17      **MR. ROSENBLUM:**  "If the statement is supported by
18  sufficient guarantees of trustworthiness after considering
19  the totality of the circumstances under which it was made
20  and the evidence, if any, corroborating the statement.  Two:
21  It is more probative on the point for which it is offered
22  than other evidence that the proponent can obtain from
23  reasonable sources."
24      "The statement is admissible only if proponent gives
25  an adverse party reasonable notice of the intent to offer

1  the statement, including its substance and the declarant's

2  name so that the party has a fair opportunity to meet it.

3  The notice must be provided in writing before the trial or

4  hearing, or in any form during the trial or hearing if the

5  Court, for good cause, excuses a lack of earlier notice."

6      So I had discussed this with Ms. Costantin prior to

7  the last trial.  Our position is, given that Mr. Boone is

8  taking the fifth, I have no other opportunity to get this

9  statement in.

10      The reason why it has a likelihood of trustworthiness

11  is he describes the camera likely on a lanyard.  It was

12  sitting on the ground above Hall's right shoulder with the

13  light on.  We've seen pictures to that effect.  Hall's phone

14  was facedown in the gutter.  Boone believed the phone had a

15  dark X on the case.

16      **MS. COSTANTIN:**  Judge, this is just rank hearsay.  A

17  discussion, brief discussion that he had with me before a

18  previous trial back in March is not notice, first of all,

19  underneath there.  The fact that he describes --

20      **THE COURT:**  What I would be interested in is to

21  respond to the exceptions that Mr. Rosenblum just raised.

22  His point that Mr. Boone is unavailable is accurate.  What

23  about the balance of the --

24      **MS. COSTANTIN:**  First of all, I mean, I can go through

25  this with you.  Mr. Boone's statement in the very beginning

1   of his proffer is that he had a shield that night, so he

2   lied from the very beginning in the proffer.  Throughout

3   this proffer he lies about various aspects, so there's

4   nothing to show that it's -- that there's any sort of

5   indicia of trustworthiness.  I could go through this and go

6   through the different lies that he makes in this.

7         ***THE COURT:***  Go ahead and put it in.

8         ***MS. COSTANTIN:***  Okay.  Let me get my glasses on, work

9   through it.

10        First of all, the only indicia of reliability is the

11   fact that the camera was on a lanyard, okay, which is hardly

12   a specific -- the statement is, Boone stated, "Hall's camera

13   was most likely on a lanyard and it was sitting on the

14   ground above Hall's right shoulder with a light on.  Hall's

15   phone was facedown in the gutter."

16        Okay.  I believe the only thing that you wish to offer

17   is that Hall's phone was facedown in the gutter; correct?

18   That's the only thing you actually really want to offer?

19         ***MR. ROSENBLUM:***  Correct.

20         ***MS. COSTANTIN:***  There's no evidence at all that the

21   phone was facedown in the gutter.  There's no photograph

22   that shows that.  Mr. Rosenblum has gone to great lengths to

23   show us that the phone was in a completely different area.

24         ***MR. ROSENBLUM:***  I take issue with that.  My position

25   is the phone was on the asphalt.  That's why I kept going to

1  the difference of the texture of the sidewalk and the

2  asphalt and how it changed colors.

3      **MS. COSTANTIN:**  He has shown many witnesses repeatedly

4  photographs of the phone on the sidewalk.

5      **THE COURT:**  -- him lying, trustworthiness.  How did

6  Mr. Boone lie?

7      **MS. COSTANTIN:**  He indicates that Steve Korte was --

8  I'm sorry.  Boone indicates that he had a shield on

9  September 17th.  He did not have a shield on September 17th.

10 He actually carried a stick, and we have a photograph of

11 that.

12      He indicates that he heard Leyshock call out on the

13 radio that two people were running from the SWAT BEAR and

14 they were moving westbound on Olive Street.  We've already

15 heard testimony from Sergeant Caruso that, in fact, there

16 was no such description.

17      He said specifically that the -- the description said

18 a person was wearing a backpack and the other person was on

19 a bike.  You've heard from Sergeant Caruso that there was no

20 such description.

21      Okay.  He indicates that he saw the person on the bike

22 cross the intersection and stop on the northwest corner of

23 14th and Olive, when, in fact, we can see from the

24 photographs that the individual is arrested on the northeast

25 corner of Olive.  So that's incorrect.

1    He indicates that he did not run to get to Hall.  We

2    can see that he's running in some of those photographs.

3    He indicates that Hall was in the process of going to

4    the ground.  We've also heard testimony that he actually saw

5    Randy Hays knock him to the ground as opposed to in the

6    process of going to the ground.

7    He said he didn't see how Hall got to the ground even

8    though, just moments before in the proffer, he testified

9    that Hall was already going to the ground.  And we have

10    other individuals who've testified that he saw Hays knock

11    him to the ground.

12    I mean, I could -- if you want, I can go through, but

13    I mean --

14    **THE COURT:**  There's several things.  First of all,

15    there's no gutter there.  The asphalt runs right up to the

16    street.  There is no gutter.  I don't understand how that

17    could be a possibility.

18    And, you know, for the other reasons assigned, I'm not

19    so -- there is an issue of trustworthiness, but that's not

20    the basis for not allowing the testimony.  All of the

21    testimony so far has been that the phone was there on the --

22    in the area where Mr. Hall was taken down.  I just don't --

23    I just don't think it's actually permitted.

24    **MR. ROSENBLUM:**  That's fine.  All right.  Thank you.

25    **(End of discussion at sidebar.)**

1    Q.    (By Mr. Rosenblum) A couple final questions, Agent.

2    A.    Yes, sir.

3    Q.    With respect to some of the things that you did during

4    the course of the investigation, you acquired what's called

5    the Tac B channel, did you not?

6    A.    We acquired the -- all the radio channels from that

7    evening.

8    Q.    I'm going to go through that, but starting with the

9    Tac B channel; correct?

10   A.    I have -- I have listened to the Tac B channel from

11   the St. Louis Police Department.

12   Q.    And basically that was from 7:00 that night to

13   midnight; would that be correct?

14   A.    I believe that's correct.

15   Q.    And you listened to the entire thing; correct?

16   A.    I listened to from 7 to midnight.

17   Q.    And you listened to it to monitor what sort of

18   activity was going on during those particular timeframes;

19   correct?

20   A.    My focus was to try and figure out what time things

21   were happening.  I was trying to -- specifically trying to

22   find anywhere where Mr. Hall would have been identified as

23   potentially having done anything.

24   Q.    My question was:  Did you listen to the entire thing?

25   A.    I did.

1    Q.    Okay.  And then with respect to the Tac B channel, you

2    acquired that and listened to that as well; correct?

3    A.    I'm sorry, you just said --

4    Q.    The Tac A channel.

5    A.    The Tac A channel.  I listened to the Tac A channel as

6    well.

7    Q.    And, again, listening for what activity was going on

8    on that particular street corner; correct?

9    A.    I did the same thing with Tac A that I did with Tac B

10   where I was trying to find anywhere where Mr. Hall had been

11   identified as needing to be arrested.

12        **MR. ROSENBLUM:**  Thank you, sir.

13        I don't have anything further.

14        **THE WITNESS:**  Thank you.

15        **MR. KILGORE:**  I have no further questions, Your Honor.

16        **MS. COSTANTIN:**  Just one question literally, Judge.

17                        **CROSS-EXAMINATION**

18                  **QUESTIONS BY MS. COSTANTIN:**

19   Q.    Is it correct that the Ustream video of -- that

20   Detective Hall took that night was provided to the FBI, to

21   you, on December 8th of 2018?

22   A.    That is correct.

23   Q.    And that's just a couple weeks after your first

24   interview with Detective Hall?

25   A.    It is.

1      **MS. COSTANTIN:**  That's all I've got, Judge.

2      **THE COURT:**  You may step down, sir.

3      **THE WITNESS:**  Thank you.

4      **MR. ROSENBLUM:**  Rest, Your Honor.

5      **THE COURT:**  Myers rests.

6                    **DEFENDANT CHRISTOPHER MYERS RESTS**

7      **MR. KILGORE:**  On behalf of Dustin Boone, Your Honor, I

8      would rest as well.

9      **THE COURT:**  Boone rests.

10                    **DEFENDANT DUSTIN BOONE RESTS**

11     **THE COURT:**  Will there be rebuttal?

12     **MS. COSTANTIN:**  Your Honor, there will not be any

13     rebuttal on behalf of the government.

14     **THE COURT:**  At 11:03 a.m. on this 15th day of June,

15     the -- on this 15th day of June, this evidence is closed.

16         We are going to be taking a recess.  I can't tell you

17     exactly how long it's going to be.  We're going to start

18     with -- I want to start by saying it will be at least an

19     hour from now.  And Ms. Shirley will be advising you if it

20     will be longer.  I can assure you that we have some things

21     to do, and we will do it most expeditiously so your time is

22     used well.

23         So, with that, until the case is given to you to

24     decide, you must not discuss the case among yourselves, with

25     others, or remain in the presence of anyone discussing it.

1    If anyone should try to talk to you about the case, advise
2    me immediately.
3         Do not read, watch, or listen to any radio,
4    television, or news reports of the trial.
5         Keep an open mind until all the evidence has been
6    received and you've heard the views of your fellow jurors.
7         Court's in recess for one hour.  And this should be
8    considered the lunch recess.
9         *(Jury out.)*
10        **THE COURT:**  I understand the last version of the
11   instructions has been circulated that the government has
12   proposed.
13        And I think, first of all, we need to hear motions
14   from all the parties, and then I would expect to have a
15   discussion about amendments or offering of other
16   instructions, and then talk more about exactly when the
17   parties believe we should start argument and so forth.  So
18   let me hear the motions first.
19        **MR. FEIN:**  Other than repeat the argument from
20   yesterday, I'll renew my motion for judgment of acquittal
21   now at the close of all evidence on the same grounds as my
22   argument yesterday.
23        **THE COURT:**  And you will be permitted to file, in
24   writing, your motion as long as it contains generally the
25   same issues that were raised yesterday.

1          **MR. FEIN:**  Thank you.

2          **THE COURT:**  The motion will be denied at this time.

3          Mr. Kilgore.

4          **MR. KILGORE:**  Thank you, Your Honor.

5          On behalf of Dustin Boone, I would make a motion for

6     judgment of acquittal at the close of all the evidence at

7     this time for the same reasons as previously stated, and ask

8     for leave to follow up with a written motion.

9          **THE COURT:**  Yes, leave is granted, and motion is

10    denied.

11         I suspect you have not had an opportunity to review

12    those jury instructions?

13         **MR. ROSENBLUM:**  I think Mr. Fein has, and I -- similar

14    to the first trial.

15         **MR. FEIN:**  Your Honor, we don't have any objections.

16    We've resolved all matters during the first trial, small

17    matters that were remaining.  There was one the government

18    fixed it on its own without my discussion so --

19         **THE COURT:**  All right.

20         **MS. COSTANTIN:**  Sorry, Judge.  I've just never had

21    that happen with Mr. Fein before where he's actually agreed

22    with me.

23         **THE COURT:**  I need to make a statement.  In conducting

24    many trials over many years, it's always an issue of a judge

25    making his own assessment of the professionalism of counsel,

1    and I just want to state on the record, this experience has

2    been a joy for me because of the very professional way

3    attorneys have performed on behalf of respective clients and

4    interests, and how they have behaved as -- toward each other

5    and the respect they've shown to the Court.  Very

6    exceptional, and thank you for that.

7        **MR. ROSENBLUM:**  Thank you, Your Honor.

8        **MR. KILGORE:**  Thank you, Judge.

9        **THE COURT:**  Now, one other -- is it reasonable to

10   assume that about, let's say 12:30, we can come back, and

11   I'll read the instructions and begin argument?

12       **MR. ROSENBLUM:**  That's fine.

13       **MR. KILGORE:**  Yes, sir.

14       **THE COURT:**  Okay.

15       **MS. COSTANTIN:**  Judge, I believe so.  Mr. Livergood

16   says I have to look at the instructions one last time, so I

17   will look at that.

18       **THE COURT:**  Okay.  I'm going to be here for a while

19   doing the same thing, so if anything comes up, we'll gather

20   and take it up.

21       **MS. COSTANTIN:**  And, Judge, I'm sorry, this may have

22   already been discussed.  Are we to prepare the -- I guess

23   you already have the ones that are unmarked.

24       **THE COURT:**  Yes.  The jury will have the ones, the --

25   what I call the clean copy.  Nothing at the bottom.  I think

1  I will -- rather than have these redrafted, ordinarily I

2  would not have the 301 introduction, but it's harmless and

3  so I'm planning on leaving that in.

4      And my set has no -- and then there's a -- what I call

5  the dirty copy has that material at the bottom, and those --

6  that will be the copy that I will sign, and that will be the

7  official copy that goes into the record.

8      **MS. COSTANTIN:**  Okay.

9      **THE COURT:**  I did have one question about the special

10  findings as to Count 1.  I haven't seen that form.  Can you

11  explain why those special findings are there.  And the

12  implications, if the jury marks guilty but they fail to make

13  the findings, what, if anything, will that show in terms of

14  an inconsistent finding by the jury?

15      **MS. COSTANTIN:**  Judge, if they find him guilty but do

16  not select either bodily injury or conduct including the

17  use, it would be a misdemeanor.

18      **THE COURT:**  If they do not?

19      **MS. COSTANTIN:**  If they do not select one or the

20  other, it would be a misdemeanor.  That's the difference.

21      **THE COURT:**  Okay.  So they -- okay.  But they will not

22  be told prior anything that --

23      **MS. COSTANTIN:**  No.

24      **THE COURT:**  Then I'll read them just -- I will read

25  the instructions -- I won't read the verdict.  I don't read

```
 1   the verdict form, but I won't say anything about those
 2   findings.
 3        MS. COSTANTIN:  Okay.  Thanks, Judge.
 4        Judge, the only thing I would say is, as we review
 5   this, I believe that pages 26 and -- I'm sorry, 26 and 27
 6   should be removed.  There's a portion called -- there's an
 7   instruction on identification that was left over from the
 8   last trial, so that doesn't need to --
 9        THE COURT:  Okay.  And --
10        MS. COSTANTIN:  Eyewitness identification.
11        THE COURT:  Let's see.  My pages aren't numbered.
12        MS. COSTANTIN:  It's after -- it's towards the back,
13   after all the 404(b) instructions, just before
14   circumstantial.
15        THE COURT:  Before circumstantial?
16        MS. COSTANTIN:  Yeah, just before circumstantial,
17   those two pages, Judge.
18        THE COURT:  Okay.  That's -- it starts off, "The value
19   of identification."
20        MS. COSTANTIN:  Right.  And I believe we agree that
21   that can just be pulled.
22        MR. FEIN:  Yes.
23        MS. COSTANTIN:  Right.  We can just pull that one out.
24        THE COURT:  Agreed, Mr. Fein?  Mr. Kilgore?
25        MR. KILGORE:  Yes, Your Honor.
```

1    **MR. FEIN:**  Yes.

2    **THE COURT:**  Okay.  That one's pulled from the package.

3    **(Court recessed from 11:15 a.m. to 12:45 p.m.)**

4    **THE COURT:**  I read the instructions first, and I

5    will -- after I read them, I will instruct Ms. Shirley to

6    place them right here in the very center so that anytime you

7    want to put an instruction on the ELMO, you feel free to do

8    so.  But use only these instructions without any notes.

9    **MS. COSTANTIN:**  Judge, we have taken those

10   instructions and put them into trial director for Mr. Toth

11   to run -- they are the same exact.

12   **THE COURT:**  Same thing.  That's fine.  Sure.

13   **MS. COSTANTIN:**  Is that fine?

14   **THE COURT:**  Yeah.  Okay.  Bring the jury in.

15   **MR. LIVERGOOD:**  Your Honor, just regarding the jury

16   instructions, I know we talked about this off the record,

17   but I know the parties have submitted their instructions and

18   there were no objections from the government on the

19   instructions.

20   **THE COURT:**  Yes, that is correct.

21   **MR. LIVERGOOD:**  I don't believe either the defense had

22   objections either.

23   **THE COURT:**  No.  Yeah, I understand that there are no

24   objections to these instructions.  And, furthermore, since

25   we first discussed these earlier today, I have not received

1  any additional instructions or suggestions for changes from

2  anyone.

3      *MR. LIVERGOOD:*  Thank you, Your Honor.

4      *THE COURT:*  One additional time I'd like to express my

5  appreciation to those of you in the gallery who have been

6  absolutely silent.  As far as we -- as far as I can tell,

7  I've had no complaints.  Sometimes even the slightest sound

8  from out there when attorneys are trying to concentrate

9  becomes very destructive to the case.  I haven't heard a

10 single comment or peep up here, so I really appreciate that.

11 That doesn't always happen.

12     *MS. COSTANTIN:*  Judge, I just want you to know, at

13 some point, I'm going put the boards up but it will be

14 relatively brief.  They'll be up, they'll be down.

15     *THE COURT:*  The two jurors that block out --

16     *MS. COSTANTIN:*  We'll put them up briefly and talk

17 about them.

18     *(Jury in.)*

19     *(The following proceedings were held with the*

20      *defendants and the jury present:)*

21     *THE COURT:*  Thank you for your patience, ladies and

22 gentlemen, and at this time, I will read the Court's jury

23 instructions to you.

24     From time to time, we've had a little -- I've had some

25 problems with these microphones.  Can you hear me okay?

1          *(Jurors shook their heads.)*

2          **THE COURT:**  You cannot?  I'll switch to this one.

3          These instructions will be read and then we'll hear

4     closing arguments from counsel.

5          These instructions will be available to you in the

6     jury room, and they're -- stack's a little thick, so just

7     relax and I'll read them to you.

8                   **COURT'S INSTRUCTIONS TO THE JURY**

9          **THE COURT:**  Members of the jury -- this is Number 1:

10    Members of the jury, the instructions I gave you at the

11    beginning of the trial and during the trial remain in

12    effect.  I now give you some additional instructions.  You

13    must, of course, continue to follow the instructions I gave

14    you earlier, as well as those I give you now.

15         You must not single out some instructions and ignore

16    others because all are important.  This is true even though

17    some of those I gave you at the beginning of the trial and

18    during the trial aren't repeated here.  The instructions I'm

19    about to give you now are in writing and will be available

20    to you in the jury room.

21         I emphasize, however, that this does not mean they are

22    more important than any of my earlier instructions.  Again,

23    all instructions, whenever given and whether in writing or

24    not, must be followed.

25         Number 2:  It is your duty to find from the evidence

1  what the facts are.  You will then apply the law as I give

2  it to you to those facts.  You must follow the instructions

3  on the law even if you thought the law was different or

4  should be different.  Do not allow sympathy or prejudice to

5  influence you.  The law demands of you a just verdict

6  unaffected by anything except the evidence, your common

7  sense, and the law as I give it to you.

8       Number 3:  I mentioned the word "evidence."  The

9  evidence in this case consists of the testimony of witnesses

10  and the documents and other things received as exhibits and

11  the facts that have been stipulated that is formally agreed

12  to by the parties.  You may use reason and common sense to

13  draw deductions or conclusions from facts which have been

14  established by the evidence in the case.

15       Certain things aren't evidence.  I will list those

16  things again for you now.

17       One:  Statements, arguments, questions, and comments

18  by lawyers representing the parties in the case are not

19  evidence.

20       Two:  Objections are not evidence.  Lawyers have a

21  right to object when they believe something is improper.

22  You should not be influenced by the objection.  If I sustain

23  an objection to a question, you must ignore the question and

24  must not try to guess what the answer might have been.

25  Testimony that I struck from the record or told you to

1   disregard is not evidence and must not be considered.

2   Anything you saw or heard about this case outside the

3   courtroom is not evidence.

4        Finally, if you were instructed that some evidence was

5   received for a limited purpose only, you must follow that

6   instruction.

7        Number 4:  In deciding what the facts are, you may

8   have to decide what testimony you believe and what testimony

9   you do not believe.  You may believe all of what a witness

10  said or only part of it or none of it.

11       In deciding what testimony to believe, consider the

12  witness's intelligence; the opportunity the witness had to

13  have seen or heard the things testified about; the witness's

14  memory; any motives that witness may have for testifying a

15  certain way; the manner of the witness while testifying;

16  whether that witness said something different at an earlier

17  time; the general reasonableness of the testimony; and the

18  extent to which the testimony is consistent with any

19  evidence that you believe.

20       In deciding whether or not to believe a witness, keep

21  in mind that people sometimes hear or see things differently

22  and sometimes forget things.  You need to consider,

23  therefore, whether a contradiction is an innocent

24  misrecollection or lapse of memory or an intentional

25  falsehood, and that may depend on whether it has to do with

1    an important fact or only a small detail.

2        Number 5:  The indictment in this case charges the

3    defendants with two different crimes.  Count 1 charges that

4    Defendant Dustin Boone, while aiding and abetting others,

5    committed the crime of Deprivation of Civil Rights Under

6    Color of Law.

7        Count 2 the charges that Defendant Christopher Myers

8    committed the crime of Destruction of Evidence in a Federal

9    Investigation.

10        Each defendant has pleaded not guilty to each of

11    these -- each of those charges.

12        The indictment is simply the document that formally

13    charges the defendants with the crimes for which they are on

14    trial.  The indictment is not evidence.  At the beginning of

15    the trial, I instructed you that you must presume the

16    defendants to be innocent.  Thus, the defendants began the

17    trial with a clean slate with no evidence against them.

18        The presumption of innocence alone is sufficient to

19    find each defendant not guilty of each count.  This

20    presumption can be overcome as to each charge only if the

21    government proved, during the trial beyond a reasonable

22    doubt, each element of that charge.

23        Keep in mind that you must give separate consideration

24    to the evidence about each individual defendant.  Each

25    defendant is entitled to be treated separately, and you must

return a separate verdict for each defendant.  Also keep in mind that you must consider separately each crime charged against each individual defendant, and you must return a separate verdict for each of those crimes charged.

There is no burden upon a defendant to prove that he is innocent.  Instead, the burden of proof remains on the government throughout the trial.  The fact that a defendant did not testify must not be considered by you in any way, or even discussed, in arriving at your verdicts.

Number 6:  The charges in the indictment in this case read, in pertinent part, as follows:

**Count 1, 18 United States Code, Section 242:**

On or about September 17th, 2017, within the Eastern District of Missouri, defendant, Dustin Boone, while aiding and abetting others, while acting under color of law, wilfully deprived L.H. of the right to be free from unreasonable seizure, a right secured and protected by the Constitution and laws of the United States, which includes the right to be free from unreasonable force.  In so doing, the defendant and others threw L.H. to the ground and struck L.H. while he was compliant and not posing a physical threat to anyone.  This offense resulted in bodily injury to L.H. and included the use of a dangerous weapon, that is, a riot baton.

In violation of Title 18, United States Code,

1 | Sections 242 and 2.

2 |       Count 2**2, 18 United States Code, Section 1519:**

3 |       On or about September 17th, 2017, within the Eastern

4 | District of Missouri, defendant, Christopher Myers, did

5 | knowingly alter, destroy, and mutilate L.H.'s cellular

6 | phone, a tangible object used to record and preserve

7 | information, with the intent to impede, obstruct, and

8 | influence the investigation into the arrest and assault of

9 | L.H., such investigation being a matter within the

10 | jurisdiction of the Federal Bureau of Investigation, an

11 | agency of the United States, in violation of Title 18,

12 | United States Code.

13 |       In violation of Title 18, United States Code,

14 | Section 1519.

15 |       Number 7:  Count 1 of the present indictment is based

16 | upon two statutes.  One statute is federal law Title 18,

17 | United States Code, Section 242, which reads, in pertinent

18 | part, as follows:

19 |              "Whoever, under color of any law, statute,

20 |              ordinance, regulation, or custom, wilfully

21 |              subjects any person to the deprivation of any

22 |              rights, privileges, or immunities secured or

23 |              protected by the Constitution or laws of the

24 |              United States, and if bodily injury results

25 |              from the acts committed, or if such acts

1          include the use, attempted use, or threatened

2          use of a dangerous weapon, shall be guilty of

3          an offense."

4     The second statute is federal law, Title 18, United

5 States Code, Section 2, which reads, in pertinent part, as

6 follows:

7          "Whoever commits an offense against the

8          United States or aids, abets, counsels,

9          commands, induces, or procures its commission

10         is punishable as a principal."

11    Number 8:  Count 22 of the present indictment is based

12 upon a statute, which is federal law, Title 18, United

13 States Code, Section 1519, which reads, in pertinent part,

14 as follows:

15         "Whoever knowingly alters, destroys,

16         mutilates, any tangible object with the intent

17         to impede, obstruct, or influence the

18         investigation or proper administration of any

19         matter within the jurisdiction of any

20         department or agency of the United States

21         shall be guilty of an offense."

22    Number 9:  The crime of deprivation of civil rights,

23 as charged in Count 1 of the indictment against Defendant

24 Dustin Boone, has four elements, which are:

25         One:  On or about September 17th, 2017, in

1             the Eastern District of Missouri, a law

2             enforcement officer deprived Luther Hall of a

3             right, privilege, or immunity secured by the

4             Constitution or laws of the United States;

5             that is, the right to be free from

6             unreasonable seizure by a law enforcement

7             officer by means of unreasonable force by a

8             law enforcement officer committing one or more

9             of the following acts:  Throwing Luther Hall

10            to the ground or striking Luther Hall;

11            Two:  That a law enforcement officer acted

12            wilfully, that is, a law enforcement officer

13            committed such act or acts with a bad purpose

14            or improper motive to disobey or disregard the

15            law, specifically intending to deprive

16            Luther Hall of that right;

17            Three:  A law enforcement officer acted

18            under color of law; and

19            Four:  Bodily injury resulting from a law

20            enforcement officer's conduct, or a law

21            enforcement officer's conduct included the use

22            of a dangerous weapon, that being a riot

23            baton.

24      A person may be found guilty of deprivation of civil

25 rights even if he personally did not do every act

constituting the offense charged, if he aided and abetted
the commission of the deprivation of Luther Hall's rights to
be free from unreasonable seizure by a law enforcement
officer by means of unreasonable force by throwing
Luther Hall to the ground or striking Luther Hall.

In order to have aided and abetted in the commission
of a crime, a person must, before or at the time the crime
is committed:

(1) have known that the deprivation of
Luther Hall's civil rights was being committed
or going to be committed, and

(2) have had enough advance knowledge of
the extent and character of the crime that he
was able to make the relevant choice to walk
away from the crime before all elements of
deprivation of civil rights were complete, and

(3) have knowingly used -- have knowingly
acted in some way for the purpose of causing,
encouraging, or aiding the commission of the
deprivation of Luther Hall's civil rights, and

(4) have acted wilfully, that is, with a
bad purpose or improper motive to disobey or
disregard the law, specifically intended to
deprive Luther Hall of his civil rights.

For you to find defendant, Dustin Boone, guilty of

deprivation of civil rights by reason of aiding and abetting
as charged in Count 1, the government must prove, beyond a
reasonable doubt, all of the elements of the deprivation of
Luther Hall's right to be free from unreasonable seizure by
a law enforcement officer by means of unreasonable force by
throwing Luther Hall to the ground or striking Luther Hall,
or committed by some persons, and that defendant,
Dustin Boone, acted and abetted that crime; otherwise, you
must find the defendant, Dustin Boone, not guilty of this
crime under Count 1.

You may infer defendant, Dustin Boone, had the
requisite advance knowledge of deprivation of civil rights
if you find defendant, Dustin Boone, failed to object or
withdraw from activity participating in the commission of
the deprivation of civil rights after defendant,
Dustin Boone, observed another participant complete acts
that included throwing Luther Hall to the ground or striking
Luther Hall.

You should understand that merely being present at the
scene of an event or merely acting in the same way as others
ordinarily associating with others does not prove that a
person has become an aider and abettor.  A person who has no
knowledge that a crime is being committed or about to be
committed, but who happens to act in a way which advances
some offense, does not thereby become an aider and abettor.

1    The indictment charges that defendant, Dustin Boone,

2    deprived Luther Hall of the following right, privilege, or

3    immunity:  The right to be free from unreasonable seizure by

4    a law enforcement officer by means of unreasonable force.

5    You are instructed that this right is one secured by the

6    Constitution and laws of the United States.

7        In determining whether the force, if any, was

8    "unreasonable," you must consider:  The need for the

9    application of force, the relationship between the need and

10   the amount of force that was used; the extent of the injury

11   inflicted; and whether a reasonable officer on the scene,

12   without the benefit of hindsight, would have used that much

13   force under similar circumstances.

14       You should keep in mind that the decision about how

15   much force to use often must be made in circumstances that

16   are tense, uncertain, and rapidly changing.  You must

17   determine whether the officer's actions were reasonable in

18   the light of the facts and circumstances confronting the

19   officer without regard to the officer's own state of mind,

20   intention, or motivation.

21       To find that defendant, Dustin Boone, acted wilfully

22   is to -- is that -- let me start over.

23       To find that defendant, Dustin Boone, acted wilfully,

24   it is not necessary for you to find that defendant,

25   Dustin Boone, knew the specific constitutional provision or

federal law that his conduct violated.  You may find that

defendant, Dustin Boone, acted wilfully even if you find

that he had no real familiarity with the Constitution or

with the particular Constitutional right involved.  However,

you must find that defendant, Dustin Boone, had a specific

intent to deprive the person of a right protected by the

Constitution or federal law.

Acting "under color of law" means an act under any

state law, country -- strike that -- state law, county, or

city ordinance, or other governmental regulation, or to act

according to a custom of some governmental agency.  It means

that the defendant, Dustin Boone, acted in his official

capacity or else claimed to do so, but abused or misused his

power by going beyond the bounds of lawful authority.

"Bodily injury" means (A) a cut, abrasion, bruise,

burn, or disfigurement; (B) physical pain; (C) illness; (D)

impairment of a function of a bodily member, organ, or

mental faculty; or (E) any other injury to the body, no

matter how temporary.

A "dangerous weapon" means any object capable of being

readily used by one person to inflict bodily injury upon

another person.

Number 10:  The crime of destruction of evidence is a

federal -- in a federal investigation, as charged in

Count 22 of the indictment against defendant,

1    Christopher Myers, has three elements which are:

2              One:  On or about September 17th, 2017, in

3              the Eastern District of Missouri, the

4              defendant knowingly altered, destroyed, or

5              mutilated a tangible object used to record and

6              preserve information, that being a cellular

7              phone;

8              Two:  The defendant did so in contemplation

9              of an investigation into the arrest and

10             assault of Luther Hall and with the intent to

11             impede, obstruct, or influence that

12             investigation; and

13             Three:  The investigation was within the

14             jurisdiction of the Federal Bureau of

15             Investigation, which is an agency of the

16             United States.

17        There is no requirement that the matter had been

18   pending at the time of the obstruction, only that the acts

19   were taken in contemplation of any such matter or case.

20        In order to meet its burden, the government does not

21   have to prove that the defendant specifically knew that the

22   matter was within the jurisdiction of a department or agency

23   of the United States.

24        If all of these elements have been proved beyond a

25   reasonable doubt as to defendant, Christopher Myers, then

1    you must find defendant, Christopher Myers, guilty of the

2    crime charged in Count 22; otherwise, you must find

3    defendant, Christopher Myers, not guilty of the crime

4    charged in Count 22.

5         Number 11:  Reasonable doubt is doubt based upon

6    reason and common sense and not doubt based on speculation.

7    A reasonable doubt may arise from careful and impartial

8    consideration of all the evidence or from a lack of

9    evidence.

10        Proof beyond a reasonable doubt is proof of such a

11   convincing character that a reasonable person, after careful

12   consideration, would not hesitate to rely and act upon that

13   proof in life's most important decisions.

14        Proof beyond a reasonable doubt is proof that leaves

15   you firmly convinced of the defendant's guilt.  Proof beyond

16   a reasonable doubt does not mean proof beyond all possible

17   doubt.

18        Number 12:  You have heard testimony from persons

19   described as experts.  Persons who, by knowledge, skill,

20   training, education, or experience, have become expert in a

21   field may state their opinions on matters in that field and

22   may also state the reasons for their opinions.

23        Expert testimony should be considered just like any

24   other testimony.  You may accept or reject it, and give it

25   as much weight as you think it deserves, considering the

1  witness's education and experience, the soundness of the

2  reasons given for the opinion, the acceptability of the

3  methods used, and all other evidence in the case.

4      Number 13:  You should consider the evidence you heard

5  about text messages of Dustin Boone only against defendant,

6  Dustin Boone.  You must not consider that evidence when you

7  are deciding if the government has proved, beyond a

8  reasonable doubt, its case against defendant,

9  Christopher Myers.

10     Number 14:  You heard evidence that defendant,

11  Dustin Boone, sent text messages as indicated in

12  Exhibits 274, 275, 471, 472, 473, and 490.  You may consider

13  this evidence only if you unanimously find it is more likely

14  true than not true that the defendant committed the act.

15  This is a lower standard than proof beyond a reasonable

16  doubt.  You decide that by considering all of the evidence

17  related -- relating to the alleged act, then deciding what

18  evidence is more believable.

19     If you find this evidence has not been proved, you

20  must disregard it.  If you find this evidence has been

21  proved, then you may consider it only for the limited

22  purpose of deciding whether defendant, Dustin Boone, had the

23  state of mind or intent necessary to commit the crime

24  charged in the indictment, or committed the acts he is on

25  trial for by accident or mistake.  You should give it the

1    weight and value you believe it is entitled to receive.

2         Remember, even if you find that defendant may have

3    committed similar acts at another time, this does not --

4    this is not evidence that he committed such an act in this

5    case.  You may not convict a person simply because you

6    believe he may have committed similar acts at another time.

7    The defendant is on trial only for the crime charged, and

8    you may consider the evidence of prior acts only on issues

9    stated above.

10        Number 15:  You should consider the evidence you have

11   heard about the text messages of Christopher Myers only

12   against defendant, Christopher Myers.  You must not consider

13   that evidence when you are deciding if the government has

14   proved, beyond a reasonable doubt, its case against

15   defendant, Dustin Boone.

16        Number 16:  You heard evidence that defendant,

17   Christopher Myers, was recorded in a YouTube video and sent

18   text messages as indicated in Exhibits 276, 8 -- strike

19   that -- 276, 482A, 483, and 484A.  You may consider this

20   evidence only if you unanimously find it is more likely true

21   than not true that defendant committed the act.  This is a

22   lower standard than proof beyond a reasonable doubt.  You

23   decide that by considering all of the evidence relating to

24   the alleged act, then deciding what evidence is more

25   believable.

1            If you find that this evidence has not been proved,

         2    you must disregard it.  If you find this evidence has been

         3    proved, then you may consider it only for the limited

         4    purpose of deciding whether defendant, Christopher Myers,

         5    had the state of mind or intent necessary to commit the

         6    crime charged in the indictment or committed the acts he is

         7    on trial for by accident or mistake.  You should give it the

         8    weight and value you believe it is entitled to receive.

         9            Remember, even if you find that the defendant may have

        10    committed a similar act at another time, this is not

        11    evidence that he committed such an act in this case.  You

        12    may not convict a person simply because you believe he may

        13    have committed similar acts at another time.  The defendant

        14    is on trial only for the crime charged, and you may consider

        15    the evidence of prior acts only on the issues stated above.

        16            Number 17:  Some of you may have heard the terms

        17    "direct evidence" and "circumstantial evidence."  You are

        18    instructed that this -- that you should not be concerned

        19    with those terms.  The law makes no distinction between

        20    direct and circumstantial evidence.  You should give all

        21    evidence the weight and value you believe it is entitled to

        22    receive.

        23            Number 18:  Intent or knowledge may be proved like

        24    anything else.  You may consider any statements made and

        25    acts done by the defendant and all the facts and

1    circumstances in evidence which aid in a determination of

2    defendant's knowledge or intent.  You may not -- you may,

3    but aren't required to, infer that a person intends the

4    natural and probable consequences of acts knowingly done or

5    knowingly omitted.

6        Number 19:  In conducting your deliberations and

7    returning your verdict, there are certain rules you must

8    follow.  I will list those rules for you now.

9        First, when you go to the jury room, you must select

10   one of your members as your foreperson.  That person will

11   preside over your discussions and speak for you here in

12   court.

13       Secondly, it is your duty as jurors to discuss this

14   case with one another in the jury room.  You should try to

15   reach agreement if you can do so without violence to

16   individual judgment, because a verdict -- whether guilty or

17   not guilty -- must be unanimous.  Each of you must make your

18   own conscientious decision but only after you have

19   considered all of the evidence, discussed it fully with your

20   fellow jurors, and listened to the views of your fellow

21   jurors.

22       Do not be afraid to change your opinions if the

23   discussion persuades you that you should.  But do not come

24   to a decision simply because other jurors think it is right

25   or simply to reach a verdict.

1    Throughout your deliberations, you may discuss with

2    each other the evidence and the law that has been presented

3    in this case, but you must not communicate with anyone else

4    by any means about the case.  You also cannot learn from

5    outside sources about the case, the matters of this case,

6    the legal issues of the case, or individuals or other

7    entities involved in the case.  This means that you may not

8    use any electronic device or media, the internet, or any

9    text or instant messaging service or any social media apps

10   to research or communicate about what you have seen and

11   heard in this courtroom.

12       During your deliberations you must not use your

13   telephones or any other devices or any -- for any purpose,

14   and you must keep them powered off during this time.  If you

15   need to contact someone for scheduling or other reasons,

16   just tell the Court Security Officer who is posted outside

17   the room, and you can be escorted to an area where you can

18   use a phone.  While any juror is outside the jury room, even

19   if just in the restroom, the remaining jurors must not

20   discuss the case at all.  All twelve of you must be present

21   before any of you can discuss the case.

22       These restrictions continue during deliberations

23   because it is essential, under our Constitution, that you

24   decide this case based solely on the evidence and law

25   presented in this courtroom.  You are permitted to discuss

1   the case with your fellow jurors during deliberations

2   because they have been -- they have seen and heard the same

3   evidence and instructions on the law that you have heard,

4   and it is important that you decide this case only -- solely

5   on the evidence presented during the trial, without undue

6   influence by anyone or anything outside of the courtroom.

7   For this reason, I expect you to inform me at the earliest

8   opportunity should you learn about any -- hear or share any

9   information about this case outside the courtroom or the

10  jury room, or learn that another juror has done so.

11      Third, if you -- third, if the defendant is found

12  guilty, the sentence to be imposed is my responsibility.

13  You may not consider punishment in any way in deciding

14  whether the government has proved its case beyond a

15  reasonable doubt.

16      Fourth, if you need to communicate with me during your

17  deliberations, you may send a note to me through the Court

18  Security Officer, signed by one or more jurors.  I will

19  respond as soon as possible either in writing or orally in

20  open court.  Remember that you should not tell anyone,

21  including me, how your votes stand numerically.

22      Fifth, your verdict must be based solely on the

23  evidence and on the law which I have given to you in my

24  instructions.  The verdict, whether guilty or not guilty,

25  must be unanimous.  Nothing I have said or done is intended

1    to suggest what your verdict should be.  That is entirely

2    for you to decide.

3        Finally, the verdict form is simply the written notice

4    of the decision that you have reached in this case.  I will

5    read those forms in just a moment.  You will take the forms

6    to the jury room, and when each of you has agreed on the

7    verdicts, your foreperson will fill in the form, sign and

8    date it, and advise the Court Security Officer that you are

9    ready to return to the courtroom.

10       There are two separate verdict forms.  The first one

11   says:  "Count 1", and then in parentheses, "(Defendant

12   Dustin Boone).  We, the jury, find defendant, Dustin Boone,"

13   and then there's a blank, and under it says, "(guilty or not

14   guilty) of aiding and abetting in the commission of the

15   crime of deprivation of civil rights, as charged in Count 1

16   of the indictment."

17       And then it says:  "Special findings as to Count 1.

18   If you find defendant, Dustin Boone, guilty of Count 1, you

19   must answer the following:  Which of the following elements

20   do you find were committed?"

21       Check each element upon which the jury unanimously

22   agrees beyond a reasonable doubt, and there's a blank,

23   "Bodily injury resulted," and then there's a blank, "The

24   conduct included the use of a dangerous weapon, to wit, a

25   riot baton."

```
 1        And then the second form says:  Count 22.  "We, the

 2   jury, find defendant Christopher Myers" -- there's a line

 3   under it, it says, "guilty or not guilty, of the crime of

 4   destruction of evidence in a federal investigation, as

 5   charged in Count 22 of the indictment."

 6        And then it says, "FOREPERSON," and then, "Dated this

 7   (blank) day of June, 2021."

 8        I need to make a change on the bottom of Count 1

 9   because I failed to list foreperson and the date at the

10   bottom, and I will do that before these forms go back to the

11   jury.

12        These forms, these entire instructions -- for

13   counsels' benefit, I know that some of them are --

14   mechanical device, and they'll be brought up in that

15   fashion, but if anyone wants to use these on the ELMO or the

16   presentation cart, they'll be right down here in front.

17        All right.  Whenever you're ready, Ms. Costantin.

18        MS. COSTANTIN:  Thank you, Your Honor.

19        Ms. Shirley, can we --

20        THE COURT:  Kelley.

21             GOVERNMENT'S CLOSING ARGUMENT

22        MS. COSTANTIN:  While she's doing that, let me thank

23   you for your attention during this case.  I know that

24   wearing those masks is annoying, and we appreciate your

25   patience.
```

1    Before I talk about the evidence in the case, I want

2  to talk about what is not evidence.  The judge told you that

3  opening statements aren't evidence, so anything you heard in

4  opening statements are meaningless unless you actually heard

5  evidence, witness testimony, or physical evidence to support

6  it.

7    The judge also told you that statements, arguments,

8  questions, and comments by lawyers aren't evidence.  So when

9  a lawyer asks a witness if he is aware of something and the

10 witness says he is not, there is no evidence that that

11 statement exists.

12    For example, if I asked Mr. Livergood if he was aware

13 that the Cardinals lost last night, and he told me that he

14 was not, that doesn't mean the Cardinals lost last night

15 because, in fact, they won, okay?  So the "aware" question

16 does not provide any evidence at all.

17    Now let me talk to you about the evidence and the law

18 in this case.  And this is what I must prove in order to

19 show Defendant Boone guilty of deprivation of civil rights

20 and Defendant Myers guilty of destruction of evidence.  And

21 you've got them on the screen in front of you.  I'm going to

22 take them one at a time.

23    The first one is the deprivation of civil rights.  It

24 has four elements, and that's Instruction Number 9.  The

25 first element is that, "On or about September 17th, 2017, in

the Eastern District of Missouri, a law enforcement officer
deprived Luther Hall of a right, privilege, or immunity
secured by the Constitution or laws of the United States;
that is, the right to be free from unreasonable seizure by a
law enforcement officer by means of unreasonable force, by a
law enforcement officer committing one or more of the
following acts:  Throwing Luther Hall to the ground or
striking him."

Now, Luther Hall -- let's stay on one.  Go back and
stay on one.  Thank you.

Luther Hall was clearly subjected to unreasonable
force.  He committed no crime, he matched no description of
a person wanted for a crime, and he did not in any way
resist arrest.  He was knocked to the ground twice.  He was
hit repeatedly with the baton and struck all over his body.
That's what Detective Hall told you.  You heard his
testimony and you saw the video of the police officer with
the baton striking Detective Hall.

Let's go to the second element.

Two, I must show, "that a law enforcement officer
acted wilfully; that is, a law enforcement officer committed
such an act or acts with a bad purpose or improper motive to
disobey or disregard the law, specifically intending to
deprive Luther Hall of that right."

So what I have to show is that they acted with a bad

purpose.  And Officer Hays' actions, who's the person with
the baton, you heard that, were clearly not in compliance
with the use of force policy for the St. Louis City Police
Department to use the least amount of force necessary to
safely bring a situation under control.  No police officer
with even minimal training could think that this beating was
lawful.

The third thing I must show under color of law, is
that the person acted "under color of law."  Keep in mind,
this is a law enforcement officer, okay?  I do not have to
prove that Dustin Boone did these four acts.  We're going to
talk about a law enforcement officer did these four elements
and then we're going to talk about Dustin Boone with the
aiding and abetting.  Okay?

So what I'm talking about right now is a law
enforcement officer -- and we know at least one of those law
enforcement officers was Officer Hays, the man with the
baton.  I have to show that he acted under color of law.
And you'll see the definition of acting "under color of
law."  You heard it from the Court, which is basically
acting in their official capacity as a police officer; that
he was, in fact, a police officer.

Four, that "bodily injury resulted from the
officer" -- "a law enforcement officer's conduct; or a law
enforcement officer's conduct included the use of a

1  dangerous weapon, that being a riot baton."  And you've

2  heard both those to be true.

3        Clearly, bodily injury resulted to Luther Hall.  You

4  saw that through-and-through injury to his lip on the right

5  side of his face.  You heard of the neck injuries that were

6  sustained and the fact that he had to have the disc

7  herniation fused in his neck.  You also saw injuries to his

8  elbow and to his ear.

9        The riot baton was clearly used.  The riot baton is

10 the dangerous instrument -- I'm sorry, dangerous weapon, and

11 you saw it being used in that video.  You saw it being used

12 to strike Detective Hall.

13        So you also heard that Officer Hays -- in evidence,

14 you heard that Officer Hays had pled guilty to striking

15 Detective Hall with that baton, so we know that this crime

16 was committed.  Okay?  We know that these four elements were

17 met.  We know that that's what Officer Hall's --

18 Officer Hays did to Detective Hall.

19        Now, Defendant Boone is charged with aiding and

20 abetting this assault, and that's an important concept that

21 we're going to talk about right now.  I talked about that

22 before in voir dire.

23        Each person does not have to be personally committing

24 every act in order to be guilty of the crime if he aided and

25 abetted that crime.  For example, if I hold someone down

1   while somebody else assaults them, I am guilty of that

2   assault if I knew the assault was taking place, if I could

3   have walked away from it, and if I acted in some way to aid

4   the assault, for example, holding the person down.  That's

5   exactly what happened here with Defendant Boone.

6          Let's look at the elements of aiding and abetting.

7          Slide down.

8          In order to have aided and abetted the commission of a

9   crime, a person must, before or after the crime was

10  committed, have known that the deprivation of Luther Hall's

11  civil rights were being committed or were going to be

12  committed.

13         Now, Dustin Boone could see that Luther Hall was being

14  beaten.  That beating lasted a minute.  We have all sorts of

15  theories, seconds and stuff, but who knows how long that

16  happened?  The man who was lying on the ground being beaten

17  with a baton and being struck all over his body, he said it

18  lasted a minute, maybe two.  It seemed like it lasts

19  forever.

20         The evidence shows that Dustin Boone could see that he

21  was -- that Luther Hall was being beaten.  I'm going to walk

22  through the photographs with you.  It lasted a minute and

23  he, therefore, had the second element:  He had enough

24  advance knowledge of the event and character of the crime

25  that he was able to make the relevant choice to walk away

1   from the crime before all elements were complete.  And he

2   could have turned and walked away.  He could have not

3   participated in the actions.  He didn't need more than a

4   moment to see what was happening, that officers were beating

5   him, and for him to walk away.

6       The third element is that he has to knowingly act in

7   some way for the purpose of causing, encouraging, or aiding

8   the commission of the deprivation of Luther Hall's civil

9   rights.  And what do we know that he did?  We know that he

10  held him down.  We know he held him down because that's what

11  he said to Officer Kleffner, and he told Officer Walls that

12  he was on top of him.  And he told Officer Kleffner that

13  Detective Hays was the one who had knocked him down.

14      Now, he liked to tell Officer Kleffner that he was

15  looking down and he couldn't see what exactly was going on,

16  but Officer Kleffner said that he didn't believe that.  He

17  didn't consider that that was true, that that was unlikely,

18  that that was unbelievable.  And why would he minimize his

19  actions with Officer Kleffner?  Because Officer Kleffner

20  knew Detective Hall and he would want to minimize what he

21  actually did to him.

22      Finally, I have to show -- and that he acted with a

23  bad purpose.  The final one is that he acted wilfully, with

24  a bad purpose or improper motive to disobey or disregard the

25  law, specifically intending to deprive Luther Hall of his

1    civil rights.

2         When you look at this instruction, and it is

3    relatively complicated, you can see that I don't have to

4    show he knows of a specific right.  Basically he has to know

5    that that should not have been happening, that he acted with

6    a bad purpose to disobey the law, that he held him down when

7    he was being -- that when Hays was striking him with the

8    baton, which was clearly not in compliance with what the use

9    of force policy was for the St. Louis City Police

10   Department, to use the least amount of force necessary to

11   safely bring the situation under control.  No police officer

12   could honestly think that this beating was lawful.

13        Now, when you're trying to determine and you're

14   looking at his motive and his intent and his wilfulness, you

15   can look at those texts, you can look at what he was writing

16   during that time.  And in my second half, I'll have a

17   summary of many of those texts of what he was saying he

18   wanted to do to protest, what he said he was going to do to

19   protest, and what he did to protest, his desire to beat

20   protesters as well as his abuse of other suspects.  You can

21   consider that when you're considering his intent here.

22        Now, Defendant Boone could not dispute that

23   Detective Hall was assaulted and that the assault was a

24   violation of his civil rights, that he was knocked down,

25   beaten with the baton and struck.  Detective Hall was

1    committing no crime.  There was no dispatch to arrest him.

2    And he suffered serious injuries.

3         Now I want to move on to the elements of -- related to

4    Defendant Myers, and that's Count 2, destruction of

5    evidence.  And you can see, as we scroll through this, that

6    there's a lot more to that first instruction that I'm not

7    going to have time to talk about in detail.

8         So let's talk about the elements of Instruction 10.

9    The first element is that, "On or about September 17th,

10   2017, in the Eastern District of Missouri, the defendant

11   knowingly altered, destroyed, or mutilated a tangible object

12   used to record and preserve information, that being a

13   cellular phone."

14        Now, it's clear from the evidence -- we're going to

15   talk about this again.  Let me just --

16        **MR. ROSENBLUM:**  Objection, Your Honor.  I'm not under

17   obligation to say anything.  It's her burden.

18        **THE COURT:**  Argument.  Go ahead.

19        **MS. COSTANTIN:**  There may be discussion that this is a

20   theory or this is speculation, but you are instructed by the

21   Court very specifically that you may use your reason and

22   common sense to draw deductions or conclusions from facts

23   which have been established by the evidence in this case.

24        So let's talk about this.  We have the ASP, the ASP

25   that we know Defendant Myers had in his possession that

1     night.  We can see it in the pictures.  This phone --

2          **MR. ROSENBLUM:**  Your Honor, let me object to that.

3     That's not the ASP.  That was stated in evidence.

4          **THE COURT:**  Well, it's a similar --

5          **MS. COSTANTIN:**  I will correct that.  This is a

6     demonstrative of, similar to an ASP that he had in that --

7     and I apologize for that.  This is not the actual ASP that

8     he had; an ASP similar to this that he had that night.

9          The phone, if you recall, is black, so the camera is

10    facedown, all right?  We see the phone spinning on its

11    vertical axis, okay?  That's what you heard the testimony

12    was.  And then we immediately see Defendant Myers' face on

13    the phone, so --

14         **THE COURT:**  The court reporter is struggling.

15         **MS. COSTANTIN:**  I can do it here, Judge.

16         You can see, when you look at this phone, the circular

17    imprint of where it was struck.  You can see the point of an

18    ASP, and that's how it slides in there.  The point, the

19    circular imprint of the ASP, and how it fits that right

20    there.

21         And you can -- and it is logical that when struck on

22    the side, that it will flip over and the camera will be up,

23    which is why the -- Defendant Myers' face is caught on the

24    camera.  And you can touch the back matching this and you

25    can feel the nub on the back, which is where the strike

1    occurred and flipped over.

2         Now, what else do we know about it when it flips over?

3    We see the shadow of -- a narrow shadow.  Use your reason

4    and common sense.  We can see on those photographs, or when

5    you do the cell phone video, you can see that shadow coming

6    over.  That shadow is consistent with a thin object, it is

7    consistent with the ASP having just struck that, and causing

8    the phone to flip over.  The phone settles, and we see

9    Defendant Myers' face, and as I said, we can see the nub on

10   the back of it that is matching to the ASP.

11        And where is the location of that phone?  We can see

12   that -- first of all, when we look, we can see the generator

13   next to his head, so we know it's right where Detective Hall

14   is being assaulted, right while he is being assaulted.

15   Okay?

16        5410 is the first time we see his face, okay?  So he

17   knows what's going on there, he knows what's going on right

18   at that point.  If there's any other doubt about what we

19   see, we see that -- his face coming closer to the phone,

20   remember that?  His face comes close to the phone.

21        He's hit it, he's flipped it over, his face comes

22   closer to the phone, and then, yes, I agree, he picks it up.

23   And at that point we can see right there the electrical

24   access panel, 1 foot and 3 inches away from the traffic box,

25   which is where Detective Hall is being assaulted.  Okay?

1     Now, so I've described, one, why he's the person who

2  mutilated this object, mutilated the phone.

3     The second element that I have to show is that he did

4  it in contemplation of an investigation to the arrest and

5  assault of Luther Hall and with the intent to impede,

6  obstruct, or influence the investigation.

7     I would say, first of all, that's pretty obvious.  Why

8  else is he breaking that phone?  He wants to insure that it

9  didn't capture the assault that was just occurring, that was

10  in the process of occurring.  He's literally a foot and

11  3 inches away, so it's not like he didn't know what was

12  going on there.

13     And the other thing is, remember, later on he takes

14  the battery out of Detective Hall's camera, foolishly

15  probably thinking it was the SIM card.  Remember that on the

16  camera, when you open it up, and the SIM card is right next

17  to the battery?  When he takes that out, he probably thought

18  he was taking out the SIM card, which would be the photos,

19  in which case there would be no images on the phone because

20  he'd broken it, as well as on the camera.

21     Three, the next thing I have to show is that the

22  investigation was within the jurisdiction of the FBI, an

23  agency of the United States.  Well, that's pretty obvious

24  because there is an investigation that occurs with the FBI.

25     Let's go down a little bit more.

1    Two very important concepts.  There's no requirement

2    that the matter had been pending when the obstruction

3    occurred but only that the acts were taken in contemplation

4    of any such matter.  In other words, he couldn't know that

5    the FBI was in the process of investigating something that

6    was going on right there.  It's that he was afraid that

7    there was going to be an investigation about this man being

8    beaten and kicked a foot -- 1 foot and 3 inches away from

9    him.

10    The second thing that's important is that there's no

11    requirement that I have to prove that he knew that the

12    matter was within the jurisdiction of a department or agency

13    of the United States.  In other words, he doesn't have to

14    know that the FBI is going to investigate it; he just has to

15    know that there's going to be some sort of investigation

16    into what is happening right there.

17    Now I'm going to talk about the evidence in

18    two different ways.  I'm going to talk about it in relation

19    to the timeline, and then I'm going to talk about a summary

20    of all the evidence against each defendant, and I'm going to

21    have to break this down into two parts.

22    The first thing which I want to talk about is the

23    timeline.  Let's get the boards up real quick.

24    **(Display boards are set up in front of the jury.)**

25    **MS. COSTANTIN:**  I recognize that when these boards are

```
 1   up, you can't see me, so I'll keep them up relatively short,
 2   but I want you to see from the boards.  I want to talk about
 3   them just briefly.
 4        As you can see from the boards, the initial contact
 5   with Detective Hall is at 8:53:31, when an officer tells
 6   Detective Hall to get on the ground.  There's yelling after
 7   that, "Show me your hands, let me" -- the last statement,
 8   the last statement that is audible is, "Let me see your
 9   hands," at 8:54:02.  And if you recall from the photographs,
10   8:54:02 is also when we can see the officer with his baton
11   raised up to strike down at Detective Hall.
12        You see on the timeline that Defendant Myers' face is
13   at 8:54:10, and then the video ends at 8:54:13, again with
14   Defendant Myers' face on the video.
15        Now, Detective Hall said the beating lasted, I believe
16   he said a minute or two.  I'm going to take the most
17   conservative time, one minute, and mark that on the board.
18   Mark 8:54:51.  Starts at 8:54 --
19        THE COURT:  We can't hear you over here.
20        MS. COSTANTIN:  I'll stop talking.
21        (Counsel returns to the podium.)
22        MS. COSTANTIN:  You can see that this beating occurred
23   during that gap, during that gap when Lawrence Bryant is not
24   taking any photographs because the SWAT caravan has blocked
25   him.  During the gap when the RTCC cameras are turned away
```

1    from the corner and during the time when that cell phone

2    video ends, we can see the beginning of the beating on the

3    cell phone video, but that is not the entire beating.  You

4    cannot think that because the video ends, the beating ends.

5    Detective Hall tells you when the beating ends, and he says

6    it's a minute or two.

7         Let's take the boards down.

8         There is a 39-second gap between when there are clear

9    views of that corner and what can be seen on the corner.

10        Now let's go to the PowerPoint.  So let's fit together

11   each defendant's act during that timeframe.

12        First, let's go talk about Defendant Boone's acts.

13   And I've used the color photographs here.  Let me just say

14   something very important.  You can ask for all the evidence

15   or whatever evidence you want, so you can ask for the

16   photographs, the timelines.  You can take those timelines

17   and put the photographs together so you can see them in full

18   size.  You can ask for the video.  You can have the video

19   played for you.  Please don't sit in the jury room saying,

20   *Wish I could see this again*, because you can, okay?  You can

21   ask for all that.

22        I have used the color photographs here.  You can use

23   the colorized ones in which different people are isolated,

24   if that's easier for you.

25        Okay.  So, first of all -- and I'm going to have to

1    look to this side to see.  First of all, it's 8:54:02.

2    Okay.  8:54:02, we see Defendant Boone moving rapidly in

3    this direction.  Obviously, this is the area where the

4    assault occurs, and we can see him rapidly moving in that

5    direction.

6         Now, at that same time, what's happening on the cell

7    phone video?  The same time Officer Hays is yelling that --

8    "Let me see your hands," and he's raising that baton up to

9    hit him.  So, let's see, these are the videos.  This is

10   Defendant Boone moving.  As I said, he moves from here to

11   here.  He's moving in that direction at exactly that same

12   time.

13        As I said, you can hear Randy Hays yelling, "Let me

14   see your hands," and striking him with the riot baton.

15   That's what we're seeing at 8:54:02, okay?  That's what's

16   going on.

17        You can see another helmet there in the background.

18   It is not the government's contention that helmet there is

19   Defendant Boone.  That is not Defendant Boone.  The timing

20   could not be correct.  That's not Defendant Boone.

21        We see a helmet appear on the other side one second

22   later.  Remember, they're on one side, we see this helmet

23   appear on the other side one second later.  And recall that

24   this is during the time that Detective Hall is saying he's

25   being beaten, he's being beaten for a minute.

1        But what's the next thing that we can see?  The

2    trucks.  Okay?  We're blocked again from the trucks and we

3    cannot see the photos, and we see this 39-second gap.

4    During that gap is when Defendant Boone has pinned down

5    Detective Hall with his knees and participated in what he --

6    what is described -- he describes as -- agrees with his

7    father was a pretty good whooping.

8        And you cannot look at this case without looking at

9    what he says in his texts.  And that's what I will summarize

10   with you in my second half, is we'll go through those in

11   detail and his description about what he's done.  And his

12   apology, remember that, his apology to Detective Hall about

13   what he's done.

14       Now, this is also related to Defendant Boone because,

15   as you can see, that's Defendant Myers.  But what do we see

16   right here?  We see the belt of an individual, the belt, the

17   duty belt of an individual, either the back or the side of

18   that individual right next to the generator; right?

19       And, remember, Mr. Kilgore painstakingly showed that

20   Hays was kneeling next to the traffic box.  This person is

21   the person by the generator, okay, up by his head.  And who

22   said he was up by Detective Hall's head?  Defendant Boone.

23   Defendant Boone told Officer Kleffner that he was kneeling

24   on him, on his shoulder and his back, had his hand on his

25   head.  He also told Officer Walls that he was on top of him.

1     So Defendant Boone is by the generator.  Hays is by

2     the traffic box.  They are both engaged with Detective Hall.

3     Defendant Hays, Officer Hays is striking him.

4     Defendant Boone is holding him down.  Why do I say

5     Defendant Boone is by the generator?  Because when we get a

6     clear shot, that's who's getting up right there from that

7     spot, next to the generator.

8     Now, this -- let me be clear, this last photograph is

9     well over a minute later, okay?  This is after all the

10    trucks have gone by and everything like that.  But that's

11    the side that he is on.  He is on the generator side.

12    Now I want to talk about Defendant Myers.  And you can

13    see -- well, this is just chunks out of the timeline.  You

14    can pull out those photographs for the timeline and you can

15    look at the photographs for the timeline.

16    Here's Defendant Myers at 8:54:02.  We focused before

17    on what Defendant Boone was doing.  He's this individual

18    here moving towards there.  And we can see Defendant Myers

19    here, also moving towards the area of the assault.  And he

20    has the ASP in his hand.  Okay?  You've seen several

21    photographs in which he's got the ASP in his hand.

22    What's happening during this?  This is the point when

23    the officer is yelling, "Let me see your hands."  The baton

24    is up like this, we can see that from the synced video.

25    Now, as I said before, the judge has instructed you

1    that you may use your reason and common sense in

2    determining -- to draw deductions or conclusions from the

3    facts that's been established by the evidence.

4         This is not speculation what happened to the phone.

5    This is a logical conclusion based on the physical evidence,

6    the damage to the phone, as well as the testimony that

7    you've heard about the spin, how it is connected to the ASP,

8    how the ASP design is.

9         You can take your common sense and figure out that if

10   this phone is struck with the ASP in the corner, that it

11   will flip over and show Defendant Myers' face.  That's just

12   common sense.  That's just logic.  And you can see, as I

13   said before, the bump on the back of the phone that explains

14   it.

15        Now, you saw Myers with the -- Defendant Myers with

16   the ASP out before the phone is broken.  And then you see

17   him -- I'm sorry, you see him putting the ASP away.

18   Remember that photograph where he's putting the ASP back

19   away?

20        Now let's take a look at the next slide.  We see his

21   face on the cell phone video, 8:54:10, eight seconds later,

22   when he must be standing right next to that traffic box and

23   generator area.  He's right in that area.  That's where he

24   is eight seconds after this.  We see that photograph there,

25   and yelling of the, "Let me see your hands."  That beating

1    took a minute.

2         And what do we see at 8:54:12?  We can see the

3    electrical access panel, and we can see -- that electrical

4    access panel, if you recall, is right next to the traffic

5    box.  We can see an individual kneeling here.  Who is that?

6    That's Hays, okay?  We know that, okay?  We know that by

7    putting all of it together, by seeing -- looking at the

8    pictures of where he goes down and where he is as far as

9    holding the stick.

10        So he is -- Defendant Myers is right there when this

11   assault is occurring.  He is right there.  And that's why he

12   hits the phone.  That's why he strikes the phone.  There's

13   literally no other reason for him to do it.  And then what

14   do we see again?  There his face is again.  Remember, it's

15   getting closer.  And there is his face again as the cell

16   phone video ends.  He is right there when all of that

17   happens.

18        Now, why does the stream stop?  Well, counsel, defense

19   counsel, has speculated that he clicked the button to stop

20   it or the button was clicked to stop it.  That may well be.

21   That may well be that that's what he did after he smashed

22   it.  It's another way to stop it.  If the smashing didn't

23   work, it's another way to turn it off, turn off the video so

24   it's not recording what has just happened.

25        Once again, what can Lawrence Bryant see during this?

1    Nothing, nothing because of that SWAT caravan.  That's --

2    this is all during that 39-second gap when the view is

3    obscured by the SWAT caravan.  So the timeline places

4    Defendant Boone at Detective Hall's assault, holding him

5    down.  The timeline places Defendant Myers at

6    Detective Hall's assault breaking the phone.

7         Now, let me just take a moment and just say one thing.

8    This is not -- this case is not about being pro-police or

9    anti-police.  Nobody hates a bad cop more than a good cop,

10   and that's because bad cops make good cops' jobs harder

11   every single day.

12        Think about the encounter that Detective Hall had in

13   U City on Saturday night.  There was a lot of window

14   breaking, a lot of property damage, and he went into that

15   parking garage, and some officers, some municipal officers,

16   came up to him.

17        And what did they do?  They said, "You have to wait

18   here until the CDT line leaves."  He didn't identify

19   himself.  They didn't know who he was.  And once the line

20   went past, he went on his way and went to his car, okay?

21   That's what a good cop does.  That's what a good police

22   officer does.  That's what a -- professional interaction

23   that officers have with citizens every single day.  The

24   actions that Officer Boone and Officer Myers did makes that

25   job harder for those officers every day.

1     Think about Detective Naes' arrest when he's literally

2     a block -- he's literally a block over from where

3     Detective Hall is being beaten, okay?  He encounters police

4     officers.  They have him go through a textbook arrest;

5     literally kneeling down one at a time, they cuff him.  It's

6     completely professional.

7     We never hear about that; right?  We never hear about

8     that because that's people doing their jobs.  Those are

9     folks being professionals.  But what makes their job hard is

10    actions like what Officers Boone and Hays and Myers did.

11    That's what makes them a problem for all police officers.

12    What Defendant Boone did in particular that day was

13    completely in violation of all norms of policing, and I'll

14    talk about his texts, but it's encapsulated -- his attitude,

15    his motive, his actions are encapsulated in his texts.

16    "It's going to be a lot of fun beating the hell out of these

17    shitheads once the sun goes down and nobody can tell us

18    apart."  That's what he writes on Friday night.  That's what

19    he texts on Friday night.

20    And as to Defendant Myers' attitude, "For some sick

21    reason, I live for this."  These -- this is the attitude of

22    two men with less than two years on the job.  No

23    professionalism, no regard for the law.

24    Now, let's contrast that with Detective Hall, who's a

25    detective for over -- police officer for over 20 years on

1    the force, who, even after he's beaten by his fellow

2    officers that night, gets his hole in his lip, a

3    through-and-through hole in his lip stitched up, he goes

4    back to work.  He goes back to work to download the video of

5    the property damage so that those folks can be caught, those

6    protesters who broke those windows can be caught.  That's

7    the professionalism.  That's the actions that a professional

8    officer does.  Now contrast that with the actions of Officer

9    Myers and Officer Boone.  Their actions are the ones that

10   makes the job of a good cop harder every day.

11        In my second half I'm going to summarize the evidence

12   by each defendant, and at the end, I will ask you to find

13   the Defendant Boone guilty of aiding and abetting the

14   violation of the civil rights of Detective Hall, and

15   Defendant Myers guilty of destruction of evidence.

16        Thank you.

17        **MR. ROSENBLUM:**  May it please the Court.

18        **THE COURT:**  Mr. Rosenblum.

19        **DEFENDANT CHRISTOPHER MYERS' CLOSING ARGUMENT**

20        **MR. ROSENBLUM:**  Counsel, members of the jury.

21        I'm going to start where we started this case -- that

22   may seem like an eternity ago -- when you were talking in

23   jury selection.  At the time, I was talking to you about

24   concepts that you were probably wondering and looking at me,

25   *Why is this man talking about these concepts*, but hopefully

1   you now know.

2       I talked to you at some length about the difference

3   between objective evidence versus speculation, objective

4   evidence versus guessing, objective evidence versus

5   theorizing.  And you all agreed you know the difference.

6   Because in this country we don't speculate people into the

7   penitentiary, we don't theorize people into the

8   penitentiary, and we don't guess people into the

9   penitentiary.  And that's all the government is asking you

10  to do with respect to Chris Myers, and that's who I'm

11  speaking for.

12      She guessed correctly.  I am going to talk about

13  speculation because that's all her case is about.  What's

14  interesting, one of the last series of questions and answers

15  that Agent Boehlje answered on the witness stand was a small

16  capsulation of her closing argument.  And isn't that

17  interesting?  Because he picked out bits and pieces of the

18  only witness that talked about the destruction of evidence,

19  Marcus Burzota, and he said, "Yeah, that's what I'm relying

20  on."  And he went through -- and if you listened to him

21  closely, he went through a number of things.

22      He said, "Well, okay, here's my investigation.  I saw

23  the phone was flat at some point.  It was dark.  It didn't

24  move."

25      We talked about this vertical axis, which would

1   indicate either it was flipping on one side or the other.

2   We talked about how Christopher Myers' face, visage,

3   appeared at 8:54:10.  And we talked about that

4   Christopher Myers in -- according to him, speculated that he

5   was in the street.  Of course he was.

6        Oh, and that he had an ASP with a ball.  Okay?  As did

7   a number of officers.  And there was no secret that

8   Christopher Myers, as I told you at the beginning of the

9   case, was doing his job and guarding the perimeter.  That's

10  exactly what he was doing.

11       So compare that to the speculation and compare it to

12  what Marcus Burzota said, their expert witness, because what

13  did Marcus Burzota actually tell you that caused him to go

14  out on a limb and speculate as he has and caused the

15  government to?  Because they have no evidence.  Zero

16  evidence.  That's what they're left with.  Mr. Burzota

17  started off by saying he can't tell you what caused this

18  vertical axis.  "I am not an expert in materials, I'm not an

19  expert in ASP, I'm not an expert in what comprises the

20  making of a cell phone.  I can't even tell you whether it's

21  glass.  I can't tell you what the front portion is."

22       And specifically what did he say?  "I can't tell you

23  what caused that crack.  I can't.  I can't tell you whether

24  it was the part of a riot baton.  I can't tell you whether

25  or not it was a pre-existing crack."

1          And when I show you pictures -- and you have pictures

2    starting at 150 or so through 165, and they pick up again at

3    about 181, and they go throughout.  What were we seeing?  We

4    were seeing 200-pound Paul Chester stepping on the phone.

5    He can't tell anyone whether or not that caused additional

6    damage to a pre-existing damage.  He can't say whether a

7    pebble caused that.  And that is all speculation.

8          That is what we don't consider evidence, because

9    you've been instructed under Instruction 103, what is

10   evidence?  That instruction tells you what it is.  Evidence

11   is this:  It is testimony, it is exhibits, it is documents,

12   and things that have been stipulated to by the parties.  You

13   know what it doesn't say?  It doesn't say speculation.  It

14   doesn't say some theory because you don't have any other

15   evidence.  That's what you're bound to consider.

16         And speaking of stipulation, there has been one.

17   120 officers.  Now, he didn't want to answer my questions.

18   You can look at his demeanor.  You can look at Mr. Hall's

19   demeanor, Mr. Marcantano's demeanor, and you can remember

20   his demeanor clearly because it was today.  They can't

21   answer a simple question because they have an agenda.

22         And you're given an instruction on credibility.  You

23   can look at their demeanor.  You can look at how they answer

24   questions.  Look at it.  Compare that instruction to the

25   only witnesses that they called at the scene, Luther Hall

1  and Joe Marcantano and Luther's best friend, Lou Naes, who

2  I'll speak to again.

3       But all of this is nothing but speculation.  And what

4  is interesting, all this testimony, all this speculation

5  that she was talking about, you know what you didn't hear

6  one thing about?  One thing.  What happened at 8:54:02?

7       Can you play that portion for me with the sound,

8  please.

9       *(Playing videotape.)*

10      **MR. ROSENBLUM:**  Now, I want you to notice a couple

11  things at that moment.  Right about 8:54:02, what happened?

12  The audio went out.  That's a fact.  They can't deny it.

13  They can't explain it.  Ask 'em.  Why did the audio go out?

14  Because I asked Burzota and he told you, "I can't tell you

15  whether or not the altercation, the baton striking caused

16  the damage and caused the audio to go out."

17      Nobody's keeping track of where that phone is at the

18  time.  Nobody's keeping track of those baton strikes.  All

19  we know is that the audio goes out, and Burzota says it's

20  absolutely consistent with the riot baton striking it.

21      Did you hear an expert from this side examine the

22  phone?  It's the FBI, it's the United States government.

23  They have unlimited funds.  Did you hear one expert come in

24  and tell you why the audio went out?  You would have, you

25  could have.  That's their burden.  You heard Burzota.  That

1    was their expert who said it's completely consistent.

2         And then we followed the track of the phone.  And I
3    want you to consider something else as we follow the track
4    of the phone.  They wanted to show you 8:54:10, and I think
5    it was Exhibit 305 where Mr. Myers was standing over the
6    phone.  And I'll tell you exactly why he was there.  If you
7    follow the evidence, if you take the time, if you just take
8    the time to open your eyes, you may see.  If you take the
9    time to open your ears, you may hear.  If you don't want to,
10   if you just look in a tunnel in tunnel vision, you will find
11   or at least try to argue to support a case that doesn't
12   exist.  You ever hear an expression, "If you're a hammer,
13   everything looks like a nail"?  There it is.

14        Look at 305, that still image of Christopher Myers
15   that they just showed you.  You know what that shows.  I'll
16   tell you exactly how he got to that point.  As he was
17   walking the perimeter doing his job in Images 126, 127, 128,
18   we get to 135.  Now, if you look at that image, you know
19   what you're going to see missing compared to the video?
20   What you're going to see missing is the traffic light.
21   Remember the traffic light that they talked about that was
22   in an easterly direction past the boxes?  You saw the
23   traffic light that Burzota talked about.  You didn't see it
24   in that image.  You saw Mr. Myers by -- with his right
25   shoulder over the generator because he was standing in the

1    street.  You know why he got in the street?

2        Brad, can you show me 135 -- I'm sorry, 136, 137, and

3    then 138.

4        *(Displaying exhibits.)*

5    **MR. ROSENBLUM:**  It logically follows why he was

6    standing in the street and why, when he looked down -- look

7    at 135.  So what do we know now at 135?  That's 8:54:02.  I

8    just played you when Hays was assaulting him at 8:54:02.

9        Take into account a number of other things.  Take into

10   account Caruso, take into account Mayo, take into account

11   all these human beings that never suspected anything because

12   they never considered anything inappropriate happened other

13   than a run-of-the-mill resisting.

14       Do they want you to believe that, truly,

15   Christopher Myers is the only man on earth at that moment,

16   at the very concise moment when he picked up that phone, the

17   only man on earth that was contemplating some investigation?

18   Because they have to prove that beyond a reasonable doubt at

19   that moment.

20       A hundred and 20 officers, not one person saw it.  Do

21   you think the man's invisible?  Use your common sense, like

22   she said.  Look at all these people.  You think he's going

23   to start standing and swinging in the middle of the street?

24   That, ladies and gentlemen, is preposterous.  Somebody would

25   have saw it.  It's the FBI.  They had the duty rosters.  A

1    hundred 20 interviews.  It didn't happen.  It just didn't

2    happen.  It happened that -- what your common sense tells

3    you happened, he's right there doing his job at 8:54:02.

4        Let's go to 136.

5        What do you see?  He's still walking; right?  At that

6    corner.  Look where he is.  Basically in the middle of the

7    street.  What's he looking at?  That direction.

8        Let's go to 137.

9        He's still walking, 8:54:02.  Now we know what's going

10   on at 8:54:02.  I'm going to show you what Caruso would have

11   seen at 8:54:02 when he tells you he didn't see anything

12   untoward or didn't suspect any sort of investigation.  They

13   can't have it both ways.

14       His head is down.  You know what?  This case reminds

15   me of an Eagles song, who you going to believe, me and my

16   speculation or "Your Lying Eyes"?  I can tell you right now,

17   ladies and gentlemen, your eyes aren't lying.  They are just

18   not lying.  You're not going to buy into that stuff.  That

19   speculation.  And see where he is in the street right here?

20       Let's go to 138.

21       Lo and behold, you think he was going to get run over?

22   Of course he's not going to get run over.  The reason he

23   went back to this -- you don't even see him in this area.

24   The reason he moved back to the corner is because the SWAT

25   BEAR truck was going to run him over.  Yes, use your common

1    sense.

2         And as that phone -- as that phone then, at 8:54:02,

3    was struck by Randy Hays, she wants to tell you that this

4    caused this?  Where's the evidence?  Other than a theory in

5    her head.  She wants to tell you that there was some bump on

6    the other side that corresponded.  Where's the evidence?  It

7    certainly didn't come from Burzota, their only expert.  You

8    can make up anything you want.

9         You know what else we know about this particular

10   phone?  It was allegedly damaged on the 17th, and we have no

11   idea how, other than what Burzota says is consistent with

12   Hays striking it at 8:54:02 when the sound goes off.  And

13   then we showed you how it traveled.

14        But what else is interesting, Luther Hays seemed

15   pretty diligent about documenting a number of things.  He

16   went to his girlfriend the very next day and documented his

17   injuries.  You saw the abrasion here, you saw the abrasion

18   here, and you saw his -- I'm not saying the man wasn't

19   injured.  He was.  That's not what I'm here talking to you

20   about.

21        And I'm not here advocating for Randy Hays.  He did

22   what he did.  Nobody thought anything was unusual about it

23   that night.  That's a fact.  Not one witness came in and

24   told you that.  Not one.  It's convenient now to point to

25   Chris.  He's not some soothsayer.  He can't predict the

1    future.  None of those other people could.  And this bump

        2    and this -- you heard what Burzota said about it.  No

        3    evidence.  Zero evidence.

        4          But the other thing about this phone is, as diligent

        5    as Luther was about documenting what he was documenting,

        6    think about the things that he didn't document, because he

        7    made a statement that he was beaten by multiple police

        8    officers, but consider, and you've seen the pictures, how

        9    small that area was.

       10          You heard Caruso say that that never happened.  I saw

       11    officers standing around, interestingly enough, obscuring

       12    the view so that you couldn't see anything necessarily.  But

       13    I didn't see multiple officers kicking him.  So, of course,

       14    there's no photographs of the torso or of his back side or

       15    his legs where he said he was beaten, beaten, and beaten by

       16    multiple officers.  Why not document it?  He documented his

       17    clothes.  He brought those in.

       18          But what do we know about this phone?  We know he's a

       19    computer tech.  I'm not suggesting anything untoward.  I'm

       20    just saying, where's the evidence that you have to rely on?

       21    The next time it surfaces was April -- I'm sorry, March 28th

       22    of 2018, some nine months.  Did you see one photograph that

       23    documented the condition of this phone on that night?  The

       24    answer's no.

       25          The other thing that we know is the phone still works.

1    How do we know that?  Because he was texting Lou Naes that

2    night.  Even Luther said it uploaded information.  Not a

3    very good job of destroying it.  Luther said he texted on

4    the phone for six days, up to six days.

5        Now, if you want to use your common sense, please do.

6    If this young man decided for some reason at that very

7    moment he was going to destroy this phone, you don't think

8    he could have come up with a better plan?  How about tossing

9    it in a sewer?  How about stick it in his pocket like it

10   never existed?  How about really smash it?

11       And here's the other thing that they have -- that you

12   have to speculate on.  You have to speculate on just about

13   everything.  Why would he -- how would he even know that's

14   Luther's phone?  How?  We know other officers for a fact had

15   phones.  We know from Chester that most officers had phones.

16       We know that there was a scuffle going on.  We know

17   that most protesters were having phones or rioters were

18   having phones.  Better yet, more speculation:  How would he

19   know what's on it?  How would he know there's something bad

20   on it?  How would he know there was a livestream?  How do we

21   even know that when you see a phone that you don't even

22   recognize, doesn't have the man's pictures of his

23   girlfriend.  It's all speculation, and if you use your

24   common sense, then that fits into what he did.

25       Because what does Marcantano say and what does Caruso

say?  And they can't get further enough from this scene
because it doesn't support their speculation.  What did he
do?  As he was in Picture 137, that phone that was struck by
Randy Hays traveled -- whatever I did with it.  That phone
traveled, and you heard about his vertical axis.  You heard
about whatever.  And as it traveled, it was a period of 8
seconds.  Now, she has no idea what was going on during that
period of time.  She needs to extend this timeframe, and
that is based on no evidence, okay?  Because she wants to
say who was there.  Well, who was there was Luther Hall.

    And, again, I get it that he was struck by Randy Hays.
That's your man.  And I get it that it was traumatic, and I
get it that his memory may not be the best reporter, and
we've seen it time and time again.  We've seen it when he
said that five police officers are the ones that beat him up
when he got out of an SUV.  We've seen it when -- beaten by
all these police officers when Caruso says no.  Not another
officer says it happened.  And look at the cell phone video,
and you don't see any other officers, you see two.

    And now she wants to suggest in the picture of
Chris -- which is clearly in the street because that's why I
showed you the shadow from the asphalt -- that that was
Randy Hays' back side?  Where's that evidence?  Did somebody
come and identify that?  Even Burzota was having difficulty.
She calls an expert and basically disregards him because it

1   doesn't fit with her theory and her speculation.

2       But as that phone traveled, what did it do?  It came

3   to a rest.  And I don't remember the specific points of

4   seconds, but I remember it was somewhere around 8:54:09.

5   And don't quote me on that if you're taking notes because

6   I'm trying to remember, but it was five seconds.  That's

7   what I remember.  And during that five seconds to like

8   8:54:09, eight, Burzota said it is consistent with not

9   moving.  And that's exactly the time Chris was standing in

10  the asphalt that you saw.  That was exactly the time that --

11  when he looked down and he picked up the phone.  And don't

12  forget how Luther Hall described that phone, covered in

13  blood.

14      And don't forget how everybody that came in to testify

15  described what was going on in that riot, and don't ever

16  forget that's what it was.  These police officers were under

17  siege.  They were doing their job under extremely difficult

18  conditions.  They were doing their job when they were having

19  bricks thrown at them, when their brethren were having

20  broken jaws, broken bones, and they were getting urine

21  thrown on them.

22      Chester said he still has red stuff thrown on him.  He

23  wants to get away from how the pepperballs were that

24  weekend.  Listen to Caruso, he couldn't breathe, he couldn't

25  see.  There were officers throwing up.  Why does she not

1   want to talk about it?  It doesn't fit her theory.  It
2   doesn't fit her speculation.

3        Let's talk about the evidence.  And as he looked down
4   at that phone, what did Marcantano tell you in his big
5   reveal?  He tossed it.  That's what he did.  He tossed it,
6   in the same impulsive reaction that Marcantano had when he
7   touched Luther's blood and wiped it on his shirt.  And where
8   did he toss it?  That's even more interesting, because if
9   you're really hellbent on getting rid of a phone, are you
10  going to toss it a couple feet right where it can be found,
11  by the electrical -- by the traffic box?  That's his big
12  plan to destroy and get rid of this evidence?

13       And when that phone was there, interestingly enough,
14  as many times as we looked at these pictures, as many times
15  as we examined every inch, it wasn't until a hearing in
16  March when I pointed it out that I showed Luther Hall that
17  he was wrong.  It wasn't to his side.  It wasn't to his side
18  on the curb.  It was right by the advertising panel and
19  right by the traffic control panel.

20       And I went through picture after picture and I showed
21  you how it was there, I showed you how it stayed there.  I
22  believe this frame starts at 8:50, and goes to like 165,
23  that it flips over to where Marcantano was smashing
24  Mr. Fort's head into the ground, or into his knees.

25       And then around 170 or so, 172, when you ask for those

1    pictures, we see it again.  And we see how the phone is

2    there.  We see how, 200, Paul -- Paul Chester is stepping on

3    it.  We see how Burzota says, absolutely that could have

4    caused increased damage.

5        And then what do we see?  Then we see the phone

6    disappear.  When do we see the phone disappear?  Right after

7    Chris Myers is having a face-to-face conversation with

8    Luther Hall, the conversation that he denied having.  And

9    then I called Paul Chester, who said, absolutely they had a

10   conversation.

11       And what happened after that conversation?  That's

12   when Chris Myers opened up his backpack to put the phone in,

13   just like Marcantano --

14       **MS. COSTANTIN:**  I object.  There's no evidence of

15   that.

16       **MR. ROSENBLUM:**  It's a reasonable inference,

17   Your Honor.

18       **THE COURT:**  Go ahead.

19       **MR. ROSENBLUM:**  Just like Marcantano said, he put the

20   camera in his backpack.  And, if you remember, Luther Hall

21   referred to it as all his gear.  It was Chris Myers that put

22   his phone in the backpack because he was doing his job.  And

23   what did Luther tell you?  That's protocol, property goes

24   with the prisoner, with the suspect.

25       And not only can you see it in that picture, look at

1    the AP video.  You will see literally Chris Myers reaching

2    into his backpack.  The only logical conclusion, the only

3    logical conclusion, the only conclusion is he's putting his

4    phone in the backpack, because it disappeared right in back

5    of him.  We don't see it.

6        It's not where Luther claimed he saw a pile of gear

7    because every time I asked him about it and showed a

8    picture, "Well, it must be behind that leg."  Well, I'm

9    showing you a picture behind that leg.  "No, it must be over

10   here."  At that point it started sounding like three-card

11   Monte in New York.  They kept moving, it kept a moving

12   target.

13       So what else does she have to do?  Do you know what

14   else she has to do?  This mysterious timeline.  So we know

15   that Luther's not a reliable reporter, and I'm not blaming

16   the man.  He's invested in this outcome.  He was -- went

17   through Hays sticking him and beating him with a baton, so,

18   yes, he's not the most reliable reporter, as I pointed out.

19       But what do we know?  I'll tell you what somebody

20   is -- I'll tell you somebody who is a reliable reporter, the

21   sergeant on the scene.  We know this starts at 150 -- 8:51,

22   at 8:51 -- I'm sorry.  At 8:53, that's when you start

23   hearing the commands, "Get on the ground, get on the ground.

24   Let me see your hands."  So that's when we know this assault

25   by Randy Hays, nobody else, by Randy Hays starts occurring.

1    And we know that about 8:53:58 -- and you've seen what
2    was going on.  I'm not going to do it for you now because
3    you can track it yourself.  Or I will do it, actually.  Put
4    on the Caruso picture.  I believe it's 133.
5    So what do we know there when we're talking about a
6    timeline?  We know now we're at 8:53:58, approximately
7    seven seconds from the time that this assault started when
8    he said, "Get on the ground."  And if you remember Luther
9    saying -- if you remember, Luther is saying, "That's when I
10    went to the ground and that's when a very large man picked
11    me up and face planted me face-first twice.  Picked me up
12    once, face plant, again face plant."
13    And, again, I'm not denying the man was injured, but
14    look at the pictures.  He's not the most reliable reporter.
15    That just didn't happen.
16    But we know at 8:53:58, where's Caruso?  Right there,
17    staring right into that area.  And we know Chris is over
18    here.  That's the man they're trying to attribute somehow he
19    was in contemplation of a civil rights violation.  That is
20    preposterous because you heard every person that I brought
21    in, and that's the reason I brought these people in.  The
22    only two people at the scene they brought in was Luther Hall
23    and an individual by the name of Marcantano, that I'll talk
24    to you about, that could not be more biased because he was
25    trying to get out of trouble.

Now, Luther Hall is not the best reporter given what
he went through.  But look where he's looking.  He's looking
right there, right there.  I don't know who these men are.
Arguably there's a man there, there's a man standing up,
there's people running around there for the Fort situation,
but pay careful attention to how she's manipulating the
evidence, okay?  Because Luther Hall never once said it was
a minute.

         What he said, if you remember his testimony, because
we had to bring him back to some prior testimony, was:  How
long was it?  "It felt like forever.  I don't know.  Maybe
up to a minute."  That's what he said on one occasion.  The
next time he testified under oath last week, "Maybe up to
two minutes."  Because the truth is, his first statement, "I
don't know."

         But who knows is this gentleman, because he told you
at 8:53:58, what did he do?  He said at some point, he was a
very short distance away and was able to see "a check or a
tackle."  Didn't cause him any concern because he didn't
know what brought it on.

         And all throughout this, all throughout this
testimony, even Luther Hall, even Lou Naes, every other
officer said this consistently:  "We, as officers, rely on
the probable cause of other officers."  That is police work
101.

1    You don't run up there and question, "Oh, excuse me,
2    sir, are you committing a civil rights violation?"  You
3    assume, just like Marcantano did, you assume.  When
4    Marcantano entered that fray and decided to knee strike the
5    man three times, it was a lawful arrest.  That's why, when
6    he saw that, he didn't assume anything wrong.  He's a
7    supervisor.  He would have to report it.  He's a sergeant on
8    the scene.
9        And if you remember this -- can we see 434.  Can we
10   see 435.
11       *(Playing videotape.)*
12       Now we're three seconds, okay?  Now, remember his
13   testimony.  We're now exactly 11 seconds into it.  Look
14   where he is.  Ms. Costantin tried to force him to say he
15   stopped and supervised this arrest.  She couldn't do it
16   because it didn't happen.
17       Yes, supervisor on the scene.  "No, I didn't go over
18   there.  I didn't look at it."  His words exactly, "I peeked
19   at it to make sure there's enough men to effectuate the
20   arrest."  And what did you do?  "I continued to go along and
21   zip tie Luther Hall."
22       And what did he tell you?  It happened within seconds.
23   And if it happened within seconds, I would suggest to you
24   the realtime, the realtime is not many seconds after this.
25   What did he say, several seconds?  So give him the benefit

1   of the doubt.

2        Now we're at 8:54:05 or 8:54:06.  She has to elongate

3   a timeframe that doesn't exist to fit with her evidence that

4   doesn't exist that potentially fits with her speculation.

5   That is just that, speculation.  No evidence.

6        So that's the evidence we're talking about.  And

7   that's what you said you'd look at.  That's what each one of

8   you said you'd look at.

9        And that's what Burzota said is nothing.  Anything

10  else, anything else is speculation.  I don't care how many

11  theories this man comes up with or how many theories this

12  lady comes up with, but they're just that, they're just

13  that.

14       Think about Burzota' testimony.  It's completely

15  consistent with what Chris Myers said, completely

16  consistent.  And think about if you're really trying to get

17  rid of evidence, why are you going to put it back in the

18  man's backpack?  Use your common sense.  Does that make

19  sense to you, if you thought something was nefarious on

20  there?  That makes no sense.

21       So when you go down a row such as that, when you have

22  no evidence and you're asking you all to speculate to

23  conjecture, even when Jury Instruction 1.03 tells you not

24  to, what are you left with?  You're left with presenting

25  evidence that really has nothing to do with the case other

1 than to suggest -- other than possibly to suggest.  Frankly,

2 I'm not sure what.

3   And that's why, in jury selection, I talked to you

4 about context and taking things out of context and being

5 taken out of context.  I know I spoke to one of you about an

6 example.  And if you do so, you can draw the wrong

7 conclusion.  And if you do so and you take things out of

8 context, then you may arrive at the wrong conclusion.

9   And this is Chris Myers' only chance.  So what kind of

10 evidence is the government now presenting because they have

11 no evidence?  A YouTube video?  Well, I'm glad they did

12 because I didn't know they were going to do it when I was

13 asking you a question in jury selection about context.  And

14 when I watched it --

15   **MS. COSTANTIN:**  Judge, I'd object.  That's just not

16 correct.

17   **THE COURT:**  I'm sorry?

18   **MS. COSTANTIN:**  That's just not correct.

19   **MR. ROSENBLUM:**  Which part?

20   **MS. COSTANTIN:**  He did not know about that video.

21   **MR. ROSENBLUM:**  I didn't know they were going to

22 present it, that's correct.  Obviously I knew about the

23 video.  I did not know they were going to present it in

24 evidence.

25   But I certainly wanted to talk to you about context.

1    And when I saw it in evidence, I'm thinking to myself, Well,
2    gee, are they showing you an example of what it means to be
3    taken out of context?
4         Because what did that video show?  That video showed
5    this:  That video showed that -- Christopher Myers again
6    doing his job as an officer, approximately on the job for
7    six months, along with his very good friend, Justin Davis,
8    going into the Ridge area, which is a high-crime area,
9    answering a call of shots fired.
10        Chris is working night shift, Justin was working day
11   shift, and they're very close friends.  And Justin is used
12   to Crime Watch.  These guys that come up and, as Justin told
13   you, they do nothing except try to harass the police, and
14   they try to catch police officers in compromising positions
15   and they try to put it on YouTube.  And, yes, that is
16   something you should be concerned about.  And Justin Davis
17   told you of course you should be concerned about your safety
18   or being stalked on social media.
19        So what did we actually see?  We saw this gentleman on
20   Crime Watch come up to Justin Davis, and he told him what --
21   it was shots fired.  But that wasn't enough.  Then they sit
22   in their patrol vehicle, and as Justin Davis said, that's
23   not a good idea in that neighborhood.  "We're sitting ducks,
24   and you don't want to be there long."
25        And then the same gentleman then decides to come up

and start harassing Chris.  And he wasn't rude.  He didn't take the camera and throw it down.  He said, "What's your name?"  And he said, "Officer."

That's not enough.  He continued.  And Chris said, "Get the fuck out of here," to his partner.  His partner told you, "We're good friends.  We talk like that all the time."  But what happened to the context?  What happened to the context?  Where did Chris wind up?  On a YouTube video being accused of telling the Crime Watch guy to get the fuck out of here.  Context.  It couldn't be further from the truth.

But that's not enough.  Nope, that's not enough.  Then they show him smoking a cigarette.  I guess that was to show that he smoked a half-pack of cigarettes a day, ten cigarettes a day.  That's their big case.  That's their big reveal.

But what else did it show on that video?  It showed that the Crime Watch gentleman decided to say, "And he's smoking something," to suggest that he's smoking something nefarious on the job.  None of it could have been further from the truth.  Justin Davis told you that.  That's what I'm talking about, context.  That's what I'm talking about.  When you have nothing else, that's what you're going to start presenting.

And speaking of context, incidentally, what did

1    Kleffner, their witness, say?  I guess the big deal was that

2    he didn't want to be on YouTube and he covered his name

3    after being polite to that gentleman.  That's what they're

4    going to argue.

5         What did their Officer Kleffner say?  Said that the

6    riots were terrible and that he didn't want to approach

7    protesters or rioters.  Why?  "Because I didn't want to be

8    sued."  And did you then not reveal your identity?  "Yes."

9    That was their own witness, their own witness.

10        Look, police officers go through a lot.  They go

11   through a lot.  And there are some bad police officers.

12   This gentleman's not.  This gentleman did his job under

13   very, very difficult circumstances.  And for him to be put

14   on this trial on this evidence, I can tell you the only

15   crime that has unfolded in this case is the crime that he

16   has been made to sit through this trial on this evidence.

17        When they have nothing else, they introduce text

18   messages.  Now, take a hard look at text messages from

19   Chris Myers, and ask yourself, *What do those prove?  What*

20   *did we hear?*

21        Well, to start with, we heard about how text messages

22   can be taken out of context.  Who told you that?  Their

23   witness, Lou Naes, when, at some point during the night, he

24   texts his friend, Luther Hall, and says, "I'm going to get a

25   beer at the QT" or whatever it is.  Did you mean that?

"No."  So you're saying words that you didn't mean?  "Yes."
On a text message?  "Yes.  I was adding humor."

So the text messages that we have from Chris are what?
First of all, you heard nothing he said inflammatory.  You
heard, at the beginning of the -- at the beginning of the
riots on the 15th, "Let's go whoop some ass," something
you'd say before you start a basketball game, something
that -- you heard that the commanders were saying similar
things, some rah-rah stuff at the electricians' hall.

What else did you hear that was so nefarious?  You
heard at one point he was musing as to whether or not he
should apologize?  Well, so is Joe Marcantano.  The fact of
the matter is, as Caruso said, they were shocked there was
an undercover and they were shocked that they were anywhere
in the vicinity when that gentleman was arrested, rightfully
or wrongfully.

And then they found out he was hurt as a fellow
officer.  Why do you think officers from all over the
country come to officers' funerals?  That's what they do.
They feel bad.  They bleed for their brothers.  And he felt
bad that he was on that corner when he was arrested.
There's nothing nefarious about that.

Just like Marcantano said, "I was considering
apologizing because I broke the camera."  What else did you
hear?  That he was laughing with his buddy over Hotshots

1  when the guy's saying, Hey, what's going on?  "I'm out here
2  fighting protesters."  No problem, bro.  Lol.
3          She's desperate to put those text messages in.  So
4  you've heard the speculation.
5          And if you ever wondered why we have jury trials in
6  this country, wonder no more.  This is why.  You all are the
7  last chain and Constitutional protection that protects us
8  all.
9          Certainly this week, to be fair, to be clear, and to
10 be certain, it protects Chris Myers.  But don't be mistaken.
11 It protects you.  Protects you from government overreaching,
12 it protects you from the type of investigations you heard
13 from the Department of Justice.  It protects you and it
14 protects your family.
15         And when you consider this evidence -- you've also
16 been instructed how to consider it.  Not through the eyes of
17 speculation, not through the eyes, *I wonder if they proved*
18 *something suspicious.*  You can make anything look
19 suspicious.  But you look at this evidence through the prism
20 of how you are charged and how you are instructed, through
21 the prism of beyond a reasonable doubt.  That's the burden
22 of proof for each and every element.  And it will be defined
23 for you.  And it is proof so convincing that would cause you
24 to act upon it unhesitatingly in life's most important
25 decisions.  Think about those words:  To act on it

1  unhesitatingly.  How can any one of you act on this

2  speculation unhesitatingly?  That just can't happen.

3       Another way to say it, as you sit here now, if you

4  have a single, solitary reasonable doubt as to -- after

5  giving the benefit of your doubt to Christopher Myers as to

6  whether or not he mutilated that phone, based on this

7  evidence, or whether or not at the very moment he picked it

8  up because it fell to his feet and he tossed it with the

9  blood on it, if you have a single, solitary reasonable

10  doubt, it's your oath, it's your obligation to find him not

11  guilty.

12       And along those lines, if you have questions as you're

13  sitting here, if you want more evidence, if you want more

14  information, if you want to fill in the gaps, you look to

15  them.  You don't look over here.  You look to them.  That's

16  their burden, that's their charge, and that's your oath.

17  You don't guess people into the penitentiary, or theorize or

18  speculate.

19       So how did this case get started?  That's easy, ladies

20  and gentlemen.  Exhibit 3, you've seen it a hundred times.

21  The unfortunate, innocent image of a man picking up a phone

22  that traveled to his feet.  And you've heard no proof how it

23  was connected.  They want to suggest it was close to that

24  area, a foot-and-a-half.  We don't know that.  You can look

25  at how the patterns change.  You can see that he's standing

1   in the street.  I showed you how he was walking and I showed

2   you why he went over there.  And when he picked up that

3   phone, he, just like Marcantano, reacted, because of all the

4   substances, and tossed it a few feet away until, frankly, he

5   was the one that found it and put it in his backpack.

6          So starting with this picture, that's what they had.

7   Think about that.  That's what Department of Justice

8   lawyers -- Fara Gold, you've heard her name, Emily Savner,

9   you've heard her name -- this gentleman, Agent Boehlje, when

10  he shows up with Luther's -- or when Luther comes and

11  interviews him, after never really cooperating with the IAD,

12  never, not telling him that he has been given rogue

13  investigation by his friend, Kim Allen, not telling him that

14  he was going to be -- he's given pictures of people that may

15  be at the scene.  Why is he keeping that?  Why is he keeping

16  that to himself?  Doesn't say it to the IAD, doesn't say it

17  to him, not in all those nine interviews.  That's called

18  deception by omission.

19      **MS. COSTANTIN:**  Judge, there is no evidence of that at

20  all.

21      **MR. ROSENBLUM:**  I believe there is, Your Honor.  I ask

22  the jury to recall it.

23      **THE COURT:**  The jury is instructed that they will rely

24  on their recollection of what they saw and place that above

25  what they are being told.  So it's up to the jury to decide

1  what the evidence is.

2  **MR. ROSENBLUM:**  How much time do I have?

3  **DEPUTY CLERK:**  So you've got 25 -- 30 minutes.

4  **MR. ROSENBLUM:**  All right.  I'll try not to take it

5  all.  It's a dangerous thing to give a lawyer a lot of time.

6  We typically will use it, but I'll try not to.

7       But what do we know about this investigation that

8  started off with that picture?  What else did they have?

9  They had a grainy video of the RTCC.  That's important.

10  That's important to show you how dark it was.

11       And you saw all the people running, because she wants

12  to get away from the scene, but you know what that scene was

13  like.  Luther Hall told you what that scene was like.

14  Luther Hall told you what that scene was like when he's

15  livestreaming back to the RTCC and livestreaming, saying

16  what he's watching.  And what he was watching were bricks

17  being thrown at Baileys' Range when people are eating.  He's

18  showing destruction.

19       And did he downplay it?  Absolutely he downplayed it,

20  because you heard the other officers that weren't invested

21  talk about what that scene was really like and how it would

22  change in a moment's notice, how it can go to a flash pan of

23  rioters and how they were throwing bricks and frozen water

24  bottles, and even Luther said --

25  **MS. COSTANTIN:**  Judge, there's no evidence at all that

1    bricks or frozen water bottles were being thrown at that
2    intersection.

3        **MR. ROSENBLUM:**  I said that's what Chester described
4    during the course of the weekend, Your Honor.

5        She wants to get away from that scene, but you know
6    what she can't get away from?  When Luther Hall -- when he
7    was out there, what did he say?

8        Do you think he was rather urgent when he was watching
9    them, watching the rioters, and he starts saying, "Where the
10   fuck are you guys?"  That's an SOS.  "They're about to fuck
11   up Washington."  That's an SOS.  That's urgency for a police
12   response because of what he was seeing.

13       But all that RTCC video really showed, if you looked
14   at it, is in the darkness -- and consider how dark it was
15   out there when you're considering what people really saw.
16   Don't get used to these brightened photographs.  That's not
17   it.  People told you it was dark out there.  Luther told you
18   it was dark out there in that small, little space that you
19   will see and that we've showed you a picture of.

20       What else did they have when they began this
21   investigation?  They had the out-of-context photograph of
22   Christopher Myers with no other Lawrence Bryant photos.
23   They had the RTCC, they had the AP video that we showed you,
24   and the AP video showed Luther walking into the SWAT
25   vehicle.  You saw his condition at that time.  And it showed

1  you the four officers at the scene.  And it certainly showed

2  you how Mr. Marcantano's left knee, his dominant knee,

3  moved.  That's what they basically had.  That's it.

4       And then we have these 120 interviews conducted by

5  this man, being led by Fara Gold and Emily Savner.  And what

6  did we learn about that?  We learned that interview after

7  interview after interview they changed.  Sometimes he

8  accepted it, sometimes he didn't.  They tried to add

9  information that wasn't there.

10       Why would Department of Justice lawyers do that?

11  Because they were pursuing rumors that you heard.  They were

12  building a case based on air.  They had no case.  They were

13  manipulating evidence.  That's what you heard.  This man

14  said it never happened.  He never worked with Emily Savner

15  before, and then it ended when Fara Gold and Emily Savner

16  left the case.

17       Those Department of Justice lawyers, they shouldn't be

18  called Department of Justice lawyers, they should be called

19  the Department of Injustice lawyers because that's what you

20  heard, and that's how this investigation started and that's

21  how it began to go off the rails.  And after they indicted

22  Christopher Myers in November of 2018, Dustin Boone in

23  November of 2018, Randy Hays in November of 2018, that's

24  what they had.

25       And then what happens?  Then you get Lawrence Bryant,

1    discovered picture -- produced pictures a year and more than
2    a month later, a picture that -- just think about how much
3    time we've spent on these pictures.  Hours.  Think about
4    some of the testimony, how much time witnesses have spent on
5    these pictures.  And I purposely pointed out that some of
6    these witnesses -- Mr. Hall, Mr. Marcantano -- they were
7    making their statements to the FBI before these pictures
8    surfaced.

9         And what did those pictures show?  Guess what?  They
10   weren't telling the truth.  Witness after witness.  But yet
11   that young man was already indicted without the benefit of
12   those pictures that we spent hours on.  Could you imagine
13   this case without the pictures?  Of course not.  The
14   Department of Injustice lawyers could because they indicted
15   him.  They indicted him, just think about that, on the
16   evidence that they had.

17        One hundred twenty witnesses, rumors.  And we know it
18   was stipulated how many interviews, and we certainly know
19   nobody saw Chris Myers, with their own eyes, do what these
20   people are claiming that he did.  That's real hard evidence.

21        So after they indict, what happens?  I went over that.
22   Luther Hall's talked to on November 21st.  I pointed out to
23   you that in no way I'm saying that he wasn't injured; he
24   was.  We saw it.  We saw it on the video.  That didn't last
25   anywhere close to a minute.  At best, maybe 18 or 20 seconds

1    if you factor in Caruso.

2          It didn't have multiple people as he described.  He

3    thought it was people coming out of an SUV.  There's no way

4    that he was face planted face-first by that large man twice.

5    It's just not consistent.  But I'm not saying he's

6    necessarily lying.  He's invested.  And he's not the best

7    reporter of facts.  That is a fact.

8          And then we hear from -- who else do we hear from?

9    Well, we hear from his best friend, and this is when

10   credibility comes into play.  Luther Hall was at the scene.

11   Then we hear from Lou Naes.  That's the gentleman that tells

12   you that when he was approached, he revealed himself as an

13   undercover.  Now, I can't tell you why Luther Hall didn't, I

14   can't, but I can tell you, you can consider his actions.

15         Can you pull up 122, please.  Can you enlarge that,

16   please.

17         You can consider that Luther Hall -- and he tried to

18   fight me on it.  He kept saying, "My hands were raised like

19   this."  That's why I asked Agent Boehlje how important it is

20   to tell the truth before the grand jury, and he tried to

21   fight me on it even after I showed him the words.

22         But what was the truth?  The truth was -- simple

23   English.  The truth is that Luther Hall, before he saw these

24   pictures, said he raised his hands in surrender.  The same

25   words Lou Naes used, the same words that after he used, he

1   demonstrated like raising your hands in surrender.  That's

2   not what was going on there.  Nor did he pull down his mask

3   in the hopes of being recognized by his brethren.  I'm not

4   blaming him, I'm not.  I'm definitely not blaming him.  But

5   I'm saying you need to consider all the circumstances.

6       Randy Hays did what he did.  I don't know what he saw.

7   I don't know what caused him to do it.  I don't know what

8   caused him to believe that there was resisting.  But I know

9   this:  For two years and two months, until he had his

10  epiphany, he didn't plead guilty.  And nobody else on that

11  scene believed anything else was untoward.  Nobody.  And I

12  know that as you go through these pictures, you can evaluate

13  people's conduct.

14      So we heard from Lou Naes, who was not on the scene,

15  but what did we find out?  Lou Naes was another gentleman

16  that had a difficult time answering my questions, and he

17  appeared to be the only human being that was there that

18  couldn't even bring himself around to call this what it was,

19  a riot.

20      Remember that line of questioning when I kept asking

21  him, "What would it take for you to say it's a riot?

22  Throwing windows through Washington Avenue?  Looting?"

23  Certainly if you look at the text messages, Luther was

24  talking about looting, or "loot," later on in the evening.

25  They were talking about, "They're fucking up Washington

Avenue." What's a riot to Lou Naes? Well, a riot is what you heard about.

And what else did you hear from Lou Naes? That in a very short period of time, he put together this memorandum, and clearly he was talking about 150 people. Clearly he was talking about what he was observing.

Do you think, in any stretch of his imagination, that when your commander tells you to put together a memorandum, you don't get around to completing it for two months? Want to use common sense? Use your common sense. The only thing that was left open were addresses, that was it.

And it was only until day after day after day that he talked to his friend, Luther Hall. Luther Hall told you that he did. Luther even told you that he talked about his memorandum, and lo and behold, the memorandum doesn't mean what it meant. The memorandum doesn't mean that when he saw Luther, what Luther said was, "I was injured." The memorandum doesn't mention anything about being shot by a nonlethal gun. The memorandum does specifically mention 150 people.

What, he was going to have an epiphany two months later and say, "I only meant 30"? The only thing that's convenient about that is that's how Luther described. But what else did Luther describe that night? His words -- again, I had to show him -- that he was running with the

1    anarchists.  That's how he described them, anarchists.

2         And when he first came into contact with Joe Crews,

3    what did he say?  "I was running with the shitheads, and

4    they caught us, and I was assaulted by the police."  That's

5    what he said.

6         So they can try to get as far away from the scene as

7    they want because they're trying to portray a picture of a

8    Sunday afternoon in Tower Grove Park, but you all have your

9    common sense, you've heard the other descriptions, you know

10   that's not accurate, and you know that is misleading to

11   support their speculation.  That's all that is.

12        As we go down the line, who else do we hear from?

13   Joe Marcantano.  And this is another gentleman that wished

14   those Lawrence Bryant photos never surfaced because, who do

15   we find out Joe Marcantano was?

16        We found out Joe Marcantano was a man that wasn't

17   going to talk to the FBI until he determined whether or not

18   he was a suspect or a witness.  He didn't talk to the FBI

19   for two years and two months.  He realized that he was in

20   trouble.  He suspected just that Randy Hays, who pled guilty

21   some ten days before, implicated him in intentionally

22   destroying the phone.

23        **MS. COSTANTIN:**  Judge, there's no evidence of that at

24   all.

25        **MR. ROSENBLUM:**  I would ask them to remember that's

1   exactly what he said, that he suspected it.

2       **THE COURT:**  The jury is instructed to listen to

3   counsel but to always remember the evidence as it was

4   presented to you from the witness stand.  That is your

5   charge.

6       **MR. ROSENBLUM:**  Thank you, Your Honor.

7       And, again, you guys have 12 memories, I have one, so

8   I will absolutely always rely on your collective memory.

9       But what Marcantano said was that he suspected what

10  Hays said.  The man knew he was in trouble.  Use your common

11  sense.

12      Why, shortly after Hays pleads guilty, November 8th,

13  12 days later, is he in front of the government for the

14  first time?  And what did he tell you?  Yes, I did not want

15  to be charged with a crime.  And, of all those 120

16  witnesses, how many proffer letters were signed?  Randy Hays

17  and Joe Marcantano.  That's it.

18      And I went through word-by-word with that proffer --

19  with you for that proffer letter.  And what did those words

20  say?  Those words said that this is in anticipation of a

21  plea.  Those words say that you have to speak the truth.

22  But whose truth?  Only the government has a decision in the

23  truth.  They're the sole deciders as to whether or not

24  Marcantano's trying to speak -- speaking the truth, the

25  people he is trying to please.  That truth isn't your truth.

1    That truth isn't this Court's truth or my truth.  Marcantano
2    is a walking definition of an agenda and bias.
3        And you saw how he squirmed on the witness stand.  You
4    saw how his wheels were spinning.  You saw how he kept
5    trying to answer a question that would make sense of what
6    he's saying, which was nonsense because he signed that
7    letter in an effort to get out of trouble because he also
8    knew that he was hands-on with Landry Fort.
9        Now, we took you through the pictures.  We saw how he
10   had him smashed down to the ground.  And what else did he
11   say?  That he relied on the probable cause of other police
12   officers.  He didn't expect anything was untoward.
13       And when he approached Landry Fort, when he approached
14   Landry Fort, he struck him with his use of force of choice,
15   which is his knee, and he's left-handed, so his dominant
16   knee would be his left knee.  And the reason that's
17   important is as we get to the intersection.  So that's
18   Joe Marcantano.  He knew he had some serious problems.
19       And you know what else he knew? He knew this:  He
20   knew, he knew that he was the man that removed the camera
21   from Luther Hall's neck.  And as Luther described it, he was
22   on the intersection, he was seated when he removed the
23   camera, and he also knew that camera was broken.  So this
24   man knew he had a couple problems, and he didn't want to be
25   charged.  And lo and behold, he wasn't after he spoke their

1    truth.

2         But let's talk about that truth.  His story is that

3    when he removed the camera -- I mean, this is one of those

4    moments in a trial where it's a head scratcher.  His story

5    is that when he removed that camera, he accidentally dropped

6    it, and then he didn't look at it because he wanted to

7    pretend it never happened.  This is a veteran police

8    officer.  Could you imagine?  He's panicking over

9    accidentally dropping a camera?

10        Well, we know who things about that:  We know that

11   either he's lying or Luther's lying because they can't be

12   both telling the truth because, without question, Luther

13   said, "The man that took the camera off my neck threw it

14   down to the ground, breaking it."

15        That's not what Marcantano said.  But, of course, he

16   also told his sergeant that he accidentally dropped it,

17   picked it up, and then accidentally dropped it again.  Once

18   he denied that to you on the stand.  That's a lie.  That's

19   an agenda.  That's a man not to be believed, because he's

20   testifying with clear motives, clear motives.

21        And, by the way, the one thing he did say was after he

22   dropped it once or twice, who put it in Luther's backpack?

23   Chris Myers.  Just like he put the phone in.  Just like

24   Luther said that they put all his gear in.  And when I

25   questioned Luther about where this gear was sitting, as you

1    remember picture to picture, it just couldn't be found
2    because it was in his backpack.

3         So then a year -- then two years and two months after
4    the fact, the government's big witness, this guy that I just
5    described, this guy that you saw that I took you through
6    those pictures with his knee -- and we'll get to that,
7    because that's the third problem he had.

8         Because Luther clearly said, "The person that took the
9    camera off my neck was the person who used his shinguard to
10   chuck me in the back when I was seated on the corner."
11   Consistently.  I asked Luther about that under oath in the
12   past three to four times.  It never altered.  He tried to go
13   along with the theory.  Didn't work.

14        So Marcantano then says, two years and two months
15   after the fact, for the first time, very first time, "Well,
16   I think I saw him take the battery out of the camera" -- him
17   being Chris Myers -- "and throw it."

18        Really?  It didn't come out when you, as Luther said,
19   intentionally threw it to the ground on -- once, maybe
20   twice?  And you now had this epiphany because you read
21   something in the newspaper because at the very time you saw
22   it, you assumed he was smoking a cigarette and that was the
23   movement that you saw?

24        Interestingly enough, I took him picture through
25   picture, and there's no indication that Chris was smoking a

1   cigarette.  Those pictures that came out after the
2   indictment are gold because it showed people for the lies
3   that they're telling.
4       Didn't matter to Fara Gold and the Department of
5   Injustice.  They'll go ahead and indict based on nothing and
6   leave that mess with these people, who now have to try to
7   have witnesses conform to some theory and speculation that
8   doesn't exist.
9       And then Marcantano goes further to try to get out of
10  trouble, where he relays some conversation, something to the
11  effect -- a couple weeks after the fact that he was at the
12  North Patrol gas station and something to the effect, "I
13  didn't beat him, but the camera's on me" -- I mean "the
14  phone's on me."  Really?  Why would he talk to that guy?
15  They have no relationship.
16      There's only one reason.  Even Marcantano would tell
17  you, without a police report, it's unreliable to try to
18  remember something two years and two months after the fact.
19  The only reason he's coming up with this stuff is to please
20  them, to get out of trouble, to not be charged with a crime
21  after he signed his proffer agreement.
22      And, frankly, it doesn't mean anything anyway because
23  it says the camera's on him, which is consistent with, guess
24  what?  "I tossed the camera because it had stuff on it."
25  But yet he'll come up with anything because, in addition to

1    knowing all the other issues that Marcantano had -- because

2    he somehow matriculated to sergeant a couple months after

3    the fact.  And you heard about all the rumors that were

4    going on.  You heard the rumors that were going on with

5    respect to Chris day after day.  Only the Department of

6    Injustice didn't care about that.  That's why you guys are

7    here.

8         Then we have the fact that, without question, "The man

9    that took off the camera is the man that kneed me in the

10   back."  Well, it wasn't Chris, because I went through,

11   picture by picture by picture, and Marcantano squirmed and

12   he moved.  And I showed him that there were gaps of time and

13   it's not completely still, but at the end of the day when

14   you look at Pictures 205 and 206 and 207 and 208 and 209,

15   and also compare it to the AP video image where that left

16   dominant knee disappears into the back of Luther Hall,

17   that's just one more problem that Joe Marcantano had.

18        And let's look at 205 and 206 and 207 and 208 and 209.

19   Let's look at these pictures.

20        Consistently what do we see?  We see Chris Myers in

21   front.  Consistently we see this gentleman standing with an

22   ASP.  Guess what?  People have ASPs on the scene.  There's

23   nothing nefarious about it.  She can say it as many times as

24   she wants.

25        And guess what?  Who's this guy?  That's Marcantano.

1    Look at his knee.  Look at Luther's face.  His eyes are
2    shut, he's wincing in pain because of that knee.

3        Go to 06.  Again, the same.  But as you go through
4    these pictures, I want you to notice how that heel keeps
5    leaving the ground.  I also want you to notice, what would
6    be his dominant knee?  He told you he's left-handed
7    dominant.

8        Go to 07.  08.  Look at that knee.  Look at that face.
9        And 09.  209.  There you go.  Every one of those
10   pictures, you'll see Chris in front.  Every one of those
11   pictures, you'll see his knee.  And I don't care how many
12   angles you look at -- yeah, it's not frozen in time, but
13   there's only one man behind Luther Hall.  There's only one
14   man that took off that camera.  There's only one man that's
15   striking him.  And he was in trouble, and that's what you
16   can consider.  Not consider all the other just rank
17   speculation as to how that phone got damaged, which there is
18   no evidence other than a theory, other than Burzota, who
19   told you he has no idea how that crack occurred.  Can't say
20   it.

21       He went further to say, "I have no idea how the
22   vertical axis was caused."  Can't say what caused the crack,
23   can't say what caused the vertical axis.  "I can say that,
24   8:54:02, that baton would be consistent, depending on the
25   angle of the baton."

1    All of a sudden these individuals are smarter than
        2    their expert?  I don't think so.  They're not smarter than
        3    you because you can use your common sense.  You know what
        4    happened.  They don't.
        5        **DEPUTY CLERK:**  Mr. Rosenblum, five minutes.
        6        **MR. ROSENBLUM:**  And all the additional speculation
        7    that you would have to engage in 103 tells you straight and
        8    simple, that is not evidence.
        9        That's your oath.  As I said multiple times, ladies
       10    and gentlemen, this side of the table has the burden of
       11    proof, and that's a big burden.  And because they have the
       12    burden of proof, they can speak again.  I wish I would have
       13    one minute to rebut them -- those aren't the rules, and we
       14    all play by them -- I don't.
       15        But I know this:  I know when you start hearing more
       16    speculation, you'll snip it out.  I know this:  I know when
       17    you start hearing these preposterous arguments, not based on
       18    evidence, but based on conjecture and speculation, I know
       19    that the 12 of you collectively can rebut them more
       20    eloquently than I ever could.
       21        And I can't imagine -- not only would you have
       22    hesitation after this case, as the jury instruction says,
       23    you have to have questions.  You have to have questions that
       24    you need answers.  You have to have questions that, how do
       25    you have 120 people and not one human being can see what

1  they claim to have seen, and all you are left with was this
2  preposterous speculation?
3      And the fact of the matter is, even if it was Chris
4  standing there with an ASP, this long thin line, you never
5  saw it hit anything.  You never saw a shadow of a phone.
6  And, in fact, that would be completely consistent with
7  standing with an ASP and tossing a phone, but we don't know,
8  and I don't want to speculate because that's not evidence.
9      But you have to have those questions.  You have to
10 have those questions as to what evidence did you hear
11 that -- the precise moment in time they're claiming that he
12 hit the phone, that he was contemplating an investigation,
13 when witness after witness, from Caruso to Mayo to every
14 witness, and just -- there's a word called "zeitgeist."
15 Zeitgeist is the feel of a particular time.  And the
16 zeitgeist of that scene, just looking at those witnesses
17 walking around, Patrick Haug and the other individuals, it
18 didn't have the feel that any human being at all at any time
19 suspected any investigation because there wasn't one, and
20 witness after witness told you.  But yet they want to say
21 he's the only man on earth.  Ask those questions.  You need
22 them answered.
23      This case, ladies and gentlemen, has gone on this long
24 for Christopher and his family.  It's up to you to say no
25 longer.  It's gone on this far for Christopher and his

1  family and it's up to you to say no farther, not on this
2  evidence.
3      The last thing I said to each and every one of you,
4  and I know I looked you in the eyes, each and every one of
5  you, I asked you if you are selected as a juror in this
6  case, will you give real meaning to the words "the
7  presumption of innocence"?  And you all looked at me, and
8  you said you did and you would, and you were selected.
9      I upheld my promises.  I told you in opening statement
10  what this evidence was going to be.  I told you you were
11  going to hear speculation.  I'm asking you all now to do
12  what's right, to do what's just, and to do what the evidence
13  tells you to do, send this young man home to his family.
14  It's been long enough.
15      Thank you.
16  **THE COURT:**  We're going to take a 15-minute recess.
17  Until the case is given to you to decide, do not discuss the
18  case among yourselves or with others or remain in the
19  presence of anyone discussing it.  If anyone should try to
20  talk to you about the case, advise me immediately.
21      Do not read, watch, or listen to radio, television, or
22  news reports of the trial, and keep an open mind until all
23  the evidence has been received and you've heard the views of
24  your fellow jurors.
25      Court will be in recess for 15 minutes.

1      *(Court recessed from 3:24 p.m. to 3:42 p.m.)*

2      *(Proceedings reconvened in open court with the*

3       *defendants and the jury present.)*

4      **THE COURT:**  Ladies and gentlemen, the plan is to

5      conclude the closing arguments today, and it may go a little

6      beyond 5, but I want to conclude them today.

7           The expectation is for you to return promptly in the

8      morning at 9:00.  Report back up on the ninth floor, and

9      then you'll be brought down here and given a brief

10     instruction, and then you'll be taken to another room for

11     your deliberations.  Is that understood?

12     *(Jurors nodding.)*

13     **THE COURT:**  All right.  Whenever you're ready,

14     Mr. Kilgore.

15     **MR. KILGORE:**  Thank you, Your Honor.  May I proceed?

16     **THE COURT:**  Yes, sir.

17     **DEFENDANT DUSTIN BOONE'S CLOSING ARGUMENT**

18     **MR. KILGORE:**  Ladies and gentlemen, on behalf of

19     Dustin Boone, I had talked to you all in voir dire and I had

20     told you about text messages.

21          Now, Dustin Boone's -- the die was cast for him back

22     shortly after September 18th of 2017.  On that day at the

23     electricians' hall, he answered the call of

24     Sergeant Jemerson and walked outside and told

25     Sergeant Jemerson exactly what he did.  And you've seen the

1    text message, the apology to Luther Hall.  And I know
2    Luther Hall told you that he didn't respond to it because he
3    didn't think it was sincere, and that's certainly his
4    prerogative.
5         But at that moment, at that time, during the course of
6    those text messages, or that text message, that's when the
7    rumors began, and that's when the rumors began circulating
8    regarding who did what to Luther Hall, and it started coming
9    out about how seriously Mr. Hall had been injured.
10        So in the context of that text message and in the
11   context of the other text message regarding specifically
12   this event when Dustin Boone said something to the effect,
13   "I am so embarrassed to be anywhere near this," he's not
14   talking about anywhere -- being embarrassed to be involved
15   in an assault of anybody.  He's not talking about -- in that
16   text message, the context of that is, he's not embarrassed
17   to be involved in the assault of an undercover officer or a
18   police officer.  He is embarrassed because he was involved,
19   in his mind, in the lawful arrest of a police officer.
20        Now, with regard to the other text messages, certainly
21   you've seen the racist text messages, and I was very clear
22   in voir dire, there's no context to give those text
23   messages.  They are horrible and they are vile.  But there
24   is no instruction that you will receive from the Court that
25   you are to find Dustin Boone guilty, that he is guilty of

1    this offense of aiding and abetting the deprivation of

2    Luther Hall's civil rights because of those text messages.

3        This is not a hate crime.  Those texts are meant to

4    inflame you, that's what they're meant for.  So there is no

5    context for those.  There is no thing that I can say to

6    justify those.

7        But what we know is that we are a product of our

8    environment, and sometimes we learn and we evolve as human

9    beings even though, at certain times, we think that words --

10   the words that we say aren't significant, and I am not

11   saying that about those words.

12       There are another series of text messages that you've

13   seen regarding committing supposed acts of assault or

14   violence against people that Dustin Boone has arrested or

15   arrests that he's been involved in.

16       I would say, about those, that those words do not

17   equal actions.  Vile words do not equal vile actions, and

18   there is no context to those.  And there's a way in which

19   police officers -- it is a reasonable assumption, based on

20   your own life experiences, in talking about work, in texting

21   with coworkers, and specifically the job that police

22   officers do and the job that Dustin Boone did in the Fifth

23   District, one of the most violent areas in the City of

24   St. Louis, there are text messages in which he makes

25   disparaging comments about protesters.  The Galleria, for

1    instance.  He's not even present at the Galleria, so those

2    words do not translate into what his actions were or were

3    not on the night of September 17th, 2017 at the corner of

4    14th and Olive.  That, that is what he is here for, not

5    sending those text messages.

6         And, again, you'll receive an instruction from the

7    Court, and you have, and you will get to take that back with

8    you:  Those text messages are not evidence that he committed

9    this offense on September 17th, 2017.

10        So shortly after, you heard Agent Boehlje testify that

11   in June of 2018, when -- he went to talk to Dustin Boone and

12   he delivered a target letter to him.  So once Dustin Boone

13   had -- that's how we got here.  Once Dustin Boone had talked

14   truthfully about what his involvement was with the

15   Luther Hall situation, and once they had seized his phone

16   and seen the rest of those text messages, that was it.  In

17   November of 2018 he was indicted.

18        Thankfully, we have the Lawrence Bryant photos.  We

19   have actual evidence.  So, as Mr. Rosenblum stated, and I

20   state on behalf of Dustin Boone, the government is trying to

21   speculate their way into a conviction on Dustin Boone for

22   aiding and abetting in the deprivation of Luther Hall's

23   civil rights.

24        There is not one single witness who has said or will

25   say that Dustin Boone struck Luther Hall, that Dustin Boone

1   saw Luther Hall get taken to the ground, or that he took him

2   to the ground, and I'm going to review that testimony with

3   you in just a minute.  But I do want to turn, if we could,

4   to the physical evidence in this case, to the actual

5   evidence that we have, to talk to you about that.

6       Could I see 155, please.

7       Now, you'll recall in the government's closing

8   argument she put up Government's Exhibit 304, which is a

9   still from the cell phone video, Mr. Myers bending over the

10  phone, and she pointed out a shape in the bottom and said

11  that, "Well, you know what, Randy Hays is over near the

12  electrical box, so Dustin Boone must have been near the

13  generator."

14      If you look carefully at that exhibit, in 304, and

15  compare it with Government's Exhibit 155, what you will see

16  is, right here, silver ring on Dustin Boone's uniform.  That

17  figure in Government's Exhibit 304 is clearly carrying an

18  ASP on a belt.  That is not Dustin Boone.

19      122, please.  123, please.  I'm sorry.

20      So, in Government's Exhibit 123, the time is 8:53:50.

21  And I want to point this out very carefully because I want

22  to show you what happened and what the evidence shows

23  actually happened and where Dustin Boone was.

24      You can see Mr. Hall clearly situated between the

25  electrical box and the generator.  This gentleman right

```
1   here, this is the other officer in the Luther Hall cell
2   phone video.  The officer with the nametag that you can
3   read -- that you can't read, excuse me, what looks like a
4   nametag across his chest, and the patch on the arm right
5   here.  And when you go through these -- and when you go
6   through these photos, I want you to track this officer.
7        Could we see 124, please.  Here's a different photo in
8   124, and you can see the movement is a little bit more.
9        125, please.  In this photograph you can see
10  Randy Hays start to come into the photograph, as well as
11  Dustin Boone right here.  This is Mr. Hays, and you can see
12  the other officer.  This photograph, Government's
13  Exhibit 125, you can see an officer here -- excuse me.
14       Can you go to 126.  I'm sorry.  You can see an
15  officer -- you can see -- in Exhibit 126, you can see
16  Mr. Hall standing there between the electrical box and the
17  generator.  This officer's turning to confront Mr. Hall, and
18  you can see the officer I pointed out who's in the video,
19  the back of the helmet right there, this would be Randy Hays
20  and this would be Dustin Boone.
21       Go to 128, please.  In 128, you can see, the officer I
22  pointed out with the patch on his shoulder is clearly gone.
23  Mr. Hall is on the ground and Randy Hays is still right
24  here.  You can see Dustin Boone right here in this photo.  I
25  know we have other photos where he's highlighted in blue.
```

1    I'm using these color photos just to make it easier to
2    identify everybody else.
3         It's at this point that, if you'll recall,
4    Lawrence Bryant describes seeing Detective Hall get slammed
5    against the generator.  That's where that other officer is,
6    the officer with the patch, and you'll see him in the video.
7    Mr. Hays will make his way in between the generator and the
8    electrical box, and that's exactly what you see happen in
9    Government's Exhibit -- at 8:54:02.
10        Can we go to Government's Exhibit 132, please.  Now,
11   in this particular exhibit you'll see -- in this photograph
12   you will see there's an officer here and there's an officer
13   who appears to be bending down right at this moment.  This
14   gentleman would be Sergeant Caruso, who was actually looking
15   at directly where Luther Hall was situated.  Dustin Boone is
16   not in this photograph.  He has moved up this way with the
17   other officers to check on Landry Fort, the gentleman on the
18   bicycle.
19        So this is the initial takedown, and you can see --
20   what's important about this is, Sergeant Caruso, as has been
21   previously pointed out, is the sergeant on the scene, and he
22   is looking right there.  So at this particular moment, as
23   Sergeant Caruso told you, there is no indication that
24   anything is happening that's not appropriate with
25   Luther Hall.  I'm not saying that it was, but that's what

1    Sergeant Caruso's recall was, that's what his take was, and

2    he was there.  He will eventually talk to you about how he

3    makes his way over to Landry Fort, and you can see that in

4    the photographs.

5          Can we go to 133, please.  Now, here you see the same

6    photograph.  This officer's completely bent down.  There's

7    another officer here, and Mr. Hall is clearly on the ground.

8    And at this point, Sergeant Caruso is making his way over

9    this way toward Landry Fort.  And, again, Dustin Boone is

10   not there when Luther Hall is taken to the ground.  He's not

11   anywhere in this picture that you can see him.  He's not in

12   the general area.

13         134, please.  This particular photograph, you can see

14   the movements and you can see Sergeant Caruso right here.

15   There's another officer bending down right here.  I would

16   say that -- my argument to you is that is Mr. Hays, and that

17   is the officer -- the other identified officer with the

18   patch on his sleeve, and you can see that clearly in

19   Luther Hall's cell phone video.

20         Government's Exhibit 135, please.  Now, at this point,

21   Luther Hall has been on the ground for approximately

22   12 seconds.  You can see Sergeant Caruso has moved over

23   here, as he indicated to you in his testimony, to check on

24   Landry Fort, and Dustin Boone is right here.

25         136, please.  Same photograph.  You can still see

1    Sergeant Caruso's helmet. You can still see Mr. Boone is
2    right here. And there are officers bent down around
3    Luther Hall. So Dustin Boone is still by this pole here.
4    He is still several feet away, and he is not involved in
5    anything that's going on in between the electrical box and
6    the generator.
7        Finally, 137, please. I know you've seen these
8    photographs before, but here's Mr. Boone, Sergeant Caruso,
9    and it looks -- I know it appears that people are standing,
10   but this scene is very fluid, as we discussed. People are
11   moving very quickly. This is happening very fast.
12       So as Sergeant Caruso testifies, he makes his way
13   around this box, and Dustin Boone makes his way this way.
14   When Sergeant Caruso -- his timeline's extremely important.
15   And whatever the government says -- they tried to manipulate
16   the timeline. And he is very clear. He's the supervisor on
17   the scene. He didn't stand there and just watch what
18   happened with Landry Fort. He says, "I took a peep and I
19   went back around."
20       What motive does he have to lie about his timeline?
21   Absolutely none. Absolutely none. And he told you all that
22   when he came around, he saw nothing happening. Everybody
23   else had scattered. Dustin Boone was kneeling at
24   Luther Hall's head area, and Randy Hays was kneeling towards
25   his middle side area.

1      Now, his concern is getting handcuffs on people, as
2  any officer -- same concern that any officer would have.
3  Same concern he would have as a sergeant supervising that
4  scene.  Again, no evidence whatsoever from anybody, from any
5  human being that Dustin Boone committed an offense against
6  Luther Hall in any way, shape or form, either by being
7  physically involved himself or seeing it and not withdrawing
8  from that event.
9      So I want to review now the testimony that you heard.
10 What's the evidence that you heard?  And, you know, I'm not
11 here to bash Luther Hall in any way, shape, or form.  I'm
12 not here to dispute the fact that the man was injured, and
13 I'm not saying he deserved to have happen what happened to
14 him, no matter what positions his hands were in, no matter
15 where he was standing.
16      But the fact of the matter is, in order to aid and
17 abet the violation of somebody's civil rights, you have to
18 act knowingly, and you have to act willingly.
19      And what happens with this timeline -- and, again, the
20 testimony from Luther Hall, he indicated, and you all know
21 from your own life experiences, that when you're going
22 through a traumatic event, it is hard to remember exactly --
23 not only exactly what happened, but things seem to take
24 longer.
25      So what he said under oath -- and I asked him about

1  it.  He said it in this trial with you all here this last
2  week, how long -- when Ms. Costantin asked him, "How long
3  did this last," his first sentence was, "I don't know.  It
4  felt like forever.  Maybe a couple minutes."

5       I asked him on cross-examination, "Isn't it true that
6  you said in a previous hearing that this is what you said
7  when asked that same question?"  And what he said was, "I
8  don't know.  It seemed like forever.  Maybe a minute or so."
9  So now we're at the minimum of 50 seconds or a minute,
10 possibly up to two minutes.  They're stretching out the
11 timeline.  If you look at the photographs, that's absolutely
12 not possible.

13      Go to the Lawrence Bryant photographs and look at
14 what's going on at 50 seconds.  The documentation team is
15 there.  There are people standing up.  Nothing out of the
16 ordinary has happened, and he certainly has not been beaten
17 for that long.

18      I don't dispute the fact that it may have felt like
19 forever, given the circumstances, but what's important is
20 what's actually happened in time, and that timeline is
21 simply not possible based upon the testimony of the
22 witnesses that you heard from.

23      So, next is Mr. -- Officer Marcantano.  What does
24 Officer Marcantano tell you?  He tells you about the scene.
25 He says he can taste the pepperballs.  He says it's a little

chaotic as far as the organization of the CDT team, and he
says once he reaches the corner of 14th and Olive, he's --
up until that point, he's trying to keep his eye on the
helmet in front of him and he's trying to make sure that he
keeps up with the line that's moving because something's
going on.

At a certain point, people start running. And he is
focused on Landry Fort, the individual on the bicycle. And
what does he tell you happens? He sees Landry Fort get
taken off the bicycle and placed on the ground. He goes
over to assist in that arrest, same way that Dustin Boone
did with Luther Hall.

What does Officer Marcantano tell you? He tells you
what he would consider passive resistance of not letting go
of an arm when Officer Marcantano is pulling it out, and he
has to deliver up to three knee strikes to Landry Fort's
ribcage, and then Landry Fort releases his arm, and he
zip-ties him, he cuffs him.

He said at that particular moment, based on all of the
circumstances, everything that he was able to take in at
that particular scene and everything he knew that was going
on, that he participated -- did nothing more than
participate in a lawful arrest. That's it. That's exactly
what Dustin Boone did, based on circumstances that are
changing, tense and uncertain, and based on circumstances in

1    which you've heard about the chaotic situation and
2    everything that was going on around there and everything
3    that the CDT officers had experienced that weekend.  It's
4    all relevant.
5         They sit around at the electricians' hall and they get
6    called out, and if they get called out, it is for a purpose.
7    And you've heard discussions of what was transpiring in and
8    around those pockets in the City, air support being called
9    for.  You've heard Luther Hall discuss what he experienced
10   just blocks away and the people running in the direction of
11   14th and Olive.
12        And also the scene, how loud it was.  People are
13   yelling.  Think about what officers say when they're looking
14   for somebody's hands, and there are many officers:  "Get
15   your hands out.  Let me see your hands."  Screaming,
16   yelling.  That's what happens during an arrest.
17        And he also told you that he's entitled to rely on the
18   probable cause of other officers.  You heard from
19   Luther Hall himself about the dispersal order.  You can hear
20   it in the cell phone video.  So nothing unusual, nothing out
21   of the ordinary was happening at all.  Nothing.
22        So who else do you hear from?  Talk about
23   Detective Kleffner, Dustin Boone's partner, former partner.
24   Now, remember, Detective Kleffner told you that, "Yeah,
25   three or four times we were riding together" -- and consider

1  the timeframe when this was happening -- "Dustin Boone told
2  me that, yeah, he got there and he put his hand on Luther's
3  head and was on his shoulder somehow."
4      Well, and I asked him, I said, you know -- and I think
5  he even said on direct, "Is there anything about that that
6  caused you any concern?" No. He was consistent. What he
7  said made sense. There was nothing out of the ordinary with
8  that.
9      And then he's asked, "Well, did he tell you that
10 Randy Hays knocked him to the ground?" And
11 Detective Kleffner said, "Yeah, yeah, he told me Randy Hays
12 knocked him to the ground." If you think about that
13 question, he never said, Yeah, he told me, "'I saw
14 Randy Hays knock Luther Hall to the ground.'" There's a
15 huge difference, because that's the speculation and that's
16 this manipulation of the evidence, you trying to put
17 Dustin Boone closer to Randy Hays. You know that Randy Hays
18 was standing right there, and Officer Marcantano said as
19 well.
20     Both -- they said they had to stick him. Dustin and
21 Randy Hays, they said they had to stick him. Well, wait a
22 minute. You said one of the two, Dustin or Randy, said
23 that, but you couldn't remember which. We know who stuck
24 him: Randy Hays. We know it for sure. So that's an
25 example of this manipulation. Same thing they're doing with

1   the timeline, in the statements that come out from
2   witnesses.

3        What does Officer Walls tell you?  Officer Walls tells
4   you that he's involved in a conversation with a group of
5   people, with Dustin Boone, and Sergeant Manley is there, and
6   they're talking in the basement and talking about this
7   event.  And Dustin Boone's, "Yeah, I was at his head," or,
8   "I was on top of him," or, "I had to kneel down."  But it's
9   getting Dustin Boone closer and closer to Randy Hays.  At no
10  time does no one tell you that he saw what was going on.  At
11  no time does he say that.

12       Now, you've also heard, I believe it was
13  Detective Kleffner say that, you know, "Yeah, he was concise
14  and he was -- what he said made sense."  But what didn't
15  make sense was that he didn't see Luther Hall getting
16  assaulted.  Well, again, that's an assumption that
17  Dustin Boone was there to see Luther Hall get assaulted.
18  They're stretching out the timeline.  There is no way that
19  he was assaulted for even 50 seconds, for even a minute.
20  That's what's going on in this case.

21       Instruction Number 9 is the aiding and abetting
22  instruction.  It tells you what is required, and it's
23  required that Dustin Boone have knowledge and act wilfully
24  and have not -- you have to have knowledge to form an intent
25  that a violation of deprivation of civil rights is

occurring.  There is absolutely no evidence whatsoever that
Dustin Boone participated in or aided and abetted Randy Hays
and another officer with any violation or deprivation of
Luther Hall's civil rights.  That is what the law requires.
And you cannot speculate somebody into a conviction.  That's
not what the instructions say.

        And if you look carefully at all of the evidence in
this particular case, look at everything and think of the
context and the rumors that were flying around the St. Louis
City Police Department as to who did what and how seriously
Luther Hall was hurt, and that actual scene, there is not
one person that has said that Dustin Boone violated
Luther Hall's civil rights by physically striking him or
causing any sort of injury to him.

        And there is not one person who is able to tell you
that Dustin Boone was there when Randy Hays and the other
officer or officers were violating Luther Hall's civil
rights.  There is absolutely no evidence of that.  You have
not heard a single piece of evidence from that.

        All you've heard is what Dustin Boone has said from
the very beginning, that he participated in what he -- with
everything that he could know at the time, intense,
uncertain, and changing circumstances, fast-moving and
chaotic and loud -- that he participated in what he
perceived as a lawful arrest.

1        So, ladies and gentlemen, I'm asking you to consider

2    all of the evidence you have; not speculation and not

3    manipulation.  And look carefully at the photographs.  And

4    listen to the testimony of the people that were there --

5    Sergeant Caruso, Officer Marcantano -- regarding what

6    transpired on that corner.  And you'll see that there was

7    probable cause, what officers perceived to be probable

8    cause.  You will hear the dispersal order given on

9    Luther Hall's cell phone.

10        And as any other officer in those circumstances, those

11   rapidly changing, tense, and uncertain circumstances,

12   Dustin Boone does not have to stop and ask what the probable

13   cause was for Luther Hall being on the ground.  There is

14   absolutely zero evidence, zero evidence.

15        It is just speculation as to how long Randy Hays and

16   the other officer assaulted Luther Hall.  There is no

17   evidence to show that Dustin Boone was present for that,

18   that he had knowledge of that, or that he could have aided

19   and abetted in that conduct.

20        So, for those reasons, ladies and gentlemen, I would

21   ask you to find Dustin Boone not guilty.  Your oath and your

22   obligation is that you must find evidence that leaves you

23   firmly convinced beyond a reasonable doubt.  And those words

24   have meaning inside this courtroom and in every other

25   courtroom in this country.

1        Thank you.

2        **THE COURT:**  Thank you.

3        You may conclude.

4                    **GOVERNMENT'S REBUTTAL CLOSING ARGUMENT**

5        **MS. COSTANTIN:**  Thank you, Your Honor.

6        First of all, what I want to do is address some of the

7   things that were raised in their two hours, so I'll keep it

8   quick.  I'll try and be brief.

9        There's absolutely no evidence that Officer Chester

10  stepped on the phone, okay?  Officer Chester testified

11  nobody even asked him, "Hey, were you by the phone?"  I mean

12  that's just -- that just got completely made up there, okay?

13  It's beyond speculation.

14       All right.  To be clear, a baton strike from

15  Officer Hays is not -- did not cause the damage to the

16  phone.  The phone is showing the baton going up, and then it

17  has the shakes, okay?  If the phone is struck by the baton,

18  it would be struck on this side, not this side, and it

19  didn't record any such strike.  The strike is consistent, as

20  I said, with the ASP after this has been facedown, and it's

21  the darkness.

22       Mr. Burzota, the photographer yesterday, did not

23  testify that he could see a baton strike.  What he testified

24  was that he could see the baton go up, then the phone began

25  shaking, and he couldn't tell what occurred after that time.

1    And, once again, that spinning motion is consistent with him

2    striking -- with Officer Myers striking the phone, causing

3    it to flip.

4          There's an indication or claim that Mr. Myers was

5    guarding the perimeter.  That makes no sense.  He was the

6    hands-on arrest team person.  He had no stick, he had no

7    shield, he had no role in guarding the perimeter.

8          There's also a claim that Officer Myers was actually

9    over by some other place over by the generator.  Not only do

10   we have a picture of him by the generator, we have a picture

11   of him right next to -- the electrical access panel is right

12   there, 1 foot and 3 inches away from the assault.  He's not

13   on some other side of the generator.  That's exactly where

14   he is.  He's standing right there.

15         The most offensive assertion is somehow that

16   Officer Hall broke his phone.  I didn't understand that.

17   Officer Hall kept the phone for six months and then decided

18   to break his own phone in some sort of -- that made even

19   less sense.  And that he's part of some conspiracy because

20   he didn't take photographs of his body?  He took photographs

21   of his big fat lip.  That's truly offensive.

22         The FBI asked him for his video.  He got the video to

23   them within two weeks.  And when they asked him for the

24   phone, he was given the phone -- he gave them the phone.

25         Let me talk for a moment about -- let's talk about the

1    phone.  There seems to be some claim, completely not

2    supported by anything that anyone had said, that

3    Defendant Myers threw the phone because he saw blood on the

4    phone.

5        Detective Hall was hit in his face.  He is lying on

6    the ground with his hands on his side.  He is handcuffed.

7    The blood is on his gaiter.  The blood from the gaiter does

8    not get onto his hands until after he's been -- his zip ties

9    have been cut off in the SWAT, and at the very least, he

10   goes into his backpack back at headquarters to get the

11   phone.  That's when the blood gets on the phone.

12       There's no red substance on the phone that would cause

13   anyone to throw it.  That does not make any sense at all.

14   And the phone is not covered in blood until after

15   Luther Hall gets back to headquarters and touches his face,

16   gets blood on his hands, and then takes his phone out of the

17   backpack.

18       So, question as to, why doesn't Defendant Myers throw

19   the phone out if he wants to destroy it?  What did we

20   already hear about all the protocol related to prisoner

21   property?  Okay.  It's one thing if the phone's broken; it's

22   another thing if the phone is missing entirely.  Phone is

23   broken, we can say we don't know how the phone got broken.

24   Phone is missing, that's a problem, that's a big problem.

25   That's why the phone has got to go into the backpack.

1        And let me say this on the AP video.  The AP video
2   does not show Defendant Myers reaching into the backpack.
3   If you recall, when he leans over and we turn that volume up
4   incredibly high, what does he say?  "Do you have anything on
5   you I should know about?"  He's leaning over to talk to
6   Detective Hall.  It has nothing at all to do with him
7   putting anything into the backpack at that point.  It has
8   nothing to do with that.
9        Once again, I don't want to go through this endlessly,
10  but that AP video also shows that Officer Marcantano is
11  between the two individuals, and we know it's from the same
12  timeframe because the lady's walking her dog, okay?  And we
13  can see that both on the RTCC and -- get a time for that and
14  then correlate that to the AP video.  Marcantano is between
15  the two of them.  Marcantano is not behind them bashing him
16  with his leg, okay?  That's just not -- that's just not
17  accurate.
18       Now, let me talk for a moment about Sergeant Caruso
19  because, poor Sergeant Caruso.  Sergeant Caruso thought that
20  the people who were being stopped at the corner matched the
21  description of some wanted people, until he reviewed the
22  dispatch and realized, *Oh, never mind, I was wrong about*
23  *that.*  Okay?
24       Sergeant Caruso thought it just took mere seconds that
25  he glanced over to the bike person and then went over and

1  handcuffed Luther Hall 'til he saw the photographs and

2  realized, *No, actually, I walked all the way over to where*

3  *Landry Fort, the bike guy, was being arrested and was over*

4  *there for a period of time, and then went over --*

5      **MR. ROSENBLUM:**  Not the evidence, Your Honor.

6      **MS. COSTANTIN:**  *-- to Luther Hall.*

7      **THE COURT:**  The jury must rely upon their own

8  recollection of the evidence and not necessarily as it's

9  related to them by another.

10     Proceed.

11     **MS. COSTANTIN:**  I believe he said he knows what he --

12 that's what he believed.  But the photos say differently.

13 Okay?  He believed it happened quickly, but the photos say

14 differently, I think is what he said.  So the point is

15 simply that Sergeant Caruso isn't lying.  Okay?  He's not

16 lying; it's just that this was an unimportant event to him.

17 It was kind of an important event to Luther Hall, who was

18 getting the crap beat out of him, okay, so he knows how long

19 that is.  Sergeant Caruso is not really paying attention to

20 those specific things.

21     Now, what was Sergeant Caruso concerned about?  He was

22 concerned -- he told you that he was concerned when he saw

23 that individual, later determined to be Detective Hall,

24 knocked down.  That concerned him.  Okay?  He wasn't certain

25 about that.  He didn't like that part of it.  He was

1   concerned about it.

2       He also was surprised that Detective -- who he later

3   learned to be Detective Hall hadn't been handcuffed by the

4   time he got there because it seemed like too long a period

5   of time for that to have happened for them not to have

6   handcuffed him.

7       Most importantly, he said his hands were just laying

8   on his side.  Okay?  His hands were just laying on his side

9   because there was being -- no effort being made by

10  Officer Boone or Hays to handcuff him because he was being

11  beaten, okay?  This wasn't about an arrest.  This was about

12  a beating.  That's what was happening during that time, and

13  that's why Sergeant Caruso was puzzled by why it took that

14  long.

15      We see Sergeant Caruso just before there's the

16  39-second gap of the cars driving by.  That is consistent

17  with the knockdown starting at 8:53:51 and the assault

18  continuing while the SWAT trucks go by, and then we next see

19  Sergeant Caruso adjusting his helmet a full minute later, a

20  full minute after that.  Not a full minute after the assault

21  starts; a full minute after we can't see anything anymore.

22  Okay?  So there's no indication that he's suddenly over

23  there.

24      Now, Mr. Kilgore went through some photographs showing

25  you that Officer Boone was at his -- was over to the side at

1    8:54:02. And I agree with that. That's what I showed you,

2    too, during my first half. It's at 8:53:03 where we can't

3    see him, and then we see the person appear on the cell phone

4    video. That's significant. That's the point. That's when

5    that occurs.

6         Now, let me just talk briefly -- we talked about the

7    lighting. You can see there's a light pole directly over

8    there, so we're not in some sort of dark situation.

9         The other thing that is very troubling is, the concept

10    that Luther Hall should have revealed himself as an

11    undercover officer and somehow this is his fault that he got

12    assaulted.

13         All right. First of all, he didn't exactly have an

14    opportunity because he's thrown to the ground immediately.

15    Okay? We can see that both by coordinating the cell phone

16    video as well as the photographs. He is thrown to the

17    ground immediately, and that's when the "ass whooping," to

18    use Detective -- Officer Boone's phrase, starts. Okay? So

19    it's not like he had an opportunity to do anything, to

20    identify himself.

21         But, more importantly, what? What? It was okay to do

22    it to a protester? It would have been okay if he wasn't a

23    detective? What we know for certain with Detective Hall is

24    that he didn't resist. See, if this had been a protester,

25    we would have heard about how he was resisting, only we

can't say that with Detective Hall, can we?  Because we know

he wouldn't resist.  As an undercover officer, he would

never resist.  As a police officer, he would never resist.

So now we don't have to blame him for not identifying

himself ahead of time.

    And the other thing is that he had his hands here

instead of his hands raised up over his head.  When does

Officer Naes raise his hands over his head?  Two times.  One

when he's walking towards the police officers, who've shot

him with the beanbag gun, walking towards them, okay?  Not

stationary, walking towards them.  And later on when he's --

when he comes across officers doing other arrests and he

walks towards them, and that's when they tell him to get

down.  Detective Hall is simply standing there.  He is

simply standing there.

    Now, there's discussion about how Officer Marcantano

wanted to apologize.  Why did he want to apologize?  Because

he broke the camera.  Why does Officer Boone want to

apologize?  We're going to see this in a second, because he

was part of the ass whooping.  Why does Officer Myers want

to apologize?  And we see -- we'll see shortly, again, that

he wants to apologize because he broke the phone.  Okay?

That's why they all want to apologize.  That's what

happened.  That's what they did.

    Now let's go to the PowerPoint.

1       I told you before that I'm going to summarize the

2  evidence as to each defendant.  Okay.  So let's talk about

3  Dustin Boone.  What did the witnesses say?  We know from

4  witness Lawrence Bryant that there was -- an officer had a

5  knee in Detective Hall's back and kept pushing his face to

6  the ground.  He does not identify Officer Boone, but that is

7  exactly consistent with what Officer Boone said he was

8  doing.  Luther Hall said there was pressure on his body, and

9  then there was a free-for-all.  That's the point.  He's

10  being held down while he is being assaulted.

11       Dr. Buchowski told you that he has two neck disc

12  herniations as a result of the assault, and we know that

13  because he did not have any injuries before the assault and

14  any back problems before the assault, and that's where the

15  injuries occurred.

16       Now, Officer Kleffner said that Boone had told him

17  that he had his knee on Detective Hall's back shoulder area

18  and his hand or forearm on the back of Detective Hall's

19  head.  And Boone told him that Hays had tackled

20  Detective Hall.  Okay?  Now, Mr. Kilgore said, "Well, but he

21  didn't say that he saw him," or if that wasn't clear, ask

22  him another question.  Okay?  Ask Officer Kleffner another

23  question.  Because what Officer Kleffner said was Boone

24  said, "Hays tackled Detective Hall."  He didn't say, "Boone

25  said, 'Hays told me that'" -- "Boone said that Hays told me

1    that he's the one who tackled him." He said Boone said Hays
2    tackled Detective Hall.

3        And then the highly unlikely that Boone said he was
4    looking down so he couldn't see who was striking
5    Detective Hall, which is just -- does not make any sense at
6    all because if you're an officer and you're attempting to
7    control somebody, really, you're not going to look where his
8    hands are if you're worried about him? Hey, my job is the
9    shoulder, I just do the shoulder, maybe the head. I don't
10   like look around and see if he's doing anything else. That
11   is just absurd. He knows what's going on.

12       And then also we know from Officer Walls that
13   Defendant Boone said that he was on top of Detective Hall.
14   So we know that he was on top of him. We know that he was
15   pinning him down, and we know that the pinning down occurred
16   during the assault because that's what Luther Hall said and
17   that's what the photographs, the cell phone video shows you,
18   is that he's there -- the assault is just starting, just
19   starting. The actual assault with the baton is just
20   starting as Officer Boone gets there.

21       Now let's talk about the text messages. These text
22   messages are not offered to inflame you. They are offered
23   to inform you. Okay? They're offered so that you can
24   understand what is going on in the minds of both
25   Defendant Boone as well as Defendant Myers. And what he is

```
1    thinking when he sees Luther Hall standing there at the
2    corner.  Luther Hall, he doesn't know he's a detective.
3    Luther Hall, who he thinks is just a black protester.
4         Okay.  320, this is what he's talking about.  "Fucking
5    niggers" is what he says.  And then the text from
6    April 19th, and this is an important text because this lets
7    you know what his intent is, what his motive is, what his
8    thoughts are, how he treats suspects, and I would ask you to
9    pull these texts and look at these full texts.  I can only
10   do a small portion of them on here.
11               "Hahaha we made him tell the other officers
12          on scene that he is a pussy!"
13         This is after he had tased someone and EMS is there,
14   and:
15               "He was puking on himself while EMS was
16          looking at him and saying, 'I'm a pussy in a
17          pussy.'  And crying . . . . it was the
18          greatest moment of my short career!"
19         "It was the greatest moment of my short career."
20   That's the point.  That's what this is about for him.  This
21   is about his intent here when he is dealing with
22   Detective Hall.  There's no mistake about what he's doing.
23   He's participating in a beating just the same way that his
24   intent is here, which is abusing a suspect.  "It was the
25   greatest moment of my short career."
```

1    6/24:

2         "These fuckin niggers r the same as

3         St. Louis niggers."

4    And then in July:

5         "There r niggers running wild all across

6         the city, and even if/when we catch them . . .

7         . . they don't get in any trouble because

8         there are plate lips running the CAO."

9    What's the CAO?  The Circuit Attorney's Office.  So

10   what is he doing?  He's basically saying, "I get my evens on

11   the street.  I don't take it to the Circuit Attorney's

12   Office.  I'm getting my evens on the street."

13       And then we get the ones that are directly, directly

14   related to the protests.  We heard about what was happening

15   on the streets.  By the way, none of that, no throwing of

16   objects, nothing like that was happening at the corner of

17   Olive and 14th Street.  You saw -- and it's pretty boring,

18   isn't it?  You saw the RTCC video of it.  The chaos is,

19   frankly, caused by the dozens of police officers running

20   down the street who can't keep in two straight lines.

21   That's where the chaos is.  Okay?

22       There's -- I mean, they take down two people on the

23   corner, take them down as if, you know, they're Bonnie and

24   Clyde.  For what?  For what they think is failure to

25   disperse?  Which, of course, doesn't really make sense

1   because if there is an order to disperse -- and as you hear

2   on the video, someone says, "Go, go, go," they say "go," and

3   then you arrest them for going, okay?  That makes no sense.

4       And there's no property damage in that area.  There's

5   no evidence at all that there's property damage in that

6   area.  The property damage occurred on the other side of

7   Tucker, which is the -- which was 9th Street, okay.  It

8   occurs blocks away and time away, okay?  That's just

9   baloney.

10      Okay.  So let's go -- let's talk about -- we talk

11  about what actually is happening on that corner.  Let's talk

12  about what's happening in Dustin Boone's mind, what his

13  intentions are for those protests:  "Just fuck people up

14  when they don't act right."

15      And he's talking about another person who's going to

16  be on arrest team with him.  This is when he was assigned to

17  an arrest team before he got switched to a line team.

18  Remember, with Sergeant Caruso he was on a line team.  He

19  wasn't supposed to be doing arrests.

20          "It's he and I that just grab fuckers and

21          toss em around."

22      Also on that Friday:

23          "We really need these fuckers to start

24          acting up so we can have some fun."

25      September 15th:

1          "It's gonna be a lot of fun beating the

2          hell out of these shitheads once the sun goes

3          down and nobody can tell us apart!!!!!"

4     And that's exactly what it is.  They're all in CDT,

5     "Nobody can tell us apart."

6          And if you can focus on three texts in particular.

7     Look at, "It's the greatest moment of my short career when I

8     abuse a suspect"; "I'm going to beat the hell out of these

9     shitheads when it's dark"; and, "No one can tell us apart."

10         And then we're going to get to the last part about

11    dragging him behind an office to avoid the RTCC cameras.

12    That's what his mindset is and that's what his intent is.

13         But let's go through these first.  This is the next

14    day.  This is Saturday:

15          "This shit is crazy . . . . but it's

16          fucking AWESOME too!  Except for cops getting

17          hurt.  People on the streets got FUCKED UP.

18          Lol."

19    Okay?  We're not going to fear.  We're not talking

20    anything like that.  We're talking having a good time.

21         The 17th, this is the same day that Detective Hall is

22    beaten while Defendant Boone is holding him down:

23          "It's still a blast beating people that

24          deserve it.  I'm still enjoying each night."

25    And then -- and we can -- really haven't talked

*USA vs. Boone and Myers, Case #18-975*          6/15/21 - Pg. 207
*Government's Rebuttal Closing Argument*

1    about -- we can't talk about it because it was just evidence
2    in right now, but let's talk about the FaceTime.
3         The FaceTime.  He is FaceTiming Ashley Marie during
4    the time of the assault.  You saw the camera, the camera he
5    had not -- Detective Hall's camera.  He had that camera
6    there and he has an hour-long FaceTime because it's
7    entertainment.  That's what this is, it's simply
8    entertainment.  And it's not terror; it's entertainment.
9         And what does she say when the FaceTime ends?  "Lol,
10   that's so gross."  So what would it be?  What would be so
11   gross?  What would have been so gross?  Well, look at
12   Dustin Boone leaning over Detective Hall.  Leaning over him.
13   At one point he's turned to the side, and what would be on
14   his side?  Well, he's got his gaiter and it's bloody.  "Lol.
15   That's so gross."  Isn't it?  All that blood.
16        And then what does she do?  And I ask you to look at
17   these texts and go back because I don't have the ability to
18   put everything on.  She talks about that's basically funny;
19   Hands up, hands down, you people can't keep track of what
20   you're doing.  Okay.  We hear part of that on the audio, but
21   remember, the audio goes off and the yelling continues.
22        We know from Sergeant Caruso there's a lot of yelling
23   going on, okay?  "You guys got to get your act together," is
24   what she says.  And then she has the four "rolling on the
25   floor laughing emojis," okay?

1          And if you ever have any doubt that what she actually

2    saw, what she actually saw was Detective Hall being beaten,

3    you just need to see what the next text is.

4          What does he send to her the next day after he's

5    learned that it's an undercover detective?  Because it was

6    funny before, wasn't it?  "It was gross but it was kind of

7    funny," and, "You guys have to get your act together because

8    you just beat up a protester."  It's a funny, entertaining

9    story.

10         "Nothing about that story to anyone, please."  Once he

11   learns it's an undercover detective, "Nothing about that

12   story to anyone, please.  Not something I'm proud of.  And

13   not entertaining at all at this point."

14         At this point?  Why this point?  This is when he

15   realizes it's Detective Hall that he's beaten up.  That was

16   kind of fun when it was just a protester but it's not fun

17   anymore because he's going to get in trouble for it because

18   he can't just claim that they were resisting arrest and they

19   could all escalate violence because it's an undercover

20   detective and it's not going to fly.  That story is not

21   going to fly.

22         Let's continue with some of these text messages.  And

23   this is even afterwards, okay?  This is three days

24   afterwards.  This is two days after he's learned that he's

25   been part of beating up an undercover detective:

1          "The problem is when they start acting like

2          fools, we started beating the shit out of

3          everyone on the street after we give two

4          warnings."

5      And what does he say to -- his father said:

6          "You must have put a pretty good whipping

7          on him."

8          "Yeah, unfortunately.  Not one I'm very

9          proud of!!"

10     That is an admission.  He's been part of putting a

11 pretty good whipping on him, one he's not very proud of.

12     On the 21st, that same day, talking about the

13 protesters:

14         "Here we go.  Fuckin animals."

15     Two days later:

16         "Did everyone see the protesters getting

17         FUCKED UP in the Galleria?????  That was

18         awesome!"

19     Now, he's not part of that.  He sees it, okay?  He

20 sees a story apparently about it.  It was awesome though

21 because that's what he's about.

22     And then his text, excuse me, to Detective Hall:

23         "I feel like an apology will never be

24         enough, but I would really like to speak to

25         you in person so I can apologize

1          face-to-face."

2      He is apologizing because he has done something wrong.

3  He is apologizing probably because he's hoping that the

4  apology will help him get out of trouble as well, that it

5  will make him look good, but it is an apology, it is an

6  admission, just like to his father when he says he's not

7  proud of the pretty good whooping on him.

8      And then in October, another abuse of a suspect:  "

9          "'ve open-hand slapped him one time.  He

10          got his eyes widened a little with a slap from

11          a white boy.  Lol."

12     And in November:

13          "He was crying and bloody from making me

14          run that far."

15     Talking about the same incident:

16          "Dude got in a dead end gangway by me and

17          he is NOT in good shape now."

18     And then here's the one I was talking about:

19          "We didn't take him to children's for

20          nothin!"

21     What would that be?  Children's Hospital.

22          "We didn't take him to Children's Hospital

23          for nothin!  Lol.  There's so many RTCC

24          cameras in the fifth now, I had to literally

25          drag him behind a privacy fence to avoid one."

1    That is what he thinks his job as a police officer is.
2    If we can get away with it, he's going to do it.  If he can
3    use force, beat somebody up, he's going to do it.  What is
4    this least amount of force necessary to effect an arrest?
5    That has no meaning to him.
6         Now, let's talk about Christopher Myers.  What do we
7    know from Sergeant Marcantano?  Sergeant Marcantano saw
8    Christopher Myers remove the battery from Detective Hall's
9    camera, and Sergeant Marcantano told you that Myers said to
10   him that the cell phone was on him.
11        Now, why would he confide in him?  First of all, he
12   was shocked.  Sergeant Marcantano told you he was shocked
13   that he actually confided.  They're both at the scene that
14   night, he's going to tell him about what happened, so, you
15   know, that's why he's going to confide in four of them there
16   at the corner.  "The cell phone's on me."
17        Okay.  What does Detective Hall tell you?  That Myers
18   had removed the battery from his camera.  And so, you know,
19   we both have Luther Hall, as well as Sergeant Marcantano,
20   stating that Myers removed the battery from the camera.  We
21   can talk about who took it off his back and who dropped it
22   and who did this and who did that.  Both individuals tell
23   you that Myers, Defendant Myers, was the person who removed
24   the battery from Detective Hall's camera.  As I said before,
25   really?  What he probably thought he was getting was the SD

1   card.  That's what he thought he was taking out of the

2   camera, so there would be no evidence of it.

3        I'm not going to beat -- go through this once again in

4   detail, but Detective Hall's cell phone video, you can see

5   that shadow of the ASP at 8:54:02.  You can see the damage

6   to the back of the phone that fits the ASP, as well as the

7   damage to the front of the phone.  The glass shattering fits

8   the ASP.

9        You can see Defendant Myers' face at 8:54:10, which is

10  after the phone is facedown, and then spins on its vertical

11  axis, as you heard from Mr. Burzota, and it spins on its

12  vertical axis, and we see Defendant Myers' face at that

13  time.

14       We also see it seconds later, and we know that it is

15  right next to the assault, not simply because we could see

16  it at 10 seconds -- at 8:54:10 that he's by the generator --

17  we can also see the actual electrical access cover, so we

18  know that he is literally right there while Detective Hall

19  is being beaten in that space between the traffic box and

20  the generator.

21       And, finally, we talk about the use of video, and we

22  went, I understand why -- here's the simple reason that

23  YouTube video was played.  This is why.  Okay?  This is why:

24  Because he covered his nametag.  All right?  He covered his

25  nametag.  He's covering his -- he's hiding his identity.

1    That's why it's showed.

2         Now, I will say it was also nice that he was smoking

3    on a video because they made a big deal about the fact

4    that -- you know, Marcantano -- he's not smoking in the

5    video that -- or in the photos that we can see.

6         Of course, it's already been established that many

7    things happened that weren't in the photographs.  For

8    example, Jemerson came, SWAT came, Chester left and walked

9    across the street with Sergeant Jemerson.  All these things

10   aren't in the photos.  And the smoking's not in the photos

11   because it happened once the photos were done.  Okay?  And

12   the smoking that Sergeant Marcantano saw is why he thought

13   he had thrown away a cigarette and only later on realized

14   that that's when the battery must have been thrown.

15        So that's the reason that the YouTube video was shown

16   to you, so you could see his intent, and his intent when he

17   breaks the phone, because here's the thing:  He broke the

18   phone, okay?  I mean, you know, he broke the phone.

19        And I guess the second argument is, if you don't

20   believe he broke the phone, then it wasn't in contemplation

21   of an investigation.  Well, yes, it was.  That's why he

22   broke the phone, okay?  He didn't just break the phone for

23   the heck of it.  He broke the phone because there was an

24   assault going on and he wanted to cover it up, just like he

25   covered his name up.

```
1          Let's talk about the text messages.

2          September 15th:

3              ""Let's whoop some ass."

4          September 15th again, when they ask -- someone

5      expresses their support for him in having to work these:

6              "Lol yea but for some sick reason I live

7                for this."

8          9-16, the day before the assault:

9              "I think the bosses are being a little more

10               lenient with the use of force by us."  With a

11               smiley emoji.

12         The same day:

13              "I'm fucking fighting protesters.  I'm not

14               stressed bro lmao."

15         And that's -- point is the attitude here is, this is a

16     fun time, okay?  But when you look at the texts from Boone

17     and you look at the texts from Myers, this is a fun time.

18     This is not a stressful time; this is a fun time.  This is a

19     time when you can put your phone on and FaceTime your

20     girlfriend for an hour and she can see all the stuff you're

21     doing, including, you know, participating in the beating of

22     someone.  That's -- this is not a stressful time.

23         And Officer Myers also wanting to apologize to him,

24     Detective Hall:

25              "Personally because I feel bad.  We
```

1          obviously didn't know he was a policemen."

2          And this is where it always comes down again, is, what

3   is he apologizing for?  Breaking the phone, okay?  That's

4   what he's apologizing for.  We obviously didn't know he was

5   a policeman.  Wouldn't have broken his phone if we knew he

6   was a policeman.

7          And then just the fact that he's used violence or has

8   an intent to use violence other times:

9              "We activated our equipment to check on the

10             officer and try to fuck up the bad guys."

11         So this is not disturbing to him.

12         So, let me, in conclusion, simply say that

13  Defendant Boone said that he was going to beat protesters:

14             "It's going to be a lot of fun beating the

15             hell out of these shitheads once the sun goes

16             down and nobody can tell us apart."

17         Then he pinned down Detective Hall.  He aided and

18  abetted Officer Hays in the beating of Detective Hall, and

19  he FaceTimed it to Ashley Marie for entertainment.  He said

20  he was going to do it, he did it.  He FaceTimed while it

21  happened, and he apologized to Detective Hall after he did

22  it.  And there's no mistake here, there's no

23  misunderstanding, Oh, it was just a regular arrest or

24  something like that.  Well, there was nobody beating the

25  bike guy with a baton, okay?  There was nobody beating the

1    bike guy, Mr. Fort, with a baton when Sergeant Marcantano

2    went over there.  There's no mistake here.  He's --

3    Detective Hall's being beaten with the baton while he's

4    being pinned down by Officer Boone.

5        And the other reason we know there's no mistake, look

6    at the other times, look at his intent the other times and

7    what he says in regards to abusing other suspects.

8    Defendant Myers, his attitude, "For some sick reason I live

9    for this," he's "fucking fighting protesters."

10       We know that he removed the battery, which he thought

11   was the SD card.  We know that from both Detective Hall as

12   well as Sergeant Marcantano, and he smashes that phone with

13   the ASP light next to the assault, and he, too, wants to

14   apologize.  Both the removal of the battery as well as the

15   smashing of the phone show his intent to cover up the

16   assault.  And why else would you cover it up than if you

17   thought that there would be an investigation?  There's no

18   other reason to smash the phone.

19       You've heard all the evidence.  I ask you to find

20   Defendant Boone guilty of violating the civil rights of

21   Detective Hall, and Defendant Myers guilty of destruction of

22   evidence.

23       Thank you.

24       **THE COURT:**  Thank you.  We finished a little before

25   5:00.  You know, I've given that instruction so often, when

1   you hear something too many times, it really has no meaning.

2   So I want to change it a little bit differently.  It's such

3   a vital point in this case.

4         You're going to be going home, and just use, please,

5   extra care, avoiding any conversation whatsoever with

6   family, anyone else, any contact, anything having to do with

7   viewing anything or hearing anything that's broadcast by the

8   media, anything that might be something you haven't heard in

9   court.  Please, please, please.

10        And then the expectation will be to report at 9:00 in

11  the morning upstairs in Room 9 -- ninth floor.  Then you'll

12  be brought down and then taken to another room for

13  deliberations.

14        And I want to thank you so much for your patience

15  through all this case and obvious attention you've given to

16  it, and look forward to seeing you tomorrow morning.

17        *(Jury out.)*

18        **THE COURT:**  Just a couple things in the morning.

19  Assuming that we do not need an alternate overnight,

20  two alternates will be excused for -- the jurors will be

21  taken out and the alternates will be excused.

22        And, also, Ms. Costantin, you mentioned that all of

23  these exhibits and everything would be available to them.

24  That's true.  But let's be thinking how all this is going to

25  be shown to them if they request the equipment and, you

1   know -- it can be arranged but we just need to plan for it a
2   little bit in advance.
3       **MS. COSTANTIN:**  Judge, all I know is last time --
4       **DEPUTY CLERK:**  Judge, the cart is -- the evidence cart
5   is in the ninth floor, which is where they will be
6   deliberating, so it's up there.
7       **THE COURT:**  How much instruction do they need?
8       **DEPUTY CLERK:**  They don't.  I'll instruct them.
9       **THE COURT:**  Okay.  All right.
10      **MS. COSTANTIN:**  Do you want everything on a thumb
11  drive?
12      **DEPUTY CLERK:**  I think you only send up what they ask
13  for.
14      **THE COURT:**  And escorted.
15      **DEPUTY CLERK:**  You only send up the evidence that they
16  request; right?
17      **THE COURT:**  Yes.  If they request anything, they'll
18  have to submit a note to me asking what they want.
19      **DEPUTY CLERK:**  Did you guys hear that?
20      **MS. COSTANTIN:**  We didn't because we were talking to
21  each other.  Sorry.  You want, tomorrow morning, us to have
22  a thumb drive with the exhibits on it?
23      **THE COURT:**  Whatever -- my point is, I just -- I'm not
24  sure the best way to do that.  Your techies will know that
25  better than I.

1    **MS. COSTANTIN:**  We can easily do that.  We'll make

2    sure we only put admitted exhibits on the thumb drive.

3        **MR. ROSENBLUM:**  I shouldn't say "we."  Mr. Bilyeu can

4    as well.

5        Ms. Costantin mentioned something to me.  If the Court

6    would entertain it, I think both of us would at least like

7    to keep one alternate during the course of deliberations;

8    obviously, not deliberating, but in a separate room with

9    separate instructions.  It's been a long week, the second

10   trial, and I would hate for something to happen.  I mean,

11   last trial actually we kept both alternates, I believe.

12       **MS. COSTANTIN:**  Judge, we really would appreciate it

13   if you would.  I do know there was a trial recently which an

14   alternate had to be seated during deliberations.

15       **THE COURT:**  We will tell them that you all may stay

16   but -- Juror No. 13, you're required to stay, and we'll keep

17   them somewhere.  Okay.  That's a good idea.

18       **MR. ROSENBLUM:**  Are you -- do you want us to be here

19   at 9 or within shouting distance?

20       **THE COURT:**  Maybe a little bit before just in case

21   something comes up.  As you know, frequently something does

22   come up.

23       **MR. ROSENBLUM:**  Okay.  We will be here before 9:00.

24       **THE COURT:**  All right.  Thanks so much.

25       *(Proceedings adjourned at 4:51 p.m.)*

## REPORTER'S CERTIFICATE

I, Laura A. Esposito, Registered Professional Reporter
and Certified Realtime Reporter, hereby certify that I am a
duly appointed Official Court Reporter for the United States
District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and
accurate transcript of the proceedings held in the
above-entitled case, that said transcript contains pages 1
through 220, inclusive, and was delivered electronically.
This reporter takes no responsibility for missing or damaged
pages of this transcript when same transcript is copied by
any party other than this reporter.

Dated at St. Louis, Missouri, this 3rd day of September
2021.

*Laura A. Esposito*
_____
Laura A. Esposito, RPR, CRR, CRC
Official Court Reporter