## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

UNITED STATES OF AMERICA,  )
                           )
            PLAINTIFF.     )
                           )
VS.                        )   NO.: 4:18-cr-00975-ERW-1
                           )
DUSTIN J. BOONE,           )
                           )
            DEFENDANT.     )

### SENTENCING MEMORANDUM

The defendant, Dustin Boone, by his lawyers, Justin Kuehn and Stephen Williams, respectfully requests this Honorable Court to vary downward based on consideration of all relevant § 3553(a) factors and impose sentencing below the advisory guideline, which in this case mirrors the statutory maximum.   In support, he states:

### Introduction

Dustin Boone stands convicted of aiding and abetting the depravation of a civil rights violation which resulted in bodily harm and involved the use of a dangerous weapon by an accomplice.   Sentencing is set for November 22, 2021.   Mr. Boone faces a 10-year statutory maximum.  Probation calculated a parallel effective guidelines range of 120 months. **See PSR, ¶ 72.**

Simply  put,  the  Sentencing  Commission's  recommendation  in  this  case  is disproportionately high.   Mr. Boone is convicted not as a principle, but as an accomplice.  His criminal history score is zero.  In such circumstances, the reasonableness of any advisory range that exceeds legislative limits is drawn into question.

This is not a case that warrants a 10-year sentence or anything close to it.  Mr. Boone did not initiate the assault on Luther Hall.  In fact, photographic evidence shows Mr. Boone standing several feet away during the first 11 seconds of the attack.  It is beyond dispute that Mr. Boone eventually joined the fray.  However, because there is a 39-second lapse in photographic renderings of the assault, it is impossible to know exactly when.  The collective testimony proved, and Mr. Boone admitted to fellow officers, that at some juncture he kneeled on Mr. Hall's back and used his hand or forearm to hold down Mr. Hall's neck.  The Government argued this form of restraint by Mr. Boone aided and abetted the assault.  After lengthy deliberations, Mr. Boone's jury eventually agreed and returned a guilty verdict against him.

The force used against Luther Hall by several of the officers on scene is unjustifiable and inexcusable.  Mr. Hall fell prey to a police culture of excessive force that permeated his own department.  The chaos and potential dangers associated with days of civil unrest acted as an accelerant.  Following the Stockley acquittal, St. Louis experienced not only peaceful protests, but also, dangerous and disorderly rioting.  The rioters damaged property and injured St. Louis police officers.  While no serious threats appear to have existed at 14th and Olive on September 17, 2017, the police encountered a turbulent and ever-changing environment for several days.  Hostility between the police and the citizenry worsened by the moment.

This is not a case featuring a few rogue cops beating a man in a dark alley for being disrespectful during a traffic stop.  The police took to chaotic streets, where dispersal orders were underway and pepper-balls were being fired.  A team of police officers passed Luther Hall, who caught Bailey Colletta's eye.  She yelled for him to get to the ground, and the officers began to converge.  Violence ensued.

Several officers who did not partake in the assault, nevertheless stood present and watched. It speaks volumes about how firmly embedded force became in the department's code that multiple officers would kick, punch, and club a man in full view of fellow law enforcement colleagues, a few of whom were supervisors.   No one did anything to intervene and stop the assault.

Dustin Boone joined an ongoing civil rights deprivation well after it started. The Court is respectfully asked to judge Mr. Boone for his own actions that night, rather than the actions of a collective group, or for that matter, the shortcomings of an entire department.  The Government and the Defense both called eyewitnesses to the assault.   Hundreds of photographs, with various FBI enhancements, were introduced.  Videotaped images of the crime were admitted as well.  Yet, there is not a shred of evidence that Mr. Boone ever struck Luther Hall in any way, shape, or form. He entered an enduring situation and forcefully held Mr. Hall to the ground. The jury determined that Mr. Boone's decision to enroll aided and abetted a continuing assault and returned a guilty verdict.  The jury's decision demands a just sentence.  Dustin Boone should not, however, serve as a sacrificial lamb.  He should not shoulder the entire burden for every police officer present on the corner of 14th and Olive that fateful night.  He should not answer for a misguided departmental ethos that existed long before December 2015, when Mr. Boone joined the force.

## Analysis

### 18 U.S.C. §3553

While the advisory guidelines range is a 'starting point' for the Court, it is only one of many important sentencing considerations; and, "when sentencing a defendant, a district court must consider all sentencing factors enumerated in 18 U.S.C. §3553(a)." ***United States v. Harris, 490 F. 3d 589, 593 (7th Cir. 2007).***  The target is to arrive at a punishment that is "sufficient, but not greater than necessary, to comply with the purposes set forth" by the factors enumerated in 18

U.S.C. §3553(a).  This is the provision that serves as "the guidepost for sentencing decisions post-

Booker." ***United States v. Ferguson,*** **456 F. 3d 660, 667 (6ᵗʰ Cir. 2006).**

### 18 U.S.C. § 3553(a)(1)

Pursuant to 18 U.S.C. § 3553(a)(1), the Court is directed to consider as part of its sentencing

analysis "the nature and circumstances of the offense and the history and characteristics of the

defendant."

Nature and Circumstances of the Offense

During the first trial of this case, the most culpable police officer involved in this situation

testified as a witness for the prosecution.  Unlike any of the witnesses at trial #2, Randy Hays

provided a firsthand account delineating the conduct of several participants in the assault.   The

Government called Mr. Hays to the witness chair to present sworn testimony about his

observations.   That testimony sheds light on the nature and circumstances of this offense,

particularly in terms of Mr. Boone's role:

(Questioning by Ms. Constantin)

Q:  Mr. Hall – Hays, what was your role in the assault on Luther Hall?
A:  I struck Luther several times while he was on the ground.
Q:  Okay.   And that was with what?
A:  My riot baton.
Q:  And did you knock him to the ground?
A:  I shoved him to the ground, yes, ma'am.
Q:  Okay.  And what was Officer Korte's role?
A:  Officer Korte kicked Luther in the face.
Q:  And what did you see Officer Boone do?
A:  Officer Boone held Luther Hall's head to the ground with one hand while
    his knees were on his shoulders.  **Trial Transcript, First Trial, Volume
    6, pg. 48.**

(Questioning by Mr. Kilgore)

Q:  I understand your testimony that you struck Luther Hall in the leg, the
    right leg, five or --- three to five times first; correct?

A:     Correct.
Q:     And then you shoved him to the ground again?
A:     That is correct.
Q:     Okay.   So the strikes came first?
A:     Yes.
Q:     And just to be clear, you never saw Dustin Boone strike Luther Hall with his fist; correct?
A:     No, sir.
Q:     And you never saw Luther or you never saw Dustin Boone strike Luther Hall with a nightstick?
A:     No, sir.
Q:     A foot?
A:     No, sir.
Q:     In fact, you never saw him strike Luther Hall in any way whatsoever; correct?
A:     Correct.   **Trial Transcript, First Trial, Volume 6, pg. 229.**

With Officer Korte no longer a defendant, it is easy to understand why the Government would not wish to recall Mr. Hays at the second trial.  However, it is the defense's understanding from speaking with other attorneys involved in this case that the Government, during the course of Mr. Hays's sentencing, made the Court aware of its belief that Mr. Hays provided truthful testimony at the first trial.

Mr. Hays set forth the dichotomy between Mr. Boone's role and that of his cohorts.  Mr. Hays shoved Luther Hall to the ground and repeatedly struck him with a riot baton.  Officer Korte, if the Government's witness is to be believed, kicked Mr. Hall in the face.  Mr. Boone kneeled on Mr. Hall's back and held his head to the ground.

Dustin Boone is convicted of aiding and abetting a civil rights violation.  The jury's guilty verdict signifies a finding that Mr. Boone held down Luther Hall during at least some portion of the violence being administered by his cohorts, most notably Mr. Hays.   However, according to Mr. Hays, perhaps the most damaging blows he administered during the assault, namely the 3-5 baton strikes, occurred before he threw Mr. Hall to the ground a second time.   It was at some point thereafter that Mr. Boone entered the picture and restrained Mr. Hall after he was already on the

ground.

Mr. Hall testified that the assault occurred right after he was ordered to the ground and started to go to one knee. He was picked up and slammed to the ground twice, and it was after he hit the ground a second time that he could feel feet, fists, sticks and boots. **Trial Transcript, Volume 3, pgs. 225-26.** It is impossible to tell whether, at this juncture, Mr. Hays is continuing to strike Mr. Hall or if only other officers are doing so. Mr. Hays' testimony as a prosecution witness suggests that his baton strikes were finished when Mr. Hall hit the pavement.

Either way, we know from FBI enhanced photographs that Mr. Boone is on the sidelines for at least 11 seconds. Mr. Hall can feel pressure on his back and neck during the attack after he hits the ground. **Trial Transcript, Volume 3, pgs 225-26.** He cannot say, however, who applied that pressure. Mr. Boone at some juncture began restraining Mr. Hall, and by the jury's verdict, he did so while the assault remained ongoing. However, the beating commenced well before Mr. Boone ever restrained Mr. Hall. A herd of officers surrounded Luther Hall at 8:53:58, just seven seconds into the attack. **See Govt. Trial Ex. 330.** Mr. Boone is seen 5 full seconds after that, at 8:54:02, still standing, and still feet away from the attack. **See Govt. Trial Ex. 337.** It is very possible that the pressure felt by Mr. Hall on his back and neck at different times during the assault was being applied by various officers. In other words, someone other than Mr. Boone might have applied pressure to Mr. Hall's back and neck during initial stages of the attack, because we know for certain that Mr. Boone was a late arrival.

It is interesting to think about what this case would look like if Mr. Boone's conduct stood alone. Imagine, hypothetically, that Mr. Boone confronted Luther Hall on his own, and Mr. Hall voluntarily surrendered to the ground. Then, Mr. Boone kneeled on his back, forced his head to the ground, and waited for Sergeant Caruso to arrive with flex ties. It's difficult to conceive that

this conduct would lead to criminal charges, much less to conviction.  This same activity is concededly more serious when committed in conjunction with what other officers were already doing.  However, one question posed by this case is whether Dustin Boone held down Luther Hall so it would be easier for fellow officers to assault him, or if Mr. Boone's eventual restraint of Mr. Hall, even if it led to Mr. Hall becoming a more straightforward target, was done independently without regard for what the other officers were doing.  One thing is for certain.  The assault on Luther Hall would have continued without Dustin Boone's participation.  Before Mr. Boone rejoined his team on that street corner, the assault was already well underway.

The photographic and video evidence drives this point home.  Government's Exhibit 2 is a videotape taken by Luther Hall.   The tape captures the beginning of the assault when a female voice is heard saying "get on the ground, get on the ground."  Several other officers are heard yelling at Mr. Hall to show his hands.  The tape soon loses audio but visually continues to run for an additional 21 seconds.  Government's Exhibit 290 is a synchronization of the same video with a street mounted camera showing a time of **8:53:51**, which is the precise time at which the assault on Mr. Hall initiated.

FBI Staff Operations Specialist, Lindsay Kellis, identified Dustin Boone in photographs taken by Lawrence Bryant.  She did so based on characteristics of his uniform, including a shiny helmet with both yellow and white stickers, several police patches, and a silver ring on his belt. He also carried a baton.  **Trial Transcript, Volume 3, pg. 96-97.**   Ms. Kellis highlighted Mr. Boone in blue so that his position can be viewed at various times.

At 8:53:51, Mr. Boone is passing by the generator where the incident takes place.  **See Govt. Trial Ex. 326.**  He continues to walk past the generator and moves away from it.  At 8:53:57, six seconds into the attack, Mr. Boone has moved much farther away.  **See Govt. Trial Ex. 330.**

Based on this photograph, it is a conservative estimate to say that 10 police officers are closer to the assault than Mr. Boone at this time.  By **8:54:02**, Mr. Boone has moved a little closer to Luther Hall, but he is standing by a light pole that is still several feet away from the assault.  **See Govt. Trial Ex. 337.**  Eleven seconds into this civil rights violation, Mr. Boone is still outside the scrum.

This is the last relevant photograph taken for 39 seconds.  The next image of 14th and Olive is captured at 8:54:41.  **See Govt. Trial Ex. 348.**  Mr. Boone is no longer visible.  This is presumably because he is on the ground with Mr. Hall.  Several other officers are standing around blocking the camera's view.  Mr. Boone became part of this skirmish at some unknown point during this undocumented 39 seconds.

In Government's exhibit 348, Lieutenant Mayo is seen coming onsite.  He identifies himself as the "last individual" in the picture.  **Trial Transcript, Volume 6, pg. 181.**  Lieutenant Mayo is the bald African-American officer in the far right of this photograph, who is moving in the direction of the generator.  He acknowledges that he is not wearing a helmet in the picture.  Mr. Rosenblum asked Lieutenant Mayo if he would be wearing his helmet, pursuant to CDT guidelines, if there was an active altercation underway.  Lieutenant Mayo answers "Yes, more than likely I would, yes."  **Trial Transcript, Volume 6, pg. 181.**

This is important because it suggests that the assault was over by 8:54:41.  In addition to having his helmet removed, Lieutenant Mayo also adds that he did not see anything while onsite after his arrival at 8:54:41 that would lead him to believe that a crime or civil rights violation occurred.  **Trial Transcript, Volume 6, pg. 184.**  If the assault ended by Lieutenant Mayo's arrival at 8:54:41, the maximum window of Mr. Boone's participation is reduced to 39 seconds, minus however long it took him to push past the other officers and secure a kneeling position on Mr.

Hall.[1]  Photographs show that Mr. Boone is still restraining Mr. Hall as late as 8:55:27, but it is clear that nobody is striking him during this continued restraint.  **See Govt. Trial Ex. 366.**

These timing issues are very important.  First and foremost, Dustin Boone is not connected at all with the start of this assault.  Eventually, he joined the attack and applied restraint.  However, if Mr. Boone had called in sick that night, if he was nowhere around, the Luther Hall beating would look practically the same.   The kicking, punching, and baton slugging all started without Mr. Boone's help.  It surely would have continued without his help.  Mr. Boone played a dispensable role.  This is not a "you hold him, so I can hit him" type of situation.

Secondly, these photographs, which show Mr. Boone's positioning during the first several seconds of the assault, shed light on how the behavior of Mr. Boone's other team members surely affected his judgment.   One point that Mr. Rosenblum established during trial is that police officers, as a matter of routine, rely on the probable cause of others.   When police officers see a colleague making an arrest, there is an assumption that the arrest is lawful, and they follow suit.  **See, e.g., Trial Transcript, Volume 6, pg. 212.**   This makes sense and is a vital part of understanding Dustin Boone's mindset.

Mr. Boone was not positioned well to see the very first moments of the arrest of Luther Hall unfold.  He was surely close enough, however, to hear several of his fellow police officers screaming at Luther Hall to get on the ground and to show his hands.  While Mr. Boone's line of sight is a bit obstructed in the photographs by several other officers, he could obviously tell that his team started applying force.  Again, Mr. Boone certainly heard his colleagues' verbal

---

[1]      This sets the total window of the assault at *up to* 50 seconds (8:53:51 when Colletta screams 'get on the ground' to 8:54:41 when Lt. Mayo approaches with his helmet off.).  Officer Hall initially testified at the second trial that the assault lasted *a few minutes*, but he was impeached with earlier statements where he indicated "I don't know.  It felt like forever.  Maybe up to a minute."  Mr. Hall conceded "I don't know how long the assault lasted."  **Trial Transcript, Volume 4, pg. 112-14.**

commands: "Get on the ground!" and "Show me your hands!" . **See Govt. Trial Ex. 290.**

The jury's verdict reflects a finding that Mr. Boone understood that Randy Hays and/or others were applying excessive force and that Mr. Boone aided in those efforts. This sentencing is not about challenging that verdict. However, it is at the very least mitigating that Mr. Boone's decision to involve himself in this situation in the first place was prompted by colleagues who are, at a minimum, *acting* as though they are effectuating a lawful arrest. Any reasonable officer in Mr. Boone's position would assume that Mr. Hall was resisting, even if he was not. Sergeant Caruso clearly relied on the probable cause of fellow officers, and likewise concluded that Mr. Hall deserved to be arrested, when he applied the flex cuffs.

It is important to put Dustin Boone's actions in their full context. That includes not only recognizing what Mr. Boone observed from the officers who first interacted with Mr. Hall, but also understanding everything that transpired leading up to the attack.

St. Louis became a dangerous place following the Stockley verdict. Mr. Rosenblum explored this during the cross-examination of Sergeant Marcantano:

> (By Mr. Rosenblum)
>
> Q:    Was the weekend dangerous?
> A:    It was.
> Q:    Okay.  Did you feel that the rioting was worse that weekend than you had seen in the past?
> A:    Up until that weekend, yes, it was the worst.
> Q:    It was the worst you've ever seen; right?
> A:    Until that point in my career, yes.
> Q:    Until that point in your career.  Okay. And you had worked other riots, had you not?
> A:    Yes.

**See, e.g., Trial Transcript, Volume 5, pg. 62.**

According to Sergeant Marcantano, during the course of the weekend, rioters threw objects at the police, including irritants. **See, e.g., Trial Transcript, Volume 5, pg. 63.** Several police officers were injured. Sergeant Marcantano explained:

> (By Mr. Rosenblum)
>
> Q:    You also were aware that that particular weekend of those riots a number of your brethren were hurt; correct?
> A:    Yes.
> Q:    Some hurt by having bricks thrown at them, broken bones, broken jaws; right?
> A:    Yes, correct.

**See, e.g., Trial Transcript, Volume 5, pg. 67.**

The Government established during trial that there was no 'active' rioting occurring at 14th and Olive when St. Louis officers accosted Luther Hall at that street corner. However, the Luther Hall video demonstrates that people were running around. The environment was frenzied. Police were using a loudspeaker to order dispersal and were firing off pepper balls. This was the third night of protests that occasionally turned violent. Police were suffering injuries. This all served as the backdrop of Mr. Boone's reaction when he heard fellow officers screaming "get on the ground" and "show me your hands" and he chose to become involved in the arrest.

Additionally, on the evening of September 17, 2017, Detective Hall and his undercover partner, Detective Naes, expressed concern about things becoming volatile. They texted amongst themselves, even in close physical proximity with one another, so as to preserve cover. A few hours before the assault, Detective Naes sent a text noting that "tensions are high." **See Trial Transcript, Volume 2, pg. 160.** Later the same evening, about a half-hour before Luther Hall encountered police, Detective Naes sent another text saying "kids are getting ready to break shit." Detective Hall responded "Olive loot." At 8:28, Detective Naes announced "they breaking shit." Detective Hall answers "tell Justin." **See Trial Transcript, Volume 5, pg. 160-161.** While this

is going on, Detective Hall is livestreaming, in hopes of providing headquarters a real time account of what is occurring.   He indicated that rioters are going to "fuck up" Washington Street.   He even yelled "where the fuck are you" when police failed to respond.   **See, Trial Transcript, Volume 3, pg. 213.**

Tensions were escalating.   That is the entire reason a squad of police officers with shields and batons and other riot gear were called out to the area.   Dispersals orders were given.   The crowd was sprayed with Pepperballs, to the point where some officers were wiping their eyes, and one may have even vomited.   This was a fast-moving and chaotic scene.   Police responses were being made quickly.   It is extremely difficult for the police, in these situations, to distinguish in a split second between which protestors are passive, and which might pose a greater danger.   When one or two members of a Civil Disobedience Team treat a member of the crown like a threat– the way Luther Hall was treated – it is only natural for surrounding officers to take for granted that the person poses a risk.  Mr. Boone's relative culpability for the harm done to Luther Hall should be measured against every assumption that a normal officer in his shoes could make about the need for intervention.   Even if Mr. Boone came to understand during those 39 unrecorded seconds that Mr. Hall's civil rights were being violated, an understanding that the jury's verdict signifies, that does not mean he entered this situation with that same understanding.

Everything that occurred in the days, hours, minutes, and even seconds prior to Mr. Boone's decision to restrain Mr. Hall is important context to deciding his comparative blame. Whatever role Mr. Boone played in this civil rights violation, he did not partake in a vacuum.   He responded quickly to an ongoing situation involving his team, amidst a chaotic environment where dangers tended to pop up, and officers were often injured.   And, he responded without ever throwing his fists, stomping his boots, or wielding his baton.

There is disagreement between the parties concerning whether probable cause existed to arrest Luther Hall.   Ultimately, this civil rights violation is predicated upon excessive force.   Still, to the extent the question of probable cause is the subject of some continued debate, it warrants brief discussion.

On the Luther Hall video, at 8:50:50, a loudspeaker police announcement can be heard. **See Govt. Trial Ex. 290.**  This is three minutes prior to Luther Hall's encounter with the police at 8:53:51.  It was well established at this trial that ignoring a failure to disperse order is an arrestable offense. **See, e.g., Trial Transcript, Volume 5, pgs. 92-93.**  Additionally, the police entered the area of 14th and Olive looking to arrest two subjects.   Sergeant Caruso testified: "I mean, I know there was a group of individuals that were running on Olive, and then there was an individual – there were two individuals that we were supposed to be --- as I recall, that we were supposed to be looking for that were up near that intersection. … I believe they were wanted for failure to disperse or property damage or something of that sort." **See Trial Transcript, Volume 6, pgs. 190-91.**

It is impossible to say why Bailey Colletta, Randy Hays, and the other officers that initially confronted Luther Hays reacted the way they did towards him.   They might have believed he was subject to arrest because he remained on that street corner following a dispersal order.   That would be a legitimate conclusion, though it would not justify force.   The officers also might have mistaken Mr. Hall for one of the individuals that the police were looking to arrest.   This too could establish probable cause, even if the police were ultimately proven wrong.

A third scenario is that Officer Colletta passed the generator and simply got startled when she saw Mr. Hall standing behind it, causing her to scream at him to hit the ground.   Her colleague *and boyfriend*, Randy Hays, heard the screams and rushed to give assistance.   The evidence is pretty clear that Randy Hays reacted excessively.   This is surely in part because of his personal

relationship with Officer Colletta, and her somewhat panicked response to seeing Luther Hall. Other officers watched Hays's reaction and a domino effect resulted.

Even if this plausible explanation accounts for why Mr. Hall suffered a beating at police hands, that does not mean that Mr. Boone was in a position to know that law enforcement was overreacting or that his team lacked probable cause to arrest.  Whatever Mr. Boone witnessed right before he entered the scene, he lacked the fuller picture because of his positioning throughout the first 11 seconds.   At least initially, Mr. Boone listened and watched from several feet away, amidst a crowd of police on that corner.   Most officers who see a struggle and hear colleagues yelling 'get on the ground' and 'show me your hands' are going to assume that resisting is underway and come to their aid.  At some juncture, if an officer becomes part of a situation involving excessive force, he or she is obliged to stop it.   That does not mean, however, that they were unjustified in originally concluding, based on the action of fellow officers, that the individual receiving the force was resisting and subject to arrest.  As Sergeant Caruso acknowledged, an officer assumes it's a lawful arrest and follows suit. **See Trial Transcript, Volume 6, pgs. 212.**

Police brutality is an American epidemic and has been for a long time.   The unjustified use of force, especially against minority groups, is at long last finding its way to cultural centerstage.   These are new times.   Everyone walking the street carries a video camera in their pocket or purse.   Technological evolution makes it more and more difficult to sweep police brutality under the rug.  There is a societal call for justice and this case will deliver some.

There is no justice in a 10-year-sentence for Dustin Boone, however.  Not based on the facts of this case.   Not based on Dustin Boone's comparative role.  The attack on Luther Hall should not have happened and Mr. Boone is not blameless.  However, many officers share responsibility for what occurred.  Most of those who are culpable will escape justice altogether,

while a few will have their wrists slapped.  Just because so many other culpable police officers involved in this event will go uncharged and/or under-punished is no reason to give Mr. Boone an excessively harsh sentence.

<u>History and Characteristics of the Defendant</u>

Elements of this case paint a very unflattering picture of Dustin Boone.  Hearing a police officer brag about excessive force is repugnant.  It is important to recognize, however, that there is a reason Mr. Boone felt comfortable sending those texts, which were all directed to other police officers, in the first place.  The police culture in St. Louis condoned, or perhaps even worse, encouraged it.  Even the victim in this case sent a tasteless text to his friend, Jim Taschner, about shooting black people in the face for a bounty.  **See Trial Transcript, Volume 4, pgs. 77-78.**  As a two-year rookie, Dustin Boone found himself integrating into a department where being cavalier about violence, particularly racial violence, was far too prevalent.

This is not to say that St. Louis Police Officers are without tremendous virtue.  Being a cop requires courage that very few possess.   Together with police colleagues, Dustin Boone patrolled very dangerous neighborhoods and fought crime.  Every St. Louis officer who puts himself or herself in harm's way deserves accommodation.  Unfortunately, in the depths of the department, unnecessary violence appears to be an ugly but widespread feature.  Somewhere along the line, the topic of excessive force became a cocktail hour joke.

Nothing about Mr. Boone's environment pardons these obnoxious texts.  The Court is asked to realize, however, that Mr. Boone is not just a rotten apple hanging from an otherwise healthy tree.  He joined a department desperately in need of modern-day education and reform.  Indeed, there is a reason why St. Louis is a hotspot for these types of demonstrations and protests in the first place.  At the very end of 2015, Dustin Boone joined the force and began participating

in St. Louis's police culture and conforming to norms.  His texts are a product of that assimilation.  If FBI agents did a department-wide forensic search of everyone's iphone databases, the same material would surely surface everywhere.   Again, all of Mr. Boone's infamous texts were made in communication with other officers.

Modern day communication is performed largely by text.  It's become so prevalent that much of what people say never goes away.   Every moment of poor judgment, irrational thought, or tasteless joke-telling lasts forever in an icloud.  Dustin Boone's texts put the spotlight on the darkest corners of his personality.  Thus far, this Honorable Court only knows the worst parts of Dustin Boone.   There is much more to this man.

Attached to this memorandum are several character letters written by those who know Dustin Boone not just as a police officer, but as a husband, a father, a son, a brother, a colleague, and a friend.  The Court is asked to please read all of these letters in their entirety.  Certain passages from the letters warrant special attention, however, and will be highlighted in the body of this memo.

Perhaps the worst element of Mr. Boone's texts is the use of the N-word.   Those texts paint him as a racist.   Dustin Boone is not a racist.   Erica Linhorst is the wife of a St. Louis police officer.   She considers Dustin Boone and his wife, Ashley, to be very close friends.  Ms. Linhorst is African-American.  She writes:

> "My husband does not hang out with a lot of policemen so when he does introduce me to a police officer, I know he thinks very highly of them.  Dustin, Ashley and I quickly became family.
>
> Having a very large family, money is always tight.  I can't tell you how many times Dustin has sent us clothes, toys, electronics, etc, that we never would have been able to afford.  He never made it feel like charity and the kids were always so excited." **See Exhibit 1.**

Ms. Linhorst indicates that apart from her parents and siblings, the only other house she ever let her kids spend the night at is the home of Dustin and Ashley Boone.   Ms. Linhorst's 8-year-old daughter is best friends with Lola Boone, age 7.

Ms. Linhorst attended trial.   She is aware of Mr. Boone's texts.  She knows that Dustin is "ashamed" of his texts and offers this:  "I know that Dustin loves me, my husband, and my kids as family.   No texts using racist words changes that." **See Exhibit 1.**

Officer Ryan Linhorst worked closely with Dustin Boone.   He witnessed Mr. Boone's policing tactics.     What Officer Linhorst observed with his own eyes sharply contrasts the disturbing boasts found in Mr. Boone's texting:

"I got to see how Dustin treated people that we encountered in north St. Louis, day in and day out.   That's the Dustin I know from the job:  the Dustin who treated people with respect and dignity and often left people, we made contact with, laughing.   I observed him defuse many situations with his humor and simply listening to the person.  I have been a Police Officer for 15 years and have seen the best and worst from Officers.  I have never been afraid to address a fellow Officer when I believed they were out of line.   I never once witnessed or heard anything that caused me to question Dustin's character or treatment of people in the community.

I know Dustin had texts on his phone that he is not proud of.  And he has paid dearly for those texts.  I can tell you that those texts are not an accurate representation of the character Dustin demonstrated as a Police Officer who faithfully served many people of color in North St. Louis.  When two people ride together in a patrol vehicle, handle 911 calls together, and survive life threatening situations together, they can't hide who they really are.   Dustin is a man I trusted with my life and who I was proud to get to ride with.

*** 

I've seen Dustin risk his life while serving North St. Louis and I've seen him show people like a homeless drug addict compassion.  Many people's lives never place them in those situations.  Many people have certain beliefs and ideals, but those beliefs are never actually put to the test.   I've witnessed with my own eyes how Dustin demonstrated his character in those situations." **See Exhibit 2.**

This prosecution against Dustin Boone takes snapshots of his life and paints him as a racist, uncaring thug.  He's none of those things.  Standing alone, the glimpses we see in his texts, create a grave distortion of Mr. Boone's character.  True, he did it to himself.  Mr. Boone chose a very poor topic about which to self-aggrandize.  In reality, he's not at all the self-described brute that he paints himself to be with his LOL texting.

Beyond his policing, Officer Linhorst holds Mr. Boone in high regard as a family man:  "I also saw a man who deeply loves his wife and shows his daughter and my daughters how a man is supposed to treat his wife." **See Exhibit 2.**

William Noonan is a retired veteran of the St. Louis Metropolitan Police Department.  He echoes Mr. Linhorst's description:  "Dustin was an honest, hardworking policeman and chosen to be on a team of officers who went into the most violent areas of the city to help curb the violence plaguing those areas." **See Exhibit 3.**  He adds:

> "Your Honor, I was made aware that Dustin Boone was being deemed a racist due to inappropriate text messages.  By no means is Dustin Boone a racist. I know Dustin was not brought up that way.  Dustin is the type of man who would help anyone in need.   Race would never play a factor.  Dustin is a good man, husband and father." **See Exhibit 3.**

Michael Flatley is a 8-year veteran with the St. Louis Metropolitan Police Department. He describes Mr. Boone in this fashion:  "In all my time as a Police Officer, I have not met another person as caring and loyal as my dear friend, Dustin Boone." **See Exhibit 4.**

One example of Mr. Boone's helpful nature involves his skill as a trained electrician. Officer Flatley explains that Mr. Boone frequently helped friends and colleagues who needed electrical work but could not otherwise afford it:  "This is a skill that Dustin could have used to his benefit and made considerable money for himself but instead chose to lend his time and knowledge to others who needed it." **See Exhibit 4.**

Dustin's father, Anthony Boone, expands on Dustin's generosity with his talents as an electrician:

> "During his career as an electrician, Dustin donated his personal time to Habitat for Humanity twice a year for seven (7) or eight (8) years, wiring new construction homes for low income, needy families in north Saint Louis and the surrounding areas.  Dustin routinely donated his personal time to people who had electrical problems, at no charge to them, and continues to do so to this day."  **See Exhibit 5.**

Richard Koelling is a carpenter that befriended Mr. Boone during Mr. Boone's career as an electrician.   He remembers receiving the same type of help from Mr. Boone:

> "…[O]ur property had electricity brought up to the property itself, but not to the house.   Being a commercial union carpenter, I felt that with a little direction, I could do this myself.
>
> Being the caring man he is, Dustin was adamant that I let him run the service and did not want me to do this work due to my lack of experience and how dangerous it was.
>
> I attempted to ascertain how much a job like this would cost so I could pay him for his work.   Dustin refused to give me a price and only stated that he would feel much better doing this himself and that he wouldn't sleep at night, worrying about my family's safety.
>
> … I attempted to give Dustin some money for the work, but he just simply refused any compensation."  **See Exhibit 6.**

A very consistent theme throughout the many character letters written by those who know the real Dustin Boone is that he is a doting husband and an incredible father.   One of the best descriptions is provided by Nicolas Alcocer, Mr. Boone's (soon-to-be) brother-in-law:

> "Since the first day I came to know Dustin, my first impression of him was simple – he is an incredible father.   The love Dustin has for his daughter, Lola, is unlike any love I have ever seen.  I grew up in a household without a warm or loving father figure.   My father was stern, cold and unforgiving.   Dustin's relationship with [h]is daughter is filled with laughter and gentleness.  Dustin is an encouraging father and is always teaching Lola how to be a good person.   He teaches her to love and to respect everyone she encounters.  I have witnessed Dustin guide Lola when she is faced with a difficult situation.  He doesn't abandon or criticize her.  He does not shy away from those difficult moments.  On the contrary … he embraces them.

He educates, supports and encourages Lola to do the right thing.   He teaches her humility.  He explains controversial topics such [as] hatred, discrimination and violence in ways that she understands.  He illustrates what it means to show respect, understanding and kindness to everyone.   Because of this, Lola is growing up to be a spectacular woman.

\*\*\*

We have talked about the future and what that may look like:  Ashley without her husband to support her and their daughter.  Lola celebrating milestones in her life without her father there.   Dustin missing her birthdays, school recitals, dances, gymnastics events, etc. … One would think that through all of this, Dustin would hold a great deal of resentment and anger in his heart.  However, that is not the case at all.   Dustin accepts responsibility for all the choices in his life.  He has come to understand that we are all held accountable for our actions and the consequences those actions carry.   Throughout this difficult time, he has shown bravery, humility, compassion and above all, fortitude.   Not once have I heard Dustin speak of himself or what will become of his life.  His only concern has been the wellbeing of this family."

Collateral damage is part of every sentencing.   When a man loses his freedom, a wife loses her husband and child loses her father.  This happens.   It's unavoidable.  Most of the time, defense counsel is very reticent to argue for leniency in favor of family members.  Such arguments are so often hollow because most of the time they are made by offenders who deliberately choose to commit crimes in spite of an understanding that premeditated choices have potential consequence for more than just the criminal actor.   So often, the same individuals who make these pleas for mercy in their allocutions were never present as a father, or husband, or sibling, or friend.   This situation is so very different.

Dustin Boone hit the streets understanding that he could orphan his daughter and widow his spouse.  He never dreamed they would lose him like this.  What occurred on September 17, 2017, transpired in a flash.  Throughout two trials, photos were loaded on screen and everyone studied and deliberated what occurred.  Dustin Boone did not have the luxury of slowing things down and making a reasoned decision.  He heard his civil disobedience team members screaming commands in the middle of city protests and he joined the situation.  Even if Dustin Boone could

decipher in the haste and confusion of the moment that his colleagues were engaged in excessive force, that would create a very awkward circumstance.   It takes a great deal of courage and principle, in the middle of a weekend with unfolding riots, to side with a protester and intervene. To the extent the Luther Hall assault constituted an obvious excessive force situation to all that were present, Dustin Boone was not the only officer that lacked such bravery.   That street corner was teeming with police.   No one intervened.   Moreover, as much as everyone knows that Mr. Hall presented no real threat, the kicking and hitting was not going to stop while Mr. Hall's hands were free and a possibility existed that he could rise to his feet.   As unnecessary as restraint might have been in the first place, and as hollow as it may sound coming from a convicted man's lawyer, that assault was never going to end until someone did what Mr. Boone did and took control of Luther Hall.

The Government urges the Court to treat Mr. Boone like he is a repeat offender because of his texts.   There is no evidence to support a finding that those texts are more than braggadocious puffing.   The defense is working on finding police reports to show how exaggerated the messages are.   For now, it is important that officers who worked with Mr. Boone for two years saw a man who policed differently than what can be gleamed from selected texts capturing his worst communications.   It is worth noting that Mr. Boone never once faced an excessive force complaint prior to September 17, 2021.   In fact, Mr. Boone received numerous commendations during his brief tenure for some of the most noteworthy and positive moments of his policing.   **See Exhibits 13-22.**   Mr. Boone's time at the SLMPD is marked by some very courageous and productive service to the community.   The Court is respectfully asked to Judge Dustin Boone not solely by the negative flashes highlighted in this case, but by the entirety of his span as an officer.

Moreover, the Government advocates a very slippery slope, where almost no one, despite their criminal history score, would qualify as a first-time offender.   An otherwise safety valve eligible drug offender, for instance, is not treated as a Category III offender just because law enforcement performed several controlled buys before making an arrest.   Child pornography defendants, with multiple stored images on their computer, are given the benefit of no priors, even when the repeat nature of their criminality is plain to see.   It would be very unfair to treat Mr. Boone as anything but a first-time offender because of unsubstantiated texting banter.

One strike against Mr. Boone is that he did not accept responsibility, as defined by U.S.S.G. §3E1.1.  He put the Government to the test and lost.  For the most part, the guidelines' reward for acceptance of responsibility is typically more about an offender realizing that pleading guilty is the best legal course, than it is a reward for heartfelt remorse.  Offenders who take their medicine and go quietly face lower guidelines.

Dustin Boone put the Government to the test and is therefore not entitled to a reduction for acceptance.     Throughout  this  process,  however,  Mr.  Boone  did  assume  some  level  of responsibility in a more generic sense.  Soon after the attack, Dustin Boone self-identified as one of the officers present at 14th and Olive, who was part of the arrest of Luther Hall.  And then, even though he was counseled against it, Mr. Boone reached out to apologize to Mr. Hall.   His apology ended with these words:

> "I hope you're healing both physically and mentally.  I can't imagine what you have gone through the past week.   I hope you allow me the opportunity to tell you I'm sorry in person.  It won't make it right but I feel it is the very least I can do.  I hope to talk to you soon, Luther.  Get well." **See Trial Transcript, Volume 4, pgs. 51-52.**

Dustin Boone knew Luther Hall personally.   Mr. Hall and Dustin's father, Anthony Boone, were longtime friends.  Mr. Boone felt sincere regret and reached out to apologize.  Moreover, he

did not hide from the fact that he was involved.  In terms of putting the Government to its burden, this is not a case involving a defendant who claims a complete lack of involvement.   This trial was more about whether the type of restraint employed by Mr. Boone, given the timing of his involvement, rendered him criminally responsible.  He did not deny participation.

The most damning evidence against Mr. Boone are his texts.  They surely helped to tip the balance against him in a case that presented very closely balanced evidence.   The texts are once again front and center at sentencing.   Based solely on Mr. Boone's phone, he shows himself to be an immoral and violent ruffian.  The real Mr. Boone is something quite different.  He is a kind and caring and generous person; a loving husband; an adoring father; a loyal friend; a cherished son and brother.

Mr. Boone is a skilled electrician.   He can be a taxpaying, contributing member of society. Mr. Boone is capable of earning a good living and supporting his wife and daughter.  The defense understands the need for punishment.  Mr. Boone is not the type of person, however, that needs to languish in prison for several years.   In terms of analyzing § 3553(a) and arriving at a sentence that is sufficient, but not greater than necessary, the Court is respectfully asked to consider everything good that Mr. Boone can still offer to his family and to society.   Mr. Boone historically provided free electrical service to impoverished communities.   The Court is urged to please consider shortening Mr. Boone's incarceration a bit in exchange for an MSR condition that he perform significant service of this type as part of his sentence.

### 18 U.S.C. §3553(a)(2)(A)(B)(C)&(D)

18 U.S.C. §3553(2)(A) directs the court to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

The gravity of the Luther Hall assault cannot be understated.  He suffered physically and mentally.  This case served as a posterboard for a larger problem, a societal ill.  As stated before, Mr. Boone only asks that the seriousness of his personal conduct that night drive sentencing, rather than the collective failures of the entire squadron of police officers involved.

Just punishment and respect for the law require that Dustin Boone surrender his freedom. It is high time that police brutality be addressed in a meaningful way.  Society demands a consequential measure of justice for those convicted of police brutality.  However, respect for the law is never achieved by draconian measures.  The United States Supreme Court has warned that excessive sentences "may work to promote not respect, but derision, of the law if the law if viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 553 U.S. 38, 54 (2007).  This is precisely the reasoning behind § 3553(a)'s primary rule of thumb, that a sentence be sufficient, but not greater than necessary, to achieve these aims.

18 U.S.C.§3553(2)(B)&(C) address the need for a sentence to "afford adequate deterrence to criminal conduct…[and]…to protect the public from further crimes of the defendant."

*Specific* deterrence and the need to protect the public from further crimes of the defendant are not great concerns in this case.  Mr. Boone is not the type of man who spent is life on the wrong side of the law.   Notwithstanding what happened on September 2017, and irrespective of his disconcerting texts, Dustin Boone is a man that by and large spent his time enforcing criminal laws, not breaking them.  His policing career is forever over as it should be.  But on balance, Dustin Boone is unlikely to be involved in future criminality.  He has a trade and will quickly be restored to useful citizenship upon release from prison.  Dustin Boone poses no danger to the public.  To

the contrary, those close to Mr. Boone paint him as a supportive individual, someone who is quick to lend a helpful hand, and who makes it a point to be charitable to others.

The larger issue is general deterrence.   This case is already impactful to policing agencies, particularly the SLMPD.  It shined a spotlight on policing practices in the city that will hopefully prompt some very real and much needed change.   To most human beings that are uncustomed to breaking the law, the idea of prison is terrifying.   This is particularly true for convicted police officers, who enter a community of criminal offenders, many of whom blame law enforcement for their lot in life; some of whom were on the receiving end of police misconduct.  Usually, unlawful police activity is handled internally or in the civil arena.  In cases like this one, when a police officer faces not censure or suspension or even termination, but instead faces prosecution and incarceration, alarm bells sound.   In this case, Randy Hays received 52 months.   His sentence alone will achieve impactful deterrence.  Baily Colletta lost her job and became a lifetime felon. Christopher Myers will reportedly survive this affair with only a misdemeanor, but twice starred down the barrel of a potentially devastating prosecution.  Even Steven Korte, despite his acquittal, will serve as a cautionary tale.

Dustin Boone is not asking this Court to spare his freedom.  But, if 52 months was sufficient deterrence based on the actions of Randy Hays, it is greater than necessary to achieve that aim based on what Mr. Boone did.  The juxtaposition of the actions of Randy Hays and the actions of Mr. Boone, notwithstanding the fact that one defendant pled guilty and the other did not, is something that should not go under measured.

18 U.S.C. §3553(2)(D) addresses education and vocational training, medical care, and other correctional treatment.

The federal Bureau of Prisons deserves praise for its programming.  Many offenders who never really learned a legitimate trade can find one during incarceration.  Educational and vocational training programs exist because of a recognition that the ability to find gainful employment is a substantial stride towards rehabilitation.

Dustin Boone already possesses a skill that will promote value to society.  His electrical handiness will allow him to immediately be productive upon release.  The Court is asked to please consider this in arriving as a sentence that is no greater than necessary to meet the ends of justice.

### 18 U.S.C.  §3553(3)(4)&(5)

These provisions direct the court's attention to available sentences, as well as recommendations made by the Sentencing Commission via the advisory federal guidelines.

The available range of punishment in this case, pursuant to statute, is anywhere from probation to ten years in prison.  Because of all the various enhancements that apply, the guidelines exceed this statutory ceiling.  This is true even though Dustin Boone is a Category I offender and even though he is convicted as an accomplice, rather than a principal.

The defense is respectfully urging the court to find that the advisory guidelines penalties greatly overstate the measure of punishment that is appropriate for Mr. Boone given the specific facts of his involvement.  Lawmakers decided that an examination of all § 3553(a) factors should guide a Court towards a sentence somewhere between zero (0) and one-hundred-twenty (120) months.  A sentence at the high end of this statutory range should be reserved for the worst of the worst.  One way of understanding just how overstated the guidelines are in this case is to consider the advisory range that would exist for a repeat offender.  A category VI offender, based on Mr. Boone's offense level, would face 210-262 months.  Any guideline structure that lends itself to

advisory penalties that double the maximum statutory term are simply incongruent with Congress's vision.

### 18 U.S.C.  § 3553(6)

Next, the Court is asked to address "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Only a handful of the officers who were present at 14th and Olive on September 17, 2017, faced indictment for what occurred to Luther Hall.  Bailey Colletta, the officer who lit the fuse by ordering Luther Hall to the ground, and who later lied to the FBI and to a grand jury, already received probation, though she reportedly faced advisory guidelines calling for substantial prison time.  Christopher Meyers, who is seen on Luther Hall's phone video 16 seconds into the attack, will reportedly plead to a misdemeanor pursuant to an agreement that will involve a recommendation of probation.  Officer Korte, despite firsthand testimony that he kicked Luther Hall in the face, managed an acquittal.  Even Randy Hays, who slammed Luther Hall into the ground, and beat him several times with a riot stick, received a 52-month sentence.

Mr. Boone might have put the Government to its burden, but to say that his sentence should be greater than that of Randy Hays, ignores important tenets of sentencing, including the nature and circumstances of each defendant's individual conduct.  The evidence conclusively demonstrates that Dustin Boone partook in neither the original apprehension, nor the initiation of force, against Luther Hall.  He should not face the same degree of punishment imposed upon Randy Hays, who participated in both.

Balancing the comparative fault of every officer involved, and taking into consideration all of the factors set forth by § 3553(a), the defense respectfully submits that a sentence of 26 months in the Bureau of Prisons, together with appropriate conditions of mandatory supervised release,

such as extensive community serve, is fair and just.   This recommended duration of imprisonment falls at the midway point between the probationary penalties of some defendants in this case, and the 52-month sentence imposed upon the principal actor that Dustin Boone is responsible for aiding and abetting.

### 18 U.S.C.  § 3553(6)

The last § 3553(a) factor addresses restitution.   There is a recommended restitution figure set forth in the Presentence Report totaling § 6,590.03.    The Defendant does not contest this restitution amount.  This factor does is not particularly influential in this case.

### Conclusion

WHEREFORE, the Defendant, Dustin Boone, by his lawyers, Justin Kuehn and Stephen Williams, respectfully ask the Court to impose a sentence of 26 months of incarceration, together with any mandatory supervised release conditions deemed appropriate by the Court.  This term will send an appropriate message and deliver a real punishment.  At the same time, it is not so long that Mr. Boone's entire life will unravel.  By all accounts, Mr. Boone is a wonderful father.   A 26-month term will serve the aims of § 3553(a), but will also allow him to return to his family and raise his daughter.

/s/Justin A. Kuehn
JUSTIN A. KUEHN,  #6275313
Kuehn, Beasley & Young
23 South 1st Street
Belleville, IL   62220
Telephone: (618) 277-7260
justinkuehn@kuehnlawfirm.com

/s/STEPHEN C. WILLIAMS
Kuehn, Beasley & Young, P.C.
23 South 1st Street
Belleville, IL   62220
Telephone: (618) 277-7260
Swilliams@kuehnlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2021, I electronically filed the SENTENCING MEMORANDUM with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

/s/Justin A. Kuehn
JUSTIN A. KUEHN,  #6275313
Kuehn, Beasley & Young
23 South 1st Street
Belleville, IL  62220
Telephone: (618) 277-7260
justinkuehn@kuehnlawfirm.com